*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 15, 2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
SUZANNE BROWN                       *
                                    *
              Petitioner,           *
                                    *  1:20-cv-170-JL
         v.                         *  September 25, 2020
                                    *  2:07 p.m.
UNITED STATES OF AMERICA            *
                                    *
              Respondent.           *
                                    *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
HELD VIA VIDEOCONFERENCE
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:


For the Petitioner:          Donna J. Brown, Esq.
                             Wadleigh Starr & Peters PLLC




For the Respondent:          Seth R. Aframe, AUSA
                             United States Attorney's Office




Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             U.S. District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603) 225-1442

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **ANNE LAYNE** | | | | |
| By Ms. Brown | | | 3 | |
| By Mr. Aframe | | | | 11 |
| By Ms. Brown | | | 15 | |
| By Mr. Aframe | | | | 17 |
| By Mr. Aframe | | | | 106 |
| | | | | |
| **SUZANNE BROWN** | | | | |
| By Ms. Brown | 21 | | | |
| By Mr. Aframe | | 78 | | |
| By Ms. Brown | | | 97 | |

```
 1                    P R O C E E D I N G S
 2              THE COURT:  All right.  Good afternoon, Counsel.
 3              MR. AFRAME:  Good afternoon, your Honor.
 4              MS. BROWN:  Good afternoon, your Honor.
 5              THE COURT:  Hi.
 6              THE CLERK:  The Court has before it for
 7    consideration today a motion hearing in civil case number
 8    20-cv-170-JL, Suzanne Brown vs. United States of America.
 9              THE COURT:  I'll just say for the record that I do
10    have -- I have all the exhibits, including the new exhibits
11    that were submitted today by the defendant.  I've got them in a
12    binder right here.
13              And I think -- I think procedurally we had finished
14    the cross-examination of the defense expert, Ms. Layne, and
15    the -- and defense counsel was going to conduct some redirect.
16              MS. BROWN:  Yes, your Honor.  Thank you.
17                       REDIRECT EXAMINATION
18    BY MS. BROWN:
19         Q.   Good afternoon, Ms. Layne.  How are you?
20         A.   Good afternoon.  I'm doing well, thank you.
21         Q.   Great.  One thing I wanted to ask you about -- I'm
22    going to read a statement that Ms. Brown made prior to trial
23    and I'm going to ask you some questions about it.  Okay?
24         A.   Okay.
25         Q.   Ms. Brown said:  My understanding of the
```

4

1    reimbursement process as supported by the instructions of the

2    USDA and the OMB guidelines was that I was claiming

3    reimbursement for the work that was done, the outlay, not the

4    actual payments to contractors.

5            And obviously you don't know what was in Ms. Brown's

6    head when she said that, but if you were an expert, would you

7    be able to give an opinion as to whether that statement was

8    consistent with either accrual accounting or cash accounting?

9    A.    Yes.  As an expert, I'd be able to give an opinion

10   about the -- whether that statement was consistent with accrual

11   accounting or cash accounting.

12   Q.    Okay.  And what would that opinion be?

13   A.    When Ms. Brown in that statement is talking about

14   that she's accounting for the outlay -- so the expenditures of

15   the funds, not the actual payment -- that would be in reference

16   to accrual accounting, which, as we discussed in our setting on

17   Monday -- I believe that was Monday, it's been a week -- on

18   Monday --

19   Q.    Yes.

20   A.    -- that accrual accounting takes into account things

21   as they are -- expenses as they're incurred -- so expenditures,

22   outlays, which we discussed are synonymous -- as they're

23   incurred as opposed to when the money or check is actually

24   paid, i.e., leaving the bank account.

25   Q.    Okay.  And the term, USDA guidelines, would that be

1    consistent with Exhibit C, which is also referred to as 1942-G?

2        A.    I would consider that consistent because 1942-G is

3    the regulation discussing the terms of the grant issued by the

4    USDA.

5        Q.    And there's also reference in the statement

6    Ms. Brown just -- that I just read from Ms. Brown of OMB

7    guidelines that applied to this case at the time.  Would that

8    be consistent with Exhibit E, which is circular number A-110?

9        A.    Yes, it would.

10        Q.    Okay.  Now, another statement I'm going to ask about

11    that Ms. Brown made -- and I'm going to read from it.

12            It says:  Again, my understanding of the outlay --

13    and outlay is in parentheses -- was the actual work,

14    third-party in-kind, not the funds expended.  Hence, SF 270 was

15    filled out to the best of my knowledge in accordance with the

16    grant conditions.

17            Would you have an opinion if you were asked to

18    testify at a jury trial in this case as to whether that

19    statement was consistent with either accrual accounting or cash

20    accounting?

21        A.    Yes, I would be able to provide an opinion.

22        Q.    And what would that opinion be?

23        A.    That opinion would be that that is also consistent

24    with accrual accounting because Ms. Brown is talking about

25    accounting for expenses that were incurred as opposed to the

1    flow of funds or payment that's being made from a bank account.

2        Q.    Okay.  Now, at trial, Ms. Brown was asked -- and

3    this is at Exhibit AA, page 23.  She was asked by her lawyer

4    if -- if -- what she was saying when she signed off on the

5    certification, referring to the SF 270 forms in this case.

6            And at trial she testified that:  What I was saying

7    is that I had performed the fair market value of the scope

8    of the work, that I had placed that into the form that I

9    submitted -- that I submitted the reports reporting our

10   activities to the best of my knowledge and belief.

11           If you had been called as an expert at trial in this

12   matter, would you have been able to give an opinion as to

13   whether that statement was consistent with accrual or cash

14   accounting?

15       A.    So that statement, when we're talking about fair

16   market value, I would take to -- to indicate that Ms. Brown was

17   talking about the value of the in-kinds that were being

18   reported on the form.  And reporting the in-kind values as part

19   of your accounting is considered accrual accounting, but the

20   form would also require it if she were using cash accounting

21   based on the instructions on the SF 270.

22       Q.    And you were questioned a little bit about in-kind

23   reporting during your cross-examination on Monday, and

24   specifically regarding box 11a of the SF 270 form.  Do you

25   recall that?

1      A.    Yes, I do.

2      Q.    Okay.  And box 11a of the 270 form references for

3  forms that are submitted under cash accounting how -- it

4  references how in-kind -- how in-kind expenses are to be

5  reported, correct?

6      A.    That's correct.

7      Q.    And box 11a doesn't mention anything about in-kind

8  services as to accrual accounting, right?

9      A.    That's correct.

10      Q.    And I think Attorney Aframe asked you about the fact

11  that -- whether you can report in-kind services through accrual

12  accounting and you -- my recollection is you said yes.

13      A.    Yes, that's correct.

14      Q.    And do you remember your answer as to why that's not

15  specifically noted in box 11a of the 270 form?

16      A.    So if someone were using cash basis accounting, the

17  in-kinds would not already be recorded as part of their

18  accounting system because no cash had exchanged hands and had

19  moved back and forth.  And we discussed how cash basis

20  accounting relies on the movement of cash into and out of a

21  bank account.

22          So the form specifies that in-kinds should be

23  included because they normally would not be recorded as part of

24  cash basis accounting, whereas if someone were using accrual

25  basis accounting, the in-kinds would already be included in the

1    reporting using the accrual basis.

2         Q.    Okay.  Now, just to give you a hypothetical, if

3    someone were to look at that box, 11a, and it's silent as to

4    in-kind, might -- might they need an expert like yourself to

5    explain what you just explained, that you can report in-kind

6    services using accrual, but you'd have to know how the grant

7    process works?

8         A.    Hypothetically, if someone did not have an

9    understanding of the difference between cash basis and accrual

10   accounting and how in-kinds are reported in the accounting

11   system, then -- then, yes, having someone with that expertise

12   explain it to them would be necessary.

13        Q.    And you could have explained that to the jury as

14   well?

15        A.    Yes.

16        Q.    Okay.  And so -- as you know, you've read all of

17   this, this -- this case, there's been a lot of discussion of

18   accrual accounting and in-kind contribution services and

19   reporting that.  Are those two different defenses or can they

20   coexist in the same -- not -- defense is not a good word.

21              As to this case, are they mutually exclusive?  I

22   think that might be a better question.

23        A.    I don't know if they would be mutually exclusive

24   because accrual basis accounting is talking about how you're

25   recording all of the account -- all of the transactions that

1    occurred for a company.  And part of this case is that there

2    were in-kind services performed and those in-kind services

3    would be part of the transactions that should be recorded

4    either on a cash basis or on an accrual basis, if that makes

5    sense.

6        Q.    Okay.  So if Ms. Brown testified that she used

7    accrual basis accounting but also used the concept of

8    third-party in-kind services in filling out invoices, those two

9    concepts are not mutually exclusive; both of those could have

10   happened in this case?

11       A.    Yes.

12             MS. BROWN:  I think that's all my questions.  Thank

13   you.

14             THE COURT:  The in-kind services -- I really

15   apologize because I was trying to follow, but I didn't follow

16   all of it.

17             The in-kind services that you're referring to that

18   bears some role or relationship to accrual accounting, would

19   those be in-kind services of the -- the institute, the grantee,

20   the grant reporter, Ms. Brown, or in-kind services of those

21   doing work for the institute, the grantee, Ms. Brown, the grant

22   reporter; which is it?

23             THE WITNESS:  It could be either and it can be both.

24   Because, you know, if Ms. Brown is doing work in lieu of

25   receiving salary, that could be considered in-kind services.

1    But if she has a contractor who says, okay, you need this work

2    done, I'm going to charge you -- I would normally charge

3    somebody $10,000, I'm going to charge you $2,000, then there

4    would be $8,000 worth of in-kind services that were then

5    contributed to the organization.

6                THE COURT:  Sure.  I assume -- I mean, have you read

7    the trial transcript in this case?

8                THE WITNESS:  I have.  It's been a couple of weeks

9    since I've gone through all of it, but yes, I have read the

10   trial transcript.

11               THE COURT:  Yeah.  I'm just trying to make -- I'm

12   trying to understand your opinion in the context of -- in the

13   context of the trial evidence here.  And Attorney Brown's

14   trying to illustrate that for me and I'm -- I just want to make

15   sure I'm following what I'm supposed to follow here.

16               Tell me again in your own words -- well, if you're

17   reporting grant expenditures and asking for reimbursement, the

18   in-kind -- and you're attaching invoices -- and invoices for

19   money, right?

20               THE WITNESS:  Yes.

21               THE COURT:  The invoices I've seen in this case are

22   for money.  They're not in-kind contributions; they're requests

23   for -- well, I guess they could be requests for money in

24   exchange for in-kind, but -- I don't -- I don't want to ask too

25   many questions that's going to color future testimony in this

1    case, so I'm going to leave it alone.

2                    THE WITNESS:  Okay.

3                    THE COURT:  And I'll listen to the cross and if I

4    have more questions, I'll probably ask counsel.  They can try

5    to develop it with you.

6                    Go ahead, Mr. Aframe, if you have questions.

7                        RECROSS-EXAMINATION

8    BY MR. AFRAME:

9        Q.    Ms. Layne, would you agree with me that the overall

10   thrust of Ms. Brown's testimony was that she was seeking

11   reimbursement for deferred compensation?

12       A.    I would say that there was lots of components to her

13   testimony.  There was deferred compensation that was included

14   in that.  There was also in-kind.  So I -- I don't know if I

15   would agree that the overall thrust was related to deferred --

16       Q.    Okay.  And based on your -- based on what I'm

17   understanding, that -- as an accounting matter, in-kind can be

18   separated from the deferred compensation.  That's -- that's

19   basically the thrust of what you're telling us?

20       A.    Yes, it can be.

21       Q.    And at any point in Ms. Brown's testimony did she

22   differentiate the in-kind idea from the deferred compensation

23   idea?

24       A.    It seemed during the testimony that those points

25   were convoluted and it -- there were times where it was not

1    clear to me if deferred compensation was being discussed or if

2    in-kind contributions were being discussed.

3         Q.   Okay.  And so at -- at AA, page --

4              THE COURT:  On that answer, in-kind contributions by

5    who, by the contractors or by Ms. Brown's institute?

6              THE WITNESS:  By the contractors.

7              THE COURT:  Oh.  So you -- all right.  You think --

8    you think there's evidence in this case that the contractors

9    were making in-kind contributions and requesting compensation

10   for that?  That's your understanding?

11             THE WITNESS:  So based on what I've seen in this

12   case and from reading testimony, particularly Ms. Brown's

13   testimony, who said that the contractors were providing

14   in-kind, you can provide an invoice for in-kind services that

15   demonstrates the value of those services that would then be

16   reported without necessarily expecting compensation for that

17   invoice.

18             And while there was testimony from the contractors

19   that that was not the case and that was an issue that needed to

20   be decided by the Court, but -- I guess what I'm trying to say

21   is what Ms. Brown testified to is a possibility and that there

22   was conflicting evidence in the case that was presented to the

23   jury.  But my opinion was that having an expert testify could

24   have provided additional clarity regarding that situation.

25             And if that wasn't clear, please let me know.

1              THE COURT:  Well, it's -- it's not clear, I guess,

2    but -- the contractors are doing work.  They're providing

3    services, right?  Whether they're employees or contractors,

4    they're not -- they expect to be paid.

5              And are you suggesting that there was some testimony

6    or exhibits in this case that would suggest that they were

7    supposed to receive in-kind -- or they expected to receive

8    in-kind contributions as opposed to cash payments for their

9    work for the institute?

10             THE WITNESS:  I believe Ms. Brown testified to

11   that --

12             THE COURT:  Okay.  Okay.

13             THE WITNESS:  -- and --

14             THE COURT:  Okay.  Ms. Brown testified to that.

15             THE WITNESS:  Yes.

16             THE COURT:  What about the actual contractors or

17   employees?

18             THE WITNESS:  The contractors -- the contractors did

19   not agree with Ms. Brown's testimony.

20             THE COURT:  Okay.  I'm better now.  Thank you.

21             THE WITNESS:  Okay.

22             THE COURT:  I'm sorry, Mr. Aframe.

23             MR. AFRAME:  No.

24      Q.   I mean, so if I -- is it possible that in this

25   trial, Ms. Brown was using -- based on your reading of her

1  testimony -- was using the term in-kind to capture all of this,

2  volunteer services, deferred compensation, to make the argument

3  that I didn't have to pay these people at this time to get

4  reimbursed?  Is that a fair reading of her testimony?

5       A.   I think it was part of her argument.  And as I just

6  stated, the -- the use of terms was very convoluted.  And so

7  from the trial testimony it's not always very clear as to which

8  concept Ms. Brown is referring to, but I believe it is one of

9  the concepts she was referring to.

10      Q.   And yet at no point in all of that does she ever

11 say, what I'm doing is accrual accounting, right?  She never

12 says that.  She never -- right?

13      A.   That was not included in her testimony, that's

14 correct.

15      Q.   So when she reads the definitions from the SF 270

16 that has accrual and cash in the same place under 11a in the

17 instructions, each time she read from it, she read the cash

18 definition, right?

19      A.   That was what was presented at trial, that's

20 correct.

21      Q.   And you didn't -- did you come away from reading her

22 testimony that she was trying to argue overall that she -- that

23 the -- that in part the services were volunteer and in part she

24 was going to pay them later?

25      A.   That was my understanding of her testimony.

1      Q.   And the government -- and do you understand the

2  government's position was, no, she never intended to pay them

3  all along?

4      A.   That is my understanding of the government's

5  position, yes.

6           MR. AFRAME:  I don't have any other questions.

7           THE COURT:  Okay.  Anything else you want to follow

8  up on, Attorney Brown?

9           MS. BROWN:  I do.  And I -- I want to address

10  specifically the Court's questions and I would like to give a

11  hypothetical that is sort of based on what I expect Ms. Brown's

12  testimony to be.  And if the Court -- if the Court thinks it's

13  more efficient to do that, we can recall this witness, but --

14  so I just wanted to let the Court know that's where I'm going.

15                  CONTINUED REDIRECT EXAMINATION

16  BY MS. BROWN:

17      Q.   So, Ms. Layne, I'm going to give you a hypothetical.

18           If -- if Ms. Brown's testimony was that she received

19  invoices from third parties of money they expected to be paid

20  but that these same third parties also had given services

21  beyond what they expected to be paid in terms of the word

22  contributions of their time or services and if she were to

23  testify that she -- when she was submitting the invoices in

24  this case, that the reason the invoices she submitted were

25  higher than the actual bills that were submitted by these third

1    parties, would that be consistent with the concept of

2    third-party contributions and reporting in this grant?

3        A.    If additional services had been provided above and

4    beyond what was invoiced, so in-kind services that were

5    performed, the -- the example I just provided to -- to the

6    judge, where they performed $10,000 worth of work but are only

7    invoicing for $2,000, it would be appropriate to report the

8    additional $8,000 as an in-kind contribution.

9            Now, I will say that best practice in that situation

10   would be to have the vendor or contractor provide an invoice

11   that reflects that additional amount for the in-kind

12   contribution.

13       Q.    But the -- the practice that you just said of you

14   have an invoice for 2,000, but you have records that say that

15   person gave another 8,000 in services, it would be consistent

16   with the grant regulations to submit a reimbursement request

17   for $10,000?

18       A.    Well -- and I want to -- to further clarify that the

19   in-kind contribution could be reported as a matching portion of

20   the grant.  So in that situation, Ms. Brown could submit the

21   $2,000 to receive reimbursement and the $8,000 would be counted

22   towards her matching requirement in the grant.

23       Q.    Okay.  And because we -- as we discussed on Monday,

24   there was questioning of her at trial about the fact that she

25   had made a commitment or signed an agreement to have matching

1    funds and the records didn't appear to support the actual

2    literal funds were in the accounts, correct?

3         A.    I'm sorry.  Could you repeat the question?

4         Q.    Okay.  Do you remember at trial there was

5    questioning about the fact that she had committed to have

6    certain matching funds, correct?

7         A.    Correct.

8         Q.    Contributed from her organization to match the

9    grants, correct?

10        A.    That's correct.

11        Q.    And what -- as I understand your testimony that she

12   could have used this services not paid for, for lack of a

13   better word, to -- to account for the matching funds?

14        A.    That's correct.

15        Q.    And did you -- when you read the transcript, did you

16   see portions of the trial where she attempted to explain that?

17        A.    I -- I did see portions of the trial where she

18   attempted to explain that, yes.

19             MS. BROWN:  I think that is my only follow-up

20   question.

21             Thank you, your Honor.

22             MR. AFRAME:  Can I ask one more set of questions

23   very briefly?

24             THE COURT:  Sure.

25                  CONTINUED RECROSS-EXAMINATION

1    BY MR. AFRAME:

2        Q.    I just want to get back to the core of your

3    testimony.

4            The core of your testimony in your report is that

5    accrual accounting was required when filling out the SF 270,

6    right?  That was your report.  That's what it said.

7        A.    That's the overarching theme of the report, yes.

8        Q.    And I just want to make clear, that was based on the

9    statement in the -- in the USDA regulation that said financial

10   reporting will be on an accrual basis?

11       A.    Yes, that's correct.

12       Q.    And those were -- those are USDA's words, financial

13   reporting, right?

14       A.    Yes.

15       Q.    And I showed you reporting in the USDA letter of

16   intent and the letter in the regulation 1942 and the 270 wasn't

17   identified there as a report, right?

18       A.    That's correct that it's not identified in that

19   regulation.

20       Q.    And on every SF 270, Suzanne Brown checked the cash

21   box, correct?

22       A.    That's correct.

23       Q.    And Anne Getchell told her to check the cash box,

24   correct?

25       A.    That is what Anne Getchell told her to do, yes.

1      Q.   And Suzanne Brown's testimony at trial was she

2   filled it out on a cash basis, correct?

3      A.   Her testimony at trial was that she marked the cash

4   box and her accounting was performed on a cash basis.  I

5   believe that's how she testified.

6      Q.   And so accrual accounting only comes into this

7   because even though the relevant parties, Ms. Brown and

8   Ms. Getchell, all thought it should be cash, your expert

9   opinion is but it needed to be accrual because of the

10  "financial reporting shall be on an accrual basis" language.

11     A.   That's correct.

12     Q.   And that's really the extent of your opinion.  I

13  know we've asked a lot of other questions, but that's the core

14  of your opinion?

15     A.   That is the -- the -- the main core, yes, of my

16  report, yes.

17          MR. AFRAME:  Okay.  Thank you, your Honor.

18          THE COURT:  Thank you.  Thank you.

19          Attorney Brown, should -- should we excuse the

20  witness or would you like her to remain?

21          MS. BROWN:  I -- I think there is a chance I might

22  need to recall her.  I'm hoping not, but I think that --

23          Are you available, Ms. Layne, to stay throughout the

24  rest of the hearing?

25          THE WITNESS:  Yes, I am.

1          MS. BROWN:  Okay.  Thank you.

2          THE COURT:  Okay.

3          MS. BROWN:  And I think that if she listens in, that

4    will save time if we have to ask her about what my client says.

5          THE COURT:  Yeah.  I think you're right.  Yeah.  I'm

6    not crazy about it, but I think you're right.

7          MS. BROWN:  And I also -- I wanted to give the clerk

8    a heads-up there's probably going to be several exhibits that I

9    pull up during my examination of Ms. Brown, probably starting

10   with Exhibit C.

11         THE COURT:  C?  Yup.

12         MS. BROWN:  C, yes.  And I'm ready to proceed

13   whenever the Court is.

14         THE COURT:  Go ahead, Attorney Brown.

15         THE CLERK:  Just waiting for Exhibit C, for Tracy to

16   pull it up.

17         MS. BROWN:  I don't need it right away.

18         THE CLERK:  Oh.

19         MS. BROWN:  I have a couple questions before we get

20   to it.  I just figured I'd flag that.

21         THE CLERK:  Are you going to -- is Ms. Brown going

22   to start testifying yet or --

23         MS. BROWN:  Yes.  So she --

24         THE CLERK:  All right.  Yup.  You need to unmute

25   yourself.

1        Okay.  And could you raise your right hand, please.

2        **SUZANNE BROWN**, having been first duly sworn,

3   testified as follows:

4        THE CLERK:  Would you please state your name for the

5   record and spell your last name.

6        THE WITNESS:  Suzanne Brown, B-r-o-w-n.

7        THE CLERK:  Thank you.

8                    DIRECT EXAMINATION

9   BY MS. BROWN:

10       Q.   And before we get to Exhibit C, I have a couple

11  questions.

12       Prior to your jury trial, you reviewed the

13  indictments with your attorneys, correct?

14       A.   Yes, I did.

15       Q.   Okay.  Without a lot of detail, what did you

16  understand the charges to be against you?

17       A.   What I understood was that the charges against me

18  were stating that I had communicated somehow in SF 270 and

19  appended forms that I had paid contractors who worked for the

20  institute.

21       Q.   And the exact charge was that you made false

22  statements?

23       A.   Right, yes, that I made false statements by

24  allegedly having said this somehow in the forms.

25       Q.   Okay.  And when you filled out the forms and the

1    attached documents, did you feel that they were truthful at the

2    time?

3        A.    They were truthful.

4        Q.    And you were reporting expenses that had not been

5    paid.  Why did you think that was truthful?

6        A.    Because those were the outlays from what I

7    understood to be in the regulations and also some instruction

8    from the grant administrator --

9        Q.    Okay.

10       A.    -- amounts incurred but not paid at the time of the

11   submission of the SF 270 and other documents.

12       Q.    Okay.  Well, we'll get to your conversation with the

13   grant administrator in a minute.

14            And -- and, again, your basis for believing that in

15   reporting on these 270 forms you were reporting expenses

16   incurred not paid, where did you get that from, that idea?

17       A.    I got that from the regulations only after I had

18   been instructed by the administrator, Anne Getchell.  I had not

19   read the regulations before I signed all of the grant

20   documents, in other words.

21       Q.    Okay.  So you met with Anne Getchell and then you

22   went and read the regulations after you met with her?

23       A.    Not immediately, but certainly before I put in the

24   first claim, because I was confused and I thought maybe I

25   forgot some things.  So -- and it sounded confusing.  So I

1    wanted to -- I wanted to do a good job.

2        Q.    Okay.  And is one of the things that you read after

3    you met with Anne Getchell something that's been referred to as

4    1942-G regulations or guidelines?

5        A.    Yes, I read that.

6            MS. BROWN:  Okay.  And I would ask that Exhibit C be

7    pulled up.  And, specifically, I have the page counter on the

8    PDF at 42.  I think on the page itself it says 13.

9            And, Tracy, can you pull out paragraph H and one

10   that's right below it, about -- a little past halfway down.

11           Great.  Thank you.

12       Q.    The section we're looking at now on Exhibit C, is

13   that what you were referring to that you read after your

14   meeting with Anne Getchell?

15       A.    Yes, that and the rest of the document.

16       Q.    Okay.  But, specifically, this is the section that

17   says financial reporting shall be on an accrual basis.

18       A.    Yes.  Yes, I read that.

19           MS. BROWN:  You can take that down, Tracy.  Thank

20   you.

21       Q.    And prior to trial, did you communicate to your

22   juror -- to your juror -- to your lawyers that you believed

23   that these forms -- that you were making true representations

24   because you were using the accrual method of accounting?

25       A.    Yes, the accrual method of accounting for the grant

1    while the institute's accounting method was still cash.  That's

2    also allowed by the regulations.

3        Q.   Okay.  How did you communicate that to your

4    attorneys?

5        A.   I communicated that to them verbally in meetings and

6    also via email, attempting to put it in writing so that they

7    could -- to help them understand.

8        Q.   Okay.  Now, I'm going to ask you in a minute about

9    those two emails.  You provided me those two emails in the last

10   couple of days?

11       A.   Yes, I did.

12       Q.   And was that after a discussion we had about

13   arguments that Attorney Aframe had made at Monday's hearing?

14       A.   Yes.

15       Q.   And -- and you sent those to me because you thought

16   it refuted what Attorney Aframe was arguing in Monday's

17   hearing?

18       A.   That's correct.  I wanted a true statement made.

19       Q.   Okay.  And, specifically, the argument Attorney

20   Aframe made at the hearing on Monday is that you had not made

21   an argument regarding accrual accounting until after your

22   direct appeal, right?

23       A.   Right.  I did hear him say that, yes.

24       Q.   Okay.  And that was not accurate?

25       A.   That was not accurate.

1      Q.   And just for the record, there was a conference

2  before this hearing today and judge -- and Attorney Aframe

3  admitted he had made a mistake on that and -- an error on that.

4  I don't want to accuse him of making a false statement, but I

5  just wanted to set the foundation of why you sent these to me

6  when you did.  It was to respond to an argument that you had

7  not raised this accrual accounting issue earlier, correct?

8      A.   I wanted to correct the record, yes.

9           MS. BROWN:  If I can ask Tracy to bring up Exhbiit

10  FF, and it's a November 6, 2016, email.  And we'll go down to

11  the top of page 4.  And just for the record, this is a redacted

12  email between counsel.

13           So top of page 4, if you could pull out the

14  first paragraph.

15      Q.   And this paragraph -- and I'm going to read it and

16  I'm going to ask you some questions about it.

17           It says:  I knew we had done the work of the grant

18  and that we had honored our commitment to the farmers and the

19  taxpayers.  My understanding of the reimbursement process as

20  supported by the instructions of the USDA and the OMB

21  guidelines was that I was claiming reimbursement for the work

22  that was done, parentheses, the outlay, end parentheses, not

23  actual payments to contractors.

24           Did you write that?

25      A.   I did write that.

1    Q.    And who did you write it to?

2    A.    I wrote that to my trial counsel team, which was

3  Bjorn Lange, Dorothy Graham, and Chase McNiss, the

4  investigator.

5    Q.    And I said earlier the date was November 6, 2016.

6  Does that sound right?

7    A.    Yes, that's correct.

8    Q.    And your trial was in January of '17, right?

9    A.    That's correct.

10    Q.    And in that email when you refer to the USDA, you

11  basically say USDA and OMB guidelines.  What are you referring

12  to by the USDA guidelines?

13    A.    The 1942-G, the document we spoke of just a little

14  bit ago.

15    Q.    Okay.  And when you're referring to the OMB

16  guidelines, what are you referring to?

17    A.    A-110 and it also has other regulations embedded in

18  it.  And I tried to read those as well.

19    Q.    Okay.  And what was your purpose in sending this

20  email to your attorneys?

21    A.    My purpose in sending the email to the attorneys was

22  to basically say that I had not made a false statement and to

23  help them develop a defense that I had not made the false

24  statements that were alleged by the government.

25    MS. BROWN:  Okay.  You can take that down, Tracy.

1          THE COURT:  No, leave it up.  I have one question.

2          MS. BROWN:  Okay.

3          THE COURT:  I have one question about it.

4          MS. BROWN:  Sure.

5          THE COURT:  Excuse the interruption.

6          MS. BROWN:  No problem.

7          THE COURT:  Attorney Brown asked you what you meant

8  by a number of phrases here.  The phrase claiming reimbursement

9  for the work that was done, the outlay, were you referring to

10 the work done by the institute or the work done by those

11 invoicing the institute?

12         THE WITNESS:  I was collectively speaking of the

13 work that I personally had done, that the contractors had done,

14 and also even our employee, Damon Meeh, who was our farm

15 manager.  So it was -- the outlay was the complete contribution

16 of everyone, whether or not they had actually been paid at the

17 time or not.

18         THE COURT:  Uh-huh.  But you include yourself and

19 the institute in that, right?

20         THE WITNESS:  Yes, your Honor.

21         THE COURT:  Thank you.

22         MS. BROWN:  And the next exhibit is GG, which is

23 labeled January 3rd, 2017 email.

24    Q.   And, Suzanne, this is an email also that you sent to

25 your trial -- your trial team, correct?

1      A.    This one doesn't appear to be that.  This appears to

2  be something different.

3      Q.    Oh, I'm sorry.  This is from you to Attorney -- to

4  Chase McNiss, copy to Bjorn Lange and Dottie Graham.

5            Can you see it?

6      A.    My vision's not great, but --

7      Q.    Yeah, if we could --

8      A.    But I have to put my head in for a second --

9      Q.    Yeah, in the middle there's two sentences; one

10  starts with again and the other starts with please.  If we

11  could pull --

12      A.    Okay.  I apologize.  I'm with you now.

13      Q.    Okay.

14      A.    If you could pull it out so I could see it better.

15            MS. BROWN:  Yeah.  So pull out the two paragraphs

16  after again.  Yeah, that will help.

17            THE WITNESS:  Much better.  Thank you.

18      Q.    Okay.  So is this one of those emails we talked

19  about that after Attorney Aframe's questioning on Monday you

20  sent me?

21      A.    Yes.

22      Q.    Okay.  And the first sentence here says:  Again, my

23  understanding of the -- you have the word outlay in paren --

24  not parentheses, quotation marks --

25      A.    Right.

1      Q.    -- was the actual work, and you said third-party

2  in-kind, not the funds expended.

3            And this was something you sent to your lawyers?

4      A.    Yes, I did.

5      Q.    And then you go on to say:  Hence, form SF 270 was

6  filled out to the best of my knowledge in accordance with grant

7  conditions.

8            What did you mean by those two sentences?

9      A.    It was basically the same as before.  I was trying

10  to repeat what I had tried to tell them.  I believe this was an

11  email -- was it before or after?  But, anyway, it was

12  repetitive that outlay is not cash that leaves your bank.

13  Outlay is contributions that you make individually and

14  collectively.

15            So, you know, if you get to the -- the end of the

16  form where you fill out the certification, it basically means

17  that the incurred liabilities were done in accordance with the

18  grant agreement and, therefore, I signed it to the best of my

19  knowledge and belief and that I was telling the truth.

20      Q.    Okay.  And you sent this to your attorneys.  Would

21  it have been a couple of weeks before trial?

22      A.    I'm looking.

23      Q.    January 3rd --

24      A.    Oh, yes.  January 3rd was two weeks before trial,

25  yes.

 1          MS. BROWN:  Okay.  And -- and we can take that down

 2   now as well.  Thank you.

 3          THE COURT:  I get -- I just --

 4          MS. BROWN:  Sorry.

 5          THE COURT:  I get it.  Outlay is actual work,

 6   third-party in-kind.  I assume that's referring to the

 7   contractors and employees, right?

 8          THE WITNESS:  Yes, but also my labor, too, as well,

 9   your Honor.

10          THE COURT:  Okay.  All right.  Not the funds

11   expended.  Expended would be by -- expended wouldn't be by

12   contractors and employees; expended would be by the institute,

13   by you.

14          THE WITNESS:  Well, Ms. Layne says it better than me

15   in that it's -- it's not cash leaving your bank account.

16          THE COURT:  Yeah.

17          THE WITNESS:  You can expend money and it's not

18   real, basically.  But if it's cash that leaves your bank

19   account or cash that comes in your bank account -- I appreciate

20   Ms. Layne having used that terminology, which I probably didn't

21   with my attorneys and maybe that made it harder for them to

22   understand.

23          THE COURT:  Well, if you can help me, what's making

24   it hard for me to understand, all right, is that outlay is

25   actual work, but work by contractors is something they're

1    compensated for.  Work by you is something you're reimbursed

2    for, I guess, under this.  But like this concept -- it seems to

3    be -- it -- it seems like there's some suggestion it should

4    apply to everybody's work and this is work -- this is

5    reimbursement you were requesting for -- it can't be their

6    work.  They're paid for their work, although they didn't get

7    paid.  But they're paid for their work or -- or you compensate

8    them in-kind and receive reimbursement for it.  Right?

9            But I -- I'm -- it seems like we're trying to spread

10   it across everybody's work and that -- it's not even that I

11   really doubt it.  It's that I just don't understand it, how

12   it -- how all terms can apply to everyone's outlay.  It's got

13   to be -- the -- the -- as far as I understand this, the

14   reimbursement to the grant has to be your outlay, the grantee's

15   outlay, or to me it doesn't make sense.

16           And maybe Ms. Layne can explain it, but I don't

17   see how the institute can get reimbursement for in-kind

18   contributions from contractors or employees that they were

19   never paid for.  I don't understand that.

20           THE WITNESS:  I believe, your Honor, if I can

21   clarify that, it is a timing issue.

22           For example, you have a month, it's day one through

23   day 30, and everybody does the work.  And I calculate all the

24   work that everyone has done, including their indirect expenses,

25   including all their actual labor.  I have to put all of that

1    together.

2              On day 31, I tabulate all of those contributions or

3    all of that outlay.  I put it in the form not having paid

4    anyone and I submit it for reimbursement because that is how

5    the regulations allowed or, actually, required me to do that.

6              So when that -- when that submission was made, when

7    I hand walked those forms and appended documents into Anne

8    Getchell's office, there was, under a regulatory scheme, no

9    expectation that these people had already been paid yet,

10   especially since we hadn't even received the reimbursement to

11   pay them part of the money that was due to them.

12             THE COURT:  Sure.  I'm following that.  I am.

13             THE WITNESS:  Okay.

14             THE COURT:  That's deferred payment, though, right?

15             THE WITNESS:  Yes, your Honor.

16             THE COURT:  In-kind -- in-kind -- it can't be their

17   in-kind and your in-kind, at least under my understanding of

18   what you would request reimbursement for.  Their in-kind would

19   be something they would -- see, it's the -- all their work is

20   work.  What they contributed is work, goods, services,

21   something.  They get paid money or they get paid in-kind by

22   you.  I'm not sure what the institute could do in-kind for its

23   employees or contractors, but possibly there's something.

24             THE WITNESS:  Right.

25             THE COURT:  But it -- but you're requesting -- when

1    you request grant reimbursement, it's for your -- the

2    institute's work that you've expended; it's either cash you

3    have or have not yet expended or in-kind you have or have not

4    expended.  But it's the institute's in-kind contribution for

5    which you would request reimbursement.  Am I getting that

6    wrong?

7            THE WITNESS:  Including the -- including the

8    contractors' work, including our employees' work.  So it's an

9    umbrella thing.  And perhaps I'm not explaining this properly,

10   but I think maybe Ms. Layne can understand where I'm going with

11   this and maybe phrase it better.

12           THE COURT:  Just tell me, where's the in-kind then?

13   If you're asking for cash to pay them for work they did,

14   where's the in-kind?  It's not your in-kind, because you're

15   asking for cash from the government to pay them with it.  So

16   it's not going to be in-kind; it's going to a payment.  And

17   it's not in-kind from them because they are expecting to be

18   paid for their work and --

19           THE WITNESS:  Right.  That's the whole thing, your

20   Honor; it's expecting to be paid for their work.  At the time I

21   submitted the forms, they had not been paid for their work.

22           THE COURT:  Yup.

23           THE WITNESS:  And there was no expectation or

24   requirement or regulatory verbiage that I saw that they were

25   required to be paid for their work in cash, out of my bank

1  account to their hands in any way, shape, or form before I

2  submitted that form to Anne Getchell for reimbursement.

3          Am I answering your question, your Honor?

4          THE COURT:  I think you are, but, see, what I'm

5  asking for is the difference between what they thought they

6  were entitled to and what was actually requested as

7  reimbursement for the grant.

8          THE WITNESS:  I -- I think perhaps, your Honor, if

9  we look at the definition of in-kind -- third-party in-kind

10 services from their regulations and I tell you what I -- what I

11 believe they say, whether that's -- I don't have Ms. Layne's

12 level of understanding, but I can read and I can tell you what

13 I thought at the time and actually what I read to this day in

14 that definition --

15         THE COURT:  Well, that --

16         THE WITNESS:  -- if that's helpful.

17         THE COURT:  That much I do understand.  So I'm good

18 on that.

19         THE WITNESS:  Okay.

20         THE COURT:  I'll let Ms. Brown pick it up.

21     Q.   Suzanne, we heard Ms. Layne give a -- an example of

22 a hypothetical I gave or she, actually, I think gave it

23 originally, which was a -- a third-party person working for an

24 organization is -- does $10,000 worth of work or services.

25 They bill 2,000, but they've done 10,000.

1      A.    Correct.

2      Q.    She then explained that the -- the -- in terms of

3    grants and submitting a grant for reimbursement that the

4    grantee could then submit a request for the 10,000 even though

5    the third-party person didn't expect to get the other 8,000,

6    they only expected to get 2,000.

7      A.    That -- I agree with that and I also believe that --

8    I believed and I read this understanding into third-party

9    in-kind services.  And perhaps I am mistaken, but I believe

10   that noncash transactions could also include any sort of barter

11   and also deferred compensation because that's a noncash

12   transaction.

13            Now, in the future it will be a cash transaction,

14   but at the time of submitting the SF 270, it was a noncash

15   transaction with the contractors.  So everything that I got

16   from them, because they had not been paid yet and they had

17   deferred compensation and Ms. Yowell actually bartered

18   groceries for some of the services that she provided, I believe

19   that -- I believed that that came under the umbrella of in-kind

20   services, period.

21            THE COURT:  So you think -- you think the work of

22   the contractor employees was in-kind contribution?

23            THE WITNESS:  Yes, because they had not been paid

24   for it.

25            THE COURT:  So that -- that equates the concept of

1    deferred compensation with in-kind.  That's --

2              THE WITNESS:  Yes.  It conflates the two.  And it

3    also includes barter, which I also calculated into what I

4    submitted.

5              THE COURT:  Okay.  Thank you.

6         Q.   Okay.  And regardless of what these words really

7    mean to accountants, when you were submitting these forms based

8    on what you have here, did you believe those forms to be

9    truthful?

10        A.   Those forms were truthful.

11        Q.   I'm going to take down Exhibit GG.

12             So we've just talked about some emails that you sent

13   to your lawyers before trial.  Did you have verbal

14   conversations with them about the defense you wanted to present

15   at trial?

16        A.   Yes, I did.

17        Q.   And did you again talk about the method of reporting

18   that we just discussed here of that you were reporting outlays

19   incurred as opposed to cash leaving your bank account?

20        A.   That's correct.

21        Q.   Okay.  Did -- and you don't know what's in their

22   head, but at least from the tenor of the conversations, did

23   they appear to understand that defense?

24        A.   The reply I received was, Suzanne, I am not a

25   corporate attorney; I don't understand what you're talking

1    about.

2            So I took that to mean that they did not understand

3    the defense that I was putting forth.

4        Q.    Now, and we put it in our motion, did -- at some

5    point did you give them some documents that supported these

6    emails?

7        A.    Yes, I did.

8        Q.    Okay.  And did you give them the OMB regulations and

9    USDA regulations?

10       A.    Yes, I did.

11       Q.    And did you give them the sample SF -- yeah, SF 270

12   form that you talked about at trial?

13       A.    Yes, the -- the sample that was also supposed to be

14   a tutorial from Anne Getchell to myself.

15       Q.    Okay.  And we're going to get to that in a minute,

16   but before we get there -- so we've talked about pretrial.

17   Also just one more thing pretrial.

18           Did you have -- did you express to your lawyers that

19   you thought that they should consult with an expert?

20       A.    Yes, I did.

21       Q.    And to the best of your knowledge, did they consult

22   with an expert?

23       A.    No, they did not.

24       Q.    Now, now I want to kind of move forward to the

25   trial.

1          At the beginning of your trial, actually in opening

2    arguments, your lawyers said that this case was about hard work

3    and good intentions.  Do you remember your lawyer saying that?

4          A.   Yes, I do.

5          Q.   Was that consistent with the defense you wanted to

6    present at trial?

7          A.   No, it was not.

8          Q.   Did your -- did the defense team theory change in

9    the middle of the trial?

10         A.   Yes, it did.

11         Q.   Okay.  Explain how that came about.

12         A.    I sat through the government's case and I had heard

13   opening statements of my own attorneys.  And when I decided

14   that I wanted to testify, the reason was because I wanted to

15   put forth the proper defense.  And at that point I was taking a

16   risk and I knew that my attorneys didn't understand the

17   accounting and probably would not ask me the proper questions,

18   but at least maybe I would be able to help the jurors

19   understand exactly what I did and why I did it and hopefully

20   get them to use the regulations to back me up.

21         Q.   Okay.  And so you did take the witness stand?

22         A.   I did.

23         Q.   Okay.  Now, you said that one of the regulations

24   that backed you up -- we just pulled that up a few minutes ago.

25   I won't pull it up again.

1        A.    Sure.

2        Q.    It was Exhibit GG and it was accrual accounting.

3        A.    Uh-huh.

4        Q.    What was the other regulation in the OMB that backed

5   you up?

6        A.    A-110.

7              MS. BROWN:  Okay.  And that is Exhibit E.  Can we

8   pull that up?

9              Can we go to page 10 on that?  Let me see if I can

10  see it now.

11             Can you pull out the second paragraph, which is KK

12  in parentheses.

13       Q.    So, Suzanne, we're looking at deposition -- a

14  hearing exhibit, E, and we've -- we're on page 10.  It says

15  third-party in-kind contributions --

16       A.    Uh-huh.

17       Q.    -- and you've talked to the judge a little bit about

18  that a little bit ago and I'm just going to read it.

19             It says that that -- that that term means the value

20  of noncash contributions provided by nonfederal third parties.

21  Third-party in-kind contributions may be in the form of real

22  property, equipment, supplies, and other expendable property

23  and the value of goods and services directly benefiting and

24  specifically identifiable to the project or program.

25             And this I've referred to as Exhibit E.  It's also

1    the OMB guidelines you talked about and you talked --

2        A.    Yes.

3        Q.    -- about that in emails.

4              Why did you think this was important for your

5    attorneys to understand and for the jury to understand?

6        A.    It was important for them to understand because the

7    government's case was a lot of putting side by side what I had

8    claimed through the SF 270 versus what was in the bank account

9    of the institute, what came and left, and that -- I was

10   basically saying that there's really not a relationship there

11   because the contractors who are the nonfederal third parties

12   and myself personally, I was a nonfederal third-party.  The

13   institute was the recipient, like as -- almost like an

14   imaginary person, essentially.

15             So third-party in-kind contributions was a difficult

16   concept for everyone and I really needed the jury to understand

17   that that meant noncash and that when I represented the value,

18   that did not correlate with bank account activity.

19       Q.    You know, did -- did this paragraph that we're

20   looking at right now on the screen, did it get pulled up on the

21   projector like we're doing right now?

22       A.    No, it did not.

23       Q.    Was it made an exhibit like it is now?

24       A.    No, it was not.

25       Q.    Did that contribute to the -- your difficulty in

1  explaining this concept to the jurors?

2       A.    Immensely, yes.

3       Q.    Is this concept also related to the differencing of

4  the invoices you submitted versus the -- the billing you

5  received from third parties, that in some cases the invoices

6  you submitted had a higher amount than the actual bills that

7  you received directly from the third-party?

8       A.    It definitely helps explain it, yes.

9       Q.    And how does this explain that or at least how did

10 you believe this was relevant to why there was a difference in

11 the invoices you submitted versus billing from these other

12 parties?

13      A.    The regulations dictated to me that I was to

14 tabulate the full market value, the fair market value and full

15 market value, of everything that had been contributed whether

16 or not those contractors did their invoices correctly, whether

17 they donated part of their services, whether they expected to

18 be paid today, tomorrow, or in the future.  It was the outlay,

19 and that's what I was trying to communicate with what I put for

20 numbers in the boxes of SF 270; that it was not cash leaving

21 the bank account or I wasn't saying it was cash leaving the

22 bank account of NHIAF and going to the contractors.  It was the

23 outlay.  It was their noncash contributions, everyone's noncash

24 contributions.

25      Q.    Okay.  A couple minutes ago when I was speaking with

1    Anne Layne, I asked her about box 11a on the 270 form because

2    box 11a talks about reporting of in-kind services or cash

3    accounting, but it makes no reference of in-kind services for

4    accrual accounting.

5            And it -- and Ms. Layne explained that that's

6    because it's assumed that you can do in-kind services for

7    accrual accounting and you just had to be specific, but it's

8    not necessarily consistent with cash accounting.

9            Did that box at 11a create some confusion, at least

10   in terms of your conversations with your attorneys, as to

11   whether you could present or you could use in-kind

12   contributions the way you did?

13        A.    The -- the whole discussion of in-kind contributions

14   didn't even occur pretrial because they didn't look at -- they

15   didn't read the regulations for me to be able to really discuss

16   it with them.  It only came into play in a scurry after I said

17   I'm taking the stand and I'm going to tell them, the jury, the

18   jurors, exactly what my defense is.  I was -- at that point I

19   was pretty forceful about it.  Polite, but firm.

20        Q.    And they did not put that -- this into evidence so

21   that you could explain it to the jury?

22        A.    They did not.

23            MS. BROWN:  Okay.  And while we've got this exhibit

24   up, can we go to page 13 of the same exhibit?  And there -- and

25   it's very hard for me to see.  Somewhere in there, okay, about

1    halfway down, it has a small (b) and that sentence and the

2    paragraph after it, if we can pull that out.

3               Yes, thank you.

4        Q.    So this is on page 13 of that OMB circular, which is

5    Exhibit E.  It says:  Recipients' financial management systems

6    shall provide the following.  And it talks about accurate,

7    complete disclosure of financial results of each federal --

8        A.    Uh-huh.

9        Q.    -- project or program in accordance with the

10   reporting requirements set forth in section (sic).

11              It says:  If a federal awarding agency requires

12   reporting on an accrual basis from a recipient that maintains

13   its records on other than an accrual basis, the recipient shall

14   not be required to establish an accrual accounting system.

15   These recipients may develop such accrual data for its reports

16   on the basis of an analysis of the documentation at hand.

17              Is this also a part of the OMB regulation --

18   guidelines regulations that you relied on?

19       A.    Yes, it is.

20       Q.    And how is it relevant to this case?

21       A.    It was relevant to this case because the institute,

22   being a small organization, we -- our organization used cash

23   accounting.  However, the grant called for accrual accounting

24   to account for the incurred liabilities or incurred expenses.

25   I was not required to change my entire accounting basis for the

1  institute.  And during my testimony at trial, if you go through

2  and read carefully, every time I'm talking about cash

3  accounting, I'm talking about the institute.  Every time I'm

4  talking about an accrual process -- now, not the word accrual,

5  but the process, because my attorneys didn't understand the

6  word accrual -- I was talking about, okay, you tabulate

7  everything up and then you put it in a form and you request

8  reimbursement and then you pay people later at some time.  And

9  that was the plan.

10         That's what I was trying to explain and -- without

11 the questions from my attorneys.  And, I mean, I think they --

12 they did -- they worked very hard to try to understand this,

13 but ultimately they just didn't.  And -- and maybe I was trying

14 to help them understand it and if I'd had an expert, maybe, who

15 could phrase things better, it would have -- it would have gone

16 farther, but it didn't, and so I had to do the best I could

17 with what I had.

18    Q.    And we've already established this was not put into

19 evidence, so obviously you weren't able to discuss this

20 regulation as well during your testimony, correct?

21    A.    That's correct.  I wish it had been above my head

22 before -- while I was being asked questions.

23    Q.    We've heard, I think both Monday and today, Attorney

24 Aframe argue that you said you used cash accounting so,

25 therefore, this is some new defense you're presenting for your

1    2255 petition.

2              To the extent you say you used cash accounting at

3    trial, can you explain that, why that's not inconsistent with

4    what you're arguing now?

5         A.    Right.  As I said before, the cash accounting was

6    for the institute.  The accrual accounting process was what I

7    used per the regulations when I filled out the SF 270.  So the

8    accrual did not require cash leaving the bank account of NHIAF

9    before I had submitted the forms.

10        Q.    Okay.  And would --

11             THE COURT:  Wait a minute.  Time out.

12             Could I ask the reporter to read that last answer

13   back?  I didn't quite follow and I want to make sure I'm

14   keeping up.

15                 (The answer was read by the reporter.)

16             THE COURT:  Got it.  Thank you.

17             MS. BROWN:  You can take that down, thank you, the

18   Exhibit E.

19             And if we can pull up Exhibit X, which is a sample

20   request for advance or reimbursement.

21        Q.    I'm not going to spend a lot of time on this because

22   it was spent a lot of time at trial, but, Suzanne, did -- how

23   did this come to become -- this -- what we're looking at here,

24   Exhibit X, how did it come to be an exhibit in your trial?

25        A.    On June 28th, 2011, I met with Anne Getchell for

1   about 15 minutes and she ran through all of the paperwork that

2   I had to sign.  And then at the end of it she said, let me show

3   you how to do this -- this form that you need to turn in the

4   first of every month.

5         And I said okay, and she's sitting at her desk and

6   I'm looking over her desk at this form backwards.  And she

7   said, these first couple of boxes here, the front, on the top,

8   they're already filled in, so don't worry about that.  Let's

9   jump down to the period covered and then on number 10, I want

10  you to change that box.  And then she went through this very

11  quick math exercise with me and the answers in 11 and basically

12  said, okay, you got it?  Right?  Okay.  On your way.  That's

13  how it came about.

14        I took the -- I took this with me because I was

15  just, like, I've got to figure this out.  This is confusing.

16  Q.   Okay.  And you said earlier you didn't read the

17  regulations until afterwards.

18  A.   Right, because the regulations were listed on the

19  documents that I signed that day that I was supposed to follow.

20  So I didn't have a list of those regulations, to the best of my

21  knowledge or my memory, which is, again, nine years ago at the

22  time.

23  Q.   Okay.  And you've already testified that after you

24  read the regulations, especially what's now Exhibit C, you

25  discovered that these forms -- that you should be using the

1    accrual method of accounting and not the cash method of

2    accounting in submitting these forms, correct?

3         A.    Correct.  And said -- I testified that my

4    understanding was that she was asking or that she had prefilled

5    the institute's method of accounting, not the grant's method of

6    accounting.  And at that time when I signed all the forms, I

7    didn't know that there would be any differences until I read

8    the regulations.

9         Q.    Now, when you read the regulations and learned that

10   the correct method of accounting was accrual, why did you

11   continue to check off the box that says cash?

12        A.    Well, I assumed that because she had changed box 10

13   to something else that she had just changed box -- is that

14   number 2 -- yeah, box 2 -- to something else to suit her

15   purposes and so she wanted the institute's method of accounting

16   instead of the actual grant calculation's method of accounting.

17        Q.    Okay.  And as I understand what you're saying, as

18   you were filling out these -- the 270 forms that are the

19   subject of this case, you're filling them out using the accrual

20   method, but you were checking the cash box because that's what

21   Anne Getchell told you to do?

22        A.    Exactly.

23        Q.    Okay.  And why did you give this to your lawyers to

24   introduce at trial?  Why did you think it was relevant at

25   trial?

1       A.    Well, what I told them was that the box number 2 is

2  problematic because I thought that Anne -- and, again, I didn't

3  know what was going on in her head, but it appeared to me as if

4  she was assuming that I had already paid these people, but that

5  wasn't the case; that I used the process in the regulations and

6  I filled out the form to comport with what she was asking me to

7  do.

8       Q.    Okay.  Now, at this point in the trial when this was

9  introduced, it was during your testimony.  Had Anne Getchell

10 already testified that she had told you that when you submitted

11 these forms, you should only submit them for expenses that had

12 been paid?

13      A.    If I understand your question --

14      Q.    I can reask it.  It was kind of long.

15      A.    Okay.  Thanks.

16      Q.    Okay.  So obviously you would have testified after

17 Anne Getchell, because you're the defendant and she's the

18 state --

19      A.    Right.

20      Q.    -- witness.

21            And prior to you testifying, Anne -- Anne Getchell

22 said something to the effect that when she explained to you how

23 to fill out these forms that she told you that when you fill

24 out these forms, you're reporting expenses that you have --

25 money that you have sent to people, that you've actually paid,

1    as opposed to outlays.  Do you remember her testimony on that?

2         A.    I remember her testimony, yes.

3         Q.    Okay.  And is that a fair, accurate

4      representation -- summary, I guess, of her testimony?

5         A.    That is her testimony, but that is not what she told

6    me at the time --

7         Q.    I understand --

8         A.    -- of that meeting.

9         Q.    -- that.

10        A.    Okay.

11        Q.    I'm just trying to understand why you decided to

12   testify.  Was her testimony saying that part of why you decided

13   to testify?

14        A.    Right.  Oh, yes, absolutely, because I disagreed

15   with her.

16        Q.    Okay.  That's what I was trying to explain --

17        A.    Okay.

18        Q.    -- that you disagreed with what she said.

19              But she had said that, so her testimony was contrary

20   to your testimony?

21        A.    That's exactly right.

22        Q.    And that's why you felt you needed to testify, to

23   explain that she was wrong?

24        A.    That was my opinion, that she was wrong, yes.  I was

25   trying to be polite about it.

1    Q.    Okay.  And we just talked about the Exhibit C, which

2    is the U.S. -- well, Exhibit C is labeled 1942-G.

3         In your earlier emails to your attorneys when you

4    referred to USDA guidelines, you were referring to the same

5    thing, correct?

6    A.    That's correct.

7    Q.    Now, when you -- you reviewed the transcripts in

8    this case prior to testifying today, correct?

9    A.    I did.  Just my own testimony mostly.

10   Q.    Mostly focusing on that?

11        Do you remember -- and I'm going to -- I don't need

12   to pull it up at this point, but I'll refer to it as Exhibit

13   CC, page 38 -- that you testified that you thought that 1942-G

14   was in evidence?  Do you remember reading that when you were

15   reviewing?

16   A.    Yes, I remember reading that.

17   Q.    Okay.  And -- and that was wrong, right?

18   A.    I was incorrect, because I didn't understand that

19   something marked for ID in the evidence binder hadn't actually

20   been put into evidence.

21   Q.    Okay.  So you were aware defense attorneys had an

22   evidence -- a binder that had things that said A through

23   whatever marked for identification?

24   A.    I did know that, but I didn't know the difference.

25   Q.    Okay.

1           A.    I know the difference now.

2           Q.    Okay.  So at trial you stated that you thought

3     1942-G, which is now Exhibit C, was a full exhibit, correct?

4           A.    I did.  I thought the jurors would be able to see

5     that when they deliberated.

6           Q.    Okay.  Now, after the verdict in this case, did you

7     discuss with your attorneys what you think -- you can take this

8     exhibit down, thank you -- what -- that you were unhappy with

9     the way the defense had gone?

10          A.    Yes, I did discuss that with them.

11          Q.    And what happened?

12          A.    Well, I asked for a new trial and Attorney Lange

13    told me that he was not going to ask for a new trial.  And I --

14    as calmly and as respectfully as I could, because he had worked

15    so hard, the whole team worked hard, I told him that even

16    though you're a great attorney and I'm just the defendant, I do

17    believe that my proper defense was not put forth and I would

18    like a new trial in order to put forth the true and proper

19    defense and be able to talk to a jury and have them understand

20    what my defense was.

21          Q.    How soon after the trial did you raise that with

22    Attorney Lange?

23          A.    The same day as the verdict.

24          Q.    And do you recall that there was a jury question in

25    the case?

1      A.    I do recall there was a jury question in the case.

2      Q.    Okay.  And I think you've already testified about

3  this at prior hearings, but did --

4      A.    Yes.

5      Q.    Were you consulted when they spoke with the judge

6  about a response to the jury question on in-kind services?

7      A.    I was not consulted.

8      Q.    Okay.  And if you were, what would you have

9  recommended?

10     A.    I would have recommended the definition that the

11  judge was open to; what was the regulatory scheme she was

12  working under.

13           And so I would have said -- I -- and I did say to

14  Attorney Graham, who was not in chambers, please take this

15  definition and give it to the judge.  It's a government

16  proceeding.  The judge deserves a government definition and

17  then he can share that with the jurors.

18     Q.    Okay.  Now -- and your understanding is that didn't

19  happen, obviously?

20     A.    That did not happen.

21     Q.    Okay.  Now, so you brought this up with your

22  attorneys.  Eventually they withdraw from the case, correct?

23     A.    Yes.  Voluntarily.

24     Q.    Voluntarily.  And you've got a new attorney?

25     A.    I did.

1      Q.    Yeah.  And that attorney filed a motion for leave to

2  file a motion for new trial because obviously the deadline had

3  come and gone for a motion for new trial?

4      A.    Exactly, because there was a -- an attorney in

5  between who ended up withdrawing because of a conflict.

6      Q.    Okay.  And so was -- when was the next hearing after

7  your trial on the merits of your motion for a new trial?

8      A.    The next substantive hearing was in February of

9  2018.

10     Q.    And Bjorn Lange testified at that hearing?

11     A.    He did.

12     Q.    And so did Dottie Graham?

13     A.    She did.

14     Q.    And did you testify at that hearing?

15     A.    I did.

16     Q.    And at that hearing -- so this is the first hearing

17 since your trial, correct?

18     A.    To the best of my memory, yes.

19     Q.    I was going to say first evidentiary hearing.

20     A.    Substantive, right, right.

21     Q.    There might have been other stuff.

22           When you testified at that hearing, did you talk

23 about accrual accounting?

24     A.    I did.

25     Q.    Did you explain why that was relevant as you have in

1    your motion before this Court?

2         A.   I do not remember my exact verbiage, but the main

3    thrust of it was, yes, that it was definitely relevant.  The

4    accounting concepts and terms and the regulations were

5    critical.

6         Q.   Okay.  And at that hearing in February 2018, did you

7    talk to the judge about the fact that you didn't feel your

8    then-counsel really understood your defense as your trial

9    attorneys did, but that you asked the judge if you could put

10   something in your own words, like a pleading?

11        A.   It may have been the next hearing that I -- I

12   believe it was in March of 2018.  And I did basically let the

13   judge know that I -- I had a fundamental lack of confidence

14   that my new attorney understood my proper defense.

15        Q.   And -- and the judge allowed you to -- gave you

16   leave to file a *pro se* motion explaining your defense?

17        A.   It was a supplement to Attorney Wiberg's motion,

18   yes, he gave me permission to do that and I was very grateful

19   for that.

20        Q.   And if I told you that was docket 81 on the

21   underlying criminal case, does that sound about right?

22        A.   I -- docket 81, 85,000, I don't know.

23        Q.   Okay.  But that -- that's the motion that you put

24   into words what you felt should have happened at trial?

25        A.   Yes.  I submitted that on April 18th, 2018.

1    Q.    And did you mention the accrual accounting then?

2    A.    I did.

3    Q.    And did you explain in detail about the defense you

4    thought should have been presented at trial in that document,

5    what is -- I'm not sure if I said what it is for this hearing.

6    It's EE for this hearing.  In that motion, did you explain your

7    defense in Exhibit EE?

8    A.    To the best of my ability, I did in detail.

9    Q.    Okay.  If we can pull -- no, let me take that back.

10          Do you recall in that exhibit saying that you felt

11   your attorneys erred not only for not presenting the defense or

12   understanding the defense, but also for not consulting with an

13   expert?

14   A.    Yes, I did -- I did write that.

15   Q.    Okay.  And did you try to bring that issue up on

16   direct appeal?

17   A.    That an expert was not consulted?

18   Q.    Oh, no, I -- thank you for clarifying.

19          Did you try to present -- bring the ineffective

20   assistance of counsel claim on appeal?

21   A.    Yes.

22   Q.    And the result of that is that the First Circuit

23   dismissed it without prejudice; is that correct?

24   A.    That's correct.  They left it open for us to be here

25   today.

56

1          Q.    Okay.  Let's see.  I'm skipping ahead.  A couple of

2    things we've already addressed, so I don't want to waste time

3    going over that.

4               In that same document we just talked about, which is

5    EE at this hearing, which is -- was also document 81, you

6    mentioned that you thought your lawyers were ineffective in not

7    understanding and presenting this defense and the exhibits and

8    you also just mentioned that they were ineffective for not

9    calling an expert.

10              Do you also recall that you said that you did not

11   believe the grant administrators understood the regulations?

12         A.    I --

13         Q.    Do you understand that?

14         A.    I heard her testimony, so, yes, I did write that.

15         Q.    So all three of those things you put in a pleading

16   back in -- you said it was May of 2018?

17         A.    It was April 18th, 2018.

18         Q.    April 18th.  Okay.  And when you put those three

19   things in there, that the grant administrator was incorrect in

20   her instructions, that your attorneys should have consulted

21   with an expert, and that they didn't understand the defense,

22   had you had a chance to consult with an expert yourself at that

23   point?

24         A.    No, I had not, and I never have consulted with an

25   expert by myself.

57

```
 1        Q.    Okay.

 2        A.    Only through you.

 3        Q.    All right.  And so the opinions that we've heard

 4   today -- Monday and today from Anne Layne that are consistent

 5   with that, you didn't know about that, obviously, two years

 6   ago?

 7        A.    I anticipated that if an expert had been called they

 8   would be consistent, but I didn't know just what Ms. Layne was

 9   going to say Monday and today.

10        Q.    Now, also in Exhibit EE -- and just for the Court's

11   reference, at page 6 -- did you also attempt to explain to the

12   Court the relevance of the concept of in-kind services as

13   defined in OMB A-110?  Do you remember --

14        A.    Yes, I do.

15        Q.    -- that as well?

16              And, again, did you have the benefit of talking with

17   an expert prior to putting that in that motion?

18        A.    No, I did not.  But I wish I had.

19              THE COURT:  Wait a minute.  I was just looking at --

20   I was just looking at the exhibit, actually --

21              MS. BROWN:  Okay.

22              THE COURT:  -- and I didn't hear the question.  I

23   heard the answer, but not the question.

24              MS. BROWN:  Okay.  I'll repeat it, your Honor.

25        Q.    And so Exhibit EE at page 6 --
```

1           THE COURT:  Yeah.

2      Q.    -- Suzanne, you mentioned that you had -- I'm going

3 to -- you begged your attorneys to use government definition

4 from OMB A-110:  I firmly stated that the government definition

5 is required for a government proceeding.  I then found the

6 regulation and definition of in-kind services.

7           And my -- and the answer was -- I think she said she

8 wished she had an expert.

9           My question is when you put that into writing back

10 in 2018, you hadn't had an opportunity to consult with an

11 expert, correct?

12     A.    That's correct.  Yes.

13          THE COURT:  Okay.

14     Q.    And I think we've already -- I had some questions

15 about in-kind services, but I think we dealt with those earlier

16 when we talked about the emails, so I'm not going repeat them.

17 We went over the definition of that.

18          THE COURT:  Can I ask a question about this exhibit

19 then?

20          MS. BROWN:  Yes, please.

21          THE COURT:  You might have already covered this,

22 Attorney Brown, but I want to make sure.

23          I -- I saw the reference in the -- I saw the

24 reference to the question to Bjorn Lange; do you know the

25 difference between accrual and cash accounting?

```
 1                    He pretty much deflected it.

 2               MS. BROWN:  Right.

 3               THE COURT:  Was there another place in this

 4      memorandum where the accrual -- not in-kind, but the accrual

 5      method of accounting is discussed?

 6               THE WITNESS:  Your Honor, which memorandum are you

 7      talking about?

 8               THE COURT:  The one you filed, the one I gave you an

 9      opportunity to file.

10               MS. BROWN:  If you give me a moment, I can find it,

11      your Honor.

12               THE COURT:  Thanks.

13               THE WITNESS:  I believe it's on page 21 where I

14      discuss in-kind -- or cash versus accrual accounting and how

15      technically both accounting methods can account for in-kind,

16      but it would have been much easier for the jury to understand

17      amounts owed to contractors instead of trying to communicate to

18      them what in-kind services encompassed or what came under that

19      umbrella.

20               MS. BROWN:  It actually --

21               THE WITNESS:  That was the point.

22               MS. BROWN:  Oh, I'm sorry to interrupt, Suzanne.

23               THE WITNESS:  That's okay.

24               MS. BROWN:  It's at page 2, your Honor.

25          Q.   So at page 2 on Exhibit EE, it says:  In accordance
```

1  with the controlling directive of the grant, RD 1942, as

2  executive director of nonprofit, I used the prescribed accrual

3  basis of accounting and fair market valuations of services

4  rendered by all NHIAF.

5          So that's -- it's on page 2, where she refers to

6  accrual basis of accounting.

7          THE COURT:  It's on page 2 and, she's right, it's on

8  page 21 as well.

9          MS. BROWN:  And it is on page 21?  Okay.  I had it

10  on page 22.  So I think page 2 is sort of the introduction to

11  the motion --

12          THE COURT:  Yup.

13          MS. BROWN:  -- before I got it.

14      Q.    And, Suzanne, you said earlier that you felt that

15  based on the regulations that you had to report in-kind

16  services.  Was there another document that made you believe

17  that you had to report in-kind services in the 270 form?

18      A.    Yes.  Regardless of accounting method, both grant

19  letters, grant agreement letters or whatever -- the letters

20  that the government gave to me stated in no uncertain terms

21  that I was to account for in-kind services without mention of

22  accounting method.  So it's in both of those letters --

23      Q.    Okay.

24      A.    -- one from June of 2011 and one from March of 2012.

25          MS. BROWN:  I'm just going to pull up the 2011 one

1  real quick.  And it's Exhibit H, Tracy and at page -- the top

2  of page 6 at Exhibit H.

3         And if we could pull up the top two paragraphs or

4  sentences, whatever they are.

5         Thank you.

6     Q.   So that second paragraph that says:  Your financial

7  status reports must include all federal, nonfederal, and

8  in-kind financial contributions to the project, that's what

9  you're referring to?

10    A.   Yes, that's what I was required to do and that's

11 what I did.

12    Q.   Okay.  And just so it's clear for the Court -- and

13 there were two of these and I'm just going to show one of them

14 because they're pretty much identical.

15        The -- these were -- you know, some of the

16 regulations you're talking about is -- are regulations that are

17 not -- you know, this is specific to this grant; this is the

18 actual grant agreement for this -- the grant that you signed

19 that you agreed to comply with, correct?

20    A.   Right.  There are the big umbrella regulations, and

21 then there are the USDA regulations, and then there's the

22 letter to me that says and you have to do these things, too, or

23 you -- in order to qualify and continue to be qualified for the

24 grant.

25    Q.   Okay.  I'm going to keep that up there for a minute

1    because it relates to the next couple of questions.

2              In the government's --

3              THE COURT:  Wait, wait, wait, wait.  We've got to

4    give the court reporter a break.

5              MS. BROWN:  Okay.

6              THE COURT:  We've been going on this witness now for

7    an hour and a half.  Or, actually, no, we had the expert, too.

8              But while we're on this exhibit, let me just -- let

9    me just -- those are financial status reports that we're

10   talking about, right?  Those aren't the grant reimbursement

11   applications.  These are financial status reports that the regs

12   require to be done on an accrual basis, right?

13             THE WITNESS:  That's correct, your Honor.

14             THE COURT:  Okay.  Yeah.

15             THE WITNESS:  And I -- I thought that SF 270 was

16   included in financial status reports because there are numbers

17   in that report, it reflects the status of the project, and it's

18   a report.  So all three of those, it's like the Holy Roman

19   Empire.  You know, it all fits.

20             THE COURT:  Okay.  I -- but we need to break.  I

21   want to give the reporter a break.  So we'll take the usual 15

22   and reconvene.  I want to make a note of something, Ms. Brown,

23   before we break, just so I don't forget.

24             The exhibit you were showing your client

25   regarding -- regarding grantees that don't use -- that don't

1    use accrual, they can -- they can use a different method, but

2    they maintain data to substantiate -- what number was that,

3    again?  I just want to --

4              MS. BROWN:  It's Exhibit C.  So it's the same

5    exhibit that has that in-kind definition, just a different

6    page.

7              THE COURT:  Okay.

8              MS. BROWN:  So Exhibit C at page 10 has the in-kind

9    definition and then I think it's at page 13 that it has that

10   definition about two methods of accounting.  I'll double-check

11   that during the break --

12             THE COURT:  Okay.

13             MS. BROWN:  -- to make sure that my memory is

14   correct on that.  But they are both in Exhibit -- does this say

15   C or E?  It's E.  It's the OMB circular, which I'm pretty sure

16   is E.

17             THE COURT:  I'm going to check it now because I

18   don't want to lose track of it.

19             MS. BROWN:  Okay.

20             THE COURT:  I'm looking at page 13 and that doesn't

21   appear to be --

22             MS. BROWN:  Okay.  So it's Exhibit E at page --

23   well, page 13.  And then you go down halfway and there's a

24   small (b) -- the print on these things is tiny.  There's a --

25   there's a small (b) and then under that there's a (1) and the

64

1    sentence starts with accurate, current, and complete.

2              THE COURT:  Well, my page 13 doesn't have a small

3    (b).

4              MS. BROWN:  Okay.

5              THE COURT:  My page 13 of Exhibit C --

6              MS. BROWN:  Oh, no, it's Exhibit E.  I'm sorry, your

7    Honor.

8              THE COURT:  Ah, okay.

9              MS. BROWN:  Yeah.  So it's Exhibit E, page 13.

10             THE COURT:  Okay.  My Exhibit E only has three or

11   four pages.  And that's definitely not it.

12             MS. BROWN:  Well, that's --

13             THE COURT:  Exhibit E is --

14             MS. BROWN:  Didn't the clerk just pull it up a

15   minute ago?

16             THE COURT:  Yeah.  But -- and I didn't know what it

17   was and I'm asking now.  And it's not E and it's not C.  It's

18   the one where it said that grantees utilizing a method of

19   accounting other than accrual may do so, but -- and she -- and

20   your client testified that, yeah, I was doing some of it on

21   cash, some of it on accrual.  And that's the exhibit I'm

22   talking about.

23             Attorney Aframe, do you know which exhibit it was?

24             MR. AFRAME:  I don't.

25             THE COURT:  All right.

1          MS. BROWN:  Maybe we can ask the clerk, because I

2    said -- when I said Exhibit E, page 13, they pulled it up and

3    we got to -- to page 13 and we got to pull that up.  So --

4          THE COURT:  My Exhibit E is Deposition Exhibit F,

5    New Hampshire Institute of Agriculture and Forestry

6    comparison -- comparison between 270s and supporting

7    documentation.  That's what it is.

8          MS. BROWN:  I think Tracy's pulling it up right now,

9    which is -- it says Deposition Exhibit E on the bottom, which

10   they all match up because we used the same deposition exhibits.

11         THE COURT:  Okay.

12         MS. BROWN:  So this is what you're talking about --

13         THE COURT:  That's Exhibit D.  Or, actually, no, I

14   see the problem now.  We've got a little bit of a -- we've got

15   a little bit of a binder divider labeling problem here.  That's

16   all it is.

17         MS. BROWN:  Okay.

18         THE COURT:  Okay.  So that's page 13, Donna?

19         MS. BROWN:  13 on Exhibit E.  And Tracy's pulled it

20   up.  Not quite halfway down, there's a small (b) and then

21   there's a (1) and then it's the second sentence of that (1).

22         THE COURT:  Got it.  Yeah.  Thank you.

23         MS. BROWN:  Okay.

24         THE COURT:  My pages aren't numbered.

25         MS. BROWN:  Yeah.

1          THE COURT:  Okay.  Let me just mark this.  And I'm

2    not going to question your client about -- because I think I've

3    been interfering a little too much and I want to give

4    Mr. Aframe an opportunity to before I -- but I may circle back

5    to that later.

6          Okay.  We'll take 15 and reconvene.

7          MS. BROWN:  Okay.  Thank you.

8          THE COURT:  Thank you.

9          (Recess taken from 3:38 p.m. until 3:52 p.m.)

10         THE COURT:  Okay.  Attorney Brown, you were

11   finishing up?

12         MS. BROWN:  Yes.  Thank you, your Honor.

13   Q.    And, Suzanne, can you take your -- oh, you're

14   already off mute.  Thank you.

15         I want to switch to talking about the invoices in

16   this case.  And you've read the government's objection to your

17   2255 petition, correct?

18   A.    Yes, I have.

19   Q.    And in their petition they refer to something called

20   phony invoices.  Do you know what they're referring to?

21   A.    Yes, I do.

22   Q.    Okay.  And those were invoices that you wrote and

23   sent in with some of the these SF 270 forms, correct?

24   A.    That's correct.  I calculated the outlay and I

25   apportioned it per person and I put it in with the SF 270s,

67

1    correct.

2        Q.    Okay.  And you dispute the fact that the -- the use

3    of the term phony, correct?

4        A.    Absolutely.  They weren't phony.

5        Q.    Okay.  And why weren't they phony?

6        A.    Because they accurately reflected the outlays per

7    person that were attached to the SF 270s.

8        Q.    Okay.  And you wrote these invoices, not the person

9    who actually performed the services relative to each invoice,

10   correct?

11       A.    That's correct --

12       Q.    Okay.

13       A.    -- with their authorization.

14       Q.    Okay.  And did -- is that something you testified to

15   at trial, that you had authorization?

16       A.    Yes, I did.

17       Q.    And if I told you that at Exhibit AA, page 59 -- you

18   said that you had authorization to write those invoices?

19       A.    Yes.  That's what I said.

20       Q.    Do you remember that during your cross-examination

21   Attorney Aframe said that your testimony was that you -- and to

22   use his words -- made up those invoices?  Did you disagree with

23   that term?

24       A.    I did disagree with it and I still disagree with it.

25       Q.    Okay.  And at trial, did you give lengthy testimony

1    exchange why both you had authorization and explaining the

2    numbers that you put into those invoices?

3         A.    Yes, I did my best.

4         Q.    Okay.  And if I told the Court -- you reviewed that

5    coming to this hearing today, correct?

6         A.    Oh, yes.

7         Q.    And if I told the Court that that testimony is at

8    Exhibit G, pages 59 through 113, does that sound about right

9    from reviewing the exhibits?

10        A.    I don't remember the page numbers, but I'm going to

11   take your word for it.

12        Q.    Okay.  Well, I guess a better question is when you

13   reviewed your testimony on explaining these invoices and why

14   the numbers in the invoices were different than the billing

15   that the third-party people had submitted, do you stand by that

16   testimony?

17        A.    Oh, I stand by the testimony, yes.

18        Q.    And just for the Court's convenience also, I think

19   that testimony goes into a different day, which is Exhibit AA

20   at page 6 through 12.

21            Do you feel that if you --

22            THE COURT:  Let me -- well, are you going to -- are

23   you going to stay with the invoices?

24            MS. BROWN:  Yes.

25            THE COURT:  Go ahead then.

1          MS. BROWN:  Okay.  And I don't have that much left.

2     Q.    If you had an expert witness at trial to explain,

3 similar to what Ms. Layne explained earlier, that someone could

4 do $10,000 worth of work but only expect 2,000 in payment that

5 you could reimburse for 10,000, if you had had that testimony

6 at trial, do you -- do you feel that would have supported your

7 testimony on this issue?

8     A.    Oh, yes.  I wish I'd had that, yes.

9     Q.    Okay.  And you said earlier that you had

10 authorization.  Again, you gave several examples of that at

11 trial, why you felt that you had authorization.  One of those

12 examples, you talked about an email from Julie.  Can you

13 explain that?

14          MR. AFRAME:  Objection, relevance.

15          MS. BROWN:  Okay.

16          THE COURT:  Yeah, but I look at this -- I look at

17 this -- even that last testimony about would it have helped you

18 if you had this -- I mean, I look at those more for arguments

19 for you, Attorney Brown.

20          MS. BROWN:  Okay.

21          THE COURT:  You're the judge of what would have

22 helped her, not so much the client.

23          And also I should say this about the invoices.  I do

24 remember the -- the made-up question, but I -- I didn't take

25 that -- I just took that as she had created them.  I didn't

1    take that as out of whole cloth or something like that --

2             MS. BROWN:  Okay.

3             THE COURT:  -- for what it's worth.  I didn't -- you

4    know, I didn't -- I have a view of those invoices that the

5    defendant created them.  You know, the question for the jury

6    was what they represented, but I didn't get the sense that it

7    was just literally, you know, phonied up in that sense.

8             MS. BROWN:  And I was just addressing -- I'll

9    move -- that helps, because I was just addressing that issue as

10   it goes to the prejudice prong, your Honor, and -- and that

11   I -- and that's why we're not going to rehash it here.  I think

12   we just wanted to direct the Court's attention that she gave

13   that testimony and obviously we'll argue later what an -- how

14   an expert would have helped that.

15            THE COURT:  Yup.

16            MS. BROWN:  Let's see.  And that is the end of my

17   questions for Ms. Brown.

18            THE COURT:  Okay.  Yup.

19            I've got a couple questions, but I really do think I

20   should let Mr. Aframe, the government --

21            MR. AFRAME:  It's okay, Judge.  Go ahead.  We're

22   trying to do this for you, so let's get to what you're

23   concerned about.

24            THE COURT:  Okay.  That Exhibit E that we talked

25   about that I wanted to come back to, page 13 of Exhibit E, and

1  Clerk -- Deputy Clerk Uhrin had it up on the board or up on --

2  she might be gone.  I don't know if she's still with us.

3          Oh, she's with us.  Yeah, I'm going to ask her to

4  put that up.  And this is, of course, from the circular A-110,

5  right?  Yeah.

6          Quote:  If a federal awarding agency -- this is

7  almost more for counsel.  I'll let them -- I'm just trying to

8  get clear on it.  I'll let the defendant speak to this if she

9  wants to, but I really have a question for counsel.

10          The reg says:  If a federal awarding agency requires

11  reporting on an accrual basis from a recipient that maintains

12  its records on other than an accrual basis, the recipient shall

13  not be required to establish an accrual accounting system.

14  These recipients may develop such accrual of data for its

15  reports on the basis of an analysis of the documentation on

16  hand.

17          My question is was there trial evidence of data for

18  reports that was compiled on the basis of an analysis of the

19  documentation on hand to support reported finances or the -- or

20  the reimbursement requests?  Like whatever that accrual data

21  was, was it part of the trial record?

22          MS. BROWN:  So that last sentence which you just

23  asked, the answer is no, there was no evidence of accrual data

24  for its reports on the basis or whatever the rest of it says

25  there --

1          THE COURT:  Okay.

2          MS. BROWN:  -- and the analysis.

3          The reason we are focusing on this is the government

4   has argued that Suzanne said she used cash accounting.  And as

5   Suzanne explained relative to this, she did use cash accounting

6   for the organization, but used accrual accounting for her

7   reporting on the grant.  And we -- and that was -- the fact

8   that she could use two types of accounting, one for the actual

9   organization and one for the reporting.

10         But the main point of this is that when she said, I

11  used cash, at trial, she was referring to the organization.

12  And the government is now trying to say, well, she's giving a

13  different story because of -- you know, sort of a

14  postconviction story.  But what we're saying is that her

15  testimony at trial is not inconsistent with her postconviction

16  and post direct appeal claims.

17         THE COURT:  All right.  Well, let me -- so that's my

18  question, though.  Because first of all, my -- I've heard her

19  say today that -- that her -- I've heard her say today that,

20  yes, I was doing the grant on a cash basis, but my reporting on

21  an accrual.  Okay?  And I think she just said under examination

22  from you, Attorney Brown, recently that the reason she was

23  doing it under accrual was because of the regulations.  Okay?

24         Now, I don't view that as consistent with the trial

25  testimony.  I'm -- I just need to say that.  I'm going to say

1    it now.  I -- unless something changes my mind about that, I

2    think I would say that in the order.  But I don't see that as

3    consistent.  And my question for you is -- because I'm trying

4    to give that testimony every bit of credit I can.  Okay?

5              This says that recipients may develop such accrual

6    data for its reports on an analysis.

7              So if she's not using accrual and she's using cash,

8    or if a grantee is not using accrual, but the grant -- even

9    though it requires it, there's data that's supposed to be

10   created and maintained.  And I wanted to know -- it wasn't

11   presented at trial.  Do you -- is there other data that you've

12   presented here that would -- that would -- that would support

13   some other accounting method?

14             Because, remember, she said, I'm using cash to

15   report an accrual -- oh, I think I understand your point now.

16   She's saying, I -- she's saying she used cash to run the grant,

17   accrual to report.

18             MS. BROWN:  No.

19             THE COURT:  Well, if she --

20             THE COURT:  No?

21             MS. BROWN:  She's saying she used cash to run her

22   organization and then she was using accrual to report.

23             THE COURT:  Okay.

24             MS. BROWN:  So that was the point, that when she

25   said, I used cash, at trial, she was referring to NHIAF; and

1    when she -- and when she was using accrual.

2              And I would like to, based on your -- your Honor's

3    statement -- and I can ask Suzanne Brown about this.  I read

4    trial testimony to our expert at Exhibit AA, page 23, where

5    Suzanne explained what she was certifying to, and our expert

6    said that that is consistent with accrual accounting, even

7    though the --

8              THE COURT:  Oh.

9              MS. BROWN:  -- accrual wasn't used.

10             THE COURT:  Well, sure, because at trial she said --

11   look, see, that's what I'm -- I'm really having trouble with

12   this because it seemed like the case was defended that way,

13   that she was requesting reimbursement for deferred payments,

14   payments she hadn't made yet.  That doesn't seem at all

15   controversial or new to me.

16             What's new to me is this accounting concept and

17   that -- that does have a relationship with deferred

18   compensation -- deferred payment, but I guess I'm trying to

19   understand this reg that you brought up here in the circular.

20             If she's running it on cash, she's running it on

21   something other than accrual.  And that says that the recipient

22   would be -- would have to develop accrual of data for its

23   reports on the basis of an analysis of the documentation.  And

24   that -- we didn't see that at trial and I'm wondering if I'm

25   supposed to see that somewhere else here in these exhibits.

1           THE WITNESS:  Excuse me, your Honor.  Could we ask

2     Ms. Layne what that means?  She's the expert.

3           THE COURT:  Yeah, that's -- with respect -- with

4     respect, Ms. Brown, I -- I can't let you direct this

5     proceeding.

6           THE WITNESS:  I'm sorry, your Honor.

7           THE COURT:  You don't need to apologize.

8           I mean, I wouldn't have a problem if somebody asked

9     the expert, but, I mean, it would seem to me that if you're

10    saying -- it would seem to me that if she was not using accrual

11    and she said she was using cash, which is -- that it maintains

12    its records on other than an accrual basis, that would be this,

13    that would be the institute.  The recipient shall not be

14    required to establish an accrual accounting system.  All right?

15    Which she did not, because she ran her institute on a cash

16    basis.  But you're supposed to develop accrual data and

17    maintain it and if that has happened, I didn't see it at trial

18    and I haven't seen it as part of these proceedings.

19          And before anybody asks, no, we're not having

20    another hearing.

21          So I need to know if I've overlooked it, if it's

22    here.  Where is the corroboration that this -- where is the

23    supporting evidence that this reg would seem to require --

24    unless I'm misreading it, and if I'm misreading it, I am happy

25    for Ms. Layne to explain it to me.  But I'd like the lawyers to

1    tell me first -- and you've already told me we didn't have it

2    at trial -- do we have it here in the evidence for this

3    hearing.

4            MS. BROWN:  Well, your Honor, what I would say is

5    that the reason that we are showing this --

6            THE COURT:  Uh-huh.

7            MS. BROWN:  -- is that it became an issue of whether

8    she -- the government has argued she has used cash -- she said

9    she used cash accounting.

10           THE COURT:  Yeah.

11           MS. BROWN:  She is saying, I said that as to my

12   organization, not as to reporting.

13           THE COURT:  Yup.

14           MS. BROWN:  To the extent -- and I said I probably

15   couldn't give you any better definition of what that last

16   sentence -- a lot of this is very difficult for all of us.  And

17   what Ms. Brown has testified to today is that she has -- to the

18   extent there's data that she submitted information using the

19   accrual accounting method which means she was reporting data

20   which is outlays incurred but not necessarily paid.  She was

21   reporting that in her SF 270 form.

22           THE COURT:  Well, she was requesting reimbursement

23   in the SF 270, right?

24           MS. BROWN:  She was -- yes, but what's clear is that

25   reimbursement does not mean it's been paid.

1           THE COURT:  Yup.  I'm with you.

2           MS. BROWN:  So that -- right.  So she was requesting

3    reimbursement for services, as she explained earlier, that had

4    been incurred but not -- a check hadn't gone -- you know,

5    hadn't gone out of the bank.

6           And so to the extent that, you know, that's what

7    she's -- to the extent we're saying, well, how does accrual

8    basis and how does this sentence apply, it applies because she

9    had two different methods of accounting, one for organization,

10   one for her -- and she was using the accrual method to report

11   information to -- consistent with this grant.

12          And that's why we have shown this.  This is why I

13   showed it to Ms. Layne on Monday and that -- that I gave her

14   the hypothetical of exactly what Ms. Brown did of having two

15   accounting methods.

16          In fact, if you look in my motion, I found a case

17   that said that the government had argued that the defendant had

18   committed either fraud or a false statement, I can't remember

19   what, based on a theory that the company operated on one type

20   of method of accounting and, therefore, using that type of

21   method of accounting, he was not -- there was some sort of

22   falsehood or fraud --

23          THE COURT:  Yeah I read.  I read it.

24          MS. BROWN:  And the judge said, you can't assume

25   that they use one type of accounting method for one thing, that

1    they're doing it for another thing.  You can't assume that.

2    Lots of businesses do that.

3              THE COURT:  I'm with you.

4              MS. BROWN:  That's why we feel this is relevant and

5    that the jury didn't hear about this and, therefore, to the

6    extent -- first of all, they didn't understand that she was

7    using accrual accounting, but she could have also, with the

8    benefit of an expert, explained that it's not uncommon to have

9    two methods of accounting.

10             THE COURT:  Okay.  Understood.  And I've always

11   understood that that was the defense in this case.  But my -- I

12   want to make an observation.  Okay?

13             I read this reg that you've introduced as requiring

14   grant recipients to develop accrual data for the reports on the

15   basis of an analysis of documentation on hand.  Okay?  The

16   only -- the only accrual data or documentation I've seen to

17   support the 270s is the invoices she attached.  And that's all

18   I'm seeing now.  That's what I've seen.  I haven't seen

19   anything else at trial; I haven't seen anything else since

20   trial.  That's an observation.  You can do with it what you

21   will, counsel, both of you.

22             Mr. Aframe, your witness.

23                        CROSS-EXAMINATION

24   BY MR. AFRAME:

25        Q.   So let me pick up on the -- just where we left off.

1        So, Ms. Brown, as I understand your testimony today,

2   you were aware -- from having read your interpretation of the

3   USDA regulation, you were aware from shortly after meeting with

4   Ms. Anne Getchell that you should use -- you would use accrual

5   accounting for the SF 270s and, in fact, you did?

6        A.    That's correct.

7        Q.    Okay.  So let me go to Deposition Exhibit G, page

8   45.

9        This is your lawyer questioning you.  This is

10  Mr. Lange, in the middle of the page:  What did you understand

11  the instruction to be telling you about how you were supposed

12  to complete the SF 270?

13       For 11a -- and that's outlays, right, Ms. Brown?

14       A.    Mr. Aframe, can you blow that up part up so I can --

15       Q.    I cannot, no.

16       A.    Oh, okay.

17       Q.    Perhaps the clerk can.

18       THE COURT:  Clerk Uhrin can do it.

19       CLERK UHRIN:  Can you point me in the right

20  direction where you would like blown up?

21       MR. AFRAME:  The bottom answer.

22       THE WITNESS:  Line 14, please.

23       THE COURT:  Line 14?

24       MR. AFRAME:  Line 14, yes.

25       Q.    And so it says:  For 11a, which is what we're

1    talking about, I understood for requests, and I understand the

2    SF 270 to be the requests.  So for requests prepared on a cash

3    basis as our accounting method was cash outlays and then you

4    read a definition, right?

5         A.   Right.  This was --

6         Q.   That's the definition of cash accounting, right?

7         A.   Right.

8         Q.   From the 270, right?

9         A.   This was my understanding on June 28th, 2011, I

10   believe before I read the regulations, but I don't remember

11   exactly.  And our institute accounting method was cash.

12        Q.   Okay.  So your testimony today is that that

13   testimony was only limited to what you understood after the

14   meeting with Anne Getchell?

15        A.   To the best of my remembrance nine years ago, yes.

16        Q.   Okay.  And then you went through the rest of your

17   testimony, which is -- I'm not going to guess how many pages --

18   and you never told us that you actually filled it out using

19   accrual?

20        A.   I did not mention that I filled it out using

21   accrual.  I described the process that I used, similar to what

22   I had said to the judge a little while ago about day one to day

23   30, put it in the form, et cetera.  That's in a -- that is an

24   accrual process.  I did not use the word accrual because my

25   attorneys didn't understand it and I certainly didn't think

1    that the jury was going to understand it.

2         Q.    But you -- okay.  But you knew the word accrual at

3    the time of the trial, right?

4         A.    Yes, I did.

5         Q.    And you testified at length about deferred

6    compensation, right?

7         A.    That's correct.

8         Q.    And you pointed the jury and everybody in that

9    courtroom to the instructions on the SF 270, right?

10        A.    That's correct.

11        Q.    And the word accrual is right there, right?

12        A.    That's correct.

13        Q.    And you didn't tell anybody about it, right?

14        A.    That's correct.  For very --

15        Q.    Thank you.

16        A.    -- good reasons.

17        Q.    Thank you.

18              Can I bring up government -- sorry, Deposition

19    Exhibit T.

20              So you spoke a lot today about what you said in

21    the -- your pleadings to this court in your 2255 in 2018, but

22    as you said, that's very far removed from the actual events.

23    This letter's 2012, right?

24        A.    No, it is not.

25        Q.    What is it?

1      A.    It is 2013.

2      Q.    Okay.

3      A.    If you look at the attachments of that letter that

4  were removed from this letter, you will see that it was

5  actually January 22nd, 2013 that I wrote this letter.

6      Q.    All right.  I accept that.  I'm sure that's a typo

7  in the letter and this long after --

8      A.    It was my fault.  It was my typo.

9      Q.    I had forgotten that fact.  I probably knew it at

10  one time.

11          All right.  So looking at this letter, this letter

12  is in response to Mr. Robinson asking questions about the

13  administration of the grant, correct?

14      A.    That's correct.

15      Q.    And, in fact, he asked you to bring information,

16  checks, et cetera, that would support that you had made

17  payments to the contractors, right?  That was in the letter?

18      A.    I don't have his letter in front of me, so I don't

19  want to --

20      Q.    Okay.

21      A.    -- say what he asked for --

22      Q.    Okay.

23      A.    -- without looking at that letter.

24      Q.    Okay.  In any event, in response to his letter, you

25  wrote this letter when you came to meet with him?

1      A.    At the behest of my attorney or at the advice of my

2   attorney, yes, or the institute's attorney, I should say.

3      Q.    And he manages this grant program, right?

4      A.    No, he doesn't manage the grant program.  Anne

5   Getchell manages the grant program.  He manages the --

6      Q.    He supervises the people who manage the grant

7   program, correct?

8      A.    He does supervise the people that manage the grant

9   program, I believe in New Hampshire and in Vermont and perhaps

10  other states.

11     Q.    Okay.  And so he -- when you went to meet with him,

12  this is the letter you provided.  And I'd ask that the clerk

13  pull up the one, two, three -- fourth paragraph.

14           And this letter relates only to the second grant

15  because that's the one at the time Mr. Robinson was

16  questioning, right?

17     A.    That's correct.

18     Q.    And it says:  As the entire disbursement of both

19  federal funds and matching dollars was to compensate myself and

20  Julie Moran.

21           She's one of the contractors, right?

22     A.    That's one of the contractors, yes.

23     Q.    We both volunteered to accept the funds into the

24  payroll account, but then to immediately automatically return

25  them to the institute to support their mission.  The funds were

1    to be rereleased back to us at the time as NHIAF improved its

2    cash position through continuous fundraising and/or NHIAF farm

3    profits.

4            Correct?

5        A.    That is what it says.

6        Q.    Now, at that time, according to your testimony, you

7    were already aware of your defense that you'd filled out the

8    SF 270 correctly because you were using accrual accounting.

9        A.    That's correct.  It was after --

10       Q.    You did not have --

11       A.    -- I had read the regulations.

12       Q.    Because you had read them long ago at this point?

13       A.    That's correct.

14       Q.    This is the second grant.  The first grant was

15    already finished, correct?

16       A.    Yes, that's correct.

17       Q.    And so in that paragraph or those couple sentences

18    where you're explaining what you did, you don't say, hey,

19    Mr. Robinson, I was doing accrual accounting as required on the

20    back of the SF 270, do you?

21       A.    No, I do not.

22       Q.    And he's not a juror who has no understanding of any

23    of this, is he?

24       A.    I have no idea what he understands because I don't

25    know him very well at all.  I've met him once.

1    Q.   But, you know he's an official -- a high enough

2   official at the Department of Agriculture to be calling you in

3   to question you.

4    A.   Yes, but I don't know what -- I don't know how that

5   translates to skills or understanding of concepts.

6    Q.   Well, you just told me he supervises the people that

7   run the grant.

8    A.   Yes, but that doesn't mean he knows terms that they

9   use in their day-to-day operations.

10    Q.   Okay.

11    A.   I don't know what he knows.

12    Q.   That's fine.  You don't know what he knows.

13         But you chose not to tell the USDA official back in

14   2013 why what you did was proper?

15    A.   I explained what I did.  I was not defending myself

16   or anything.  I -- well, actually, I was sort of defending

17   myself when you read the letter further, but I was explaining

18   how the accounting went in the process.  In terms of where

19   the -- how the money flowed into the institute from the USDA

20   disbursement is what I was explaining in that paragraph.  And

21   it did not mean that I actually gave Julie Moran money and then

22   asked for it back, like what you said to First Circuit.

23    Q.   I don't know what my First Circuit brief has to do

24   with this, but I guess what I'm asking you is am I right to say

25   that you do not mention accrual accounting in that paragraph.

1    Yes or no?

2         A.    Yes, I do not mention that.  I did answer that

3    question for you no, and it's no.  I did not mention that.

4         Q.    Okay.  And your testimony is Anne Getchell told you

5    to check off cash back in that initial meeting?

6         A.    She prefilled the form with cash --

7         Q.    Okay.

8         A.    -- and told me to leave it as cash.

9         Q.    Okay.  That's different.  That wasn't what you said

10   to Ms. Brown.  Now you're saying she told you to leave it?

11        A.    What I said at trial was that the cash box was

12   prefilled.  If you pull up my testimony, that's exactly what I

13   said and that's exactly what I mean to say now.

14        Q.    That is what you said.

15              And when you went to fill it out on your own, you

16   had concluded, based on your reading of the regulations, that

17   that was inaccurate or incorrect?

18        A.    That's correct.  I -- I realized that she was

19   mistaken.

20        Q.    But you did not go to her and say, Ms. Getchell, I

21   think this is a mistake, I'm supposed to report in this other

22   way?

23        A.    I did not go back to her.  No, I did not.

24        Q.    Okay.  And -- now, you complained about the -- one

25   of the complaints I think at least that your lawyer put forward

1    is that this whole -- that the whole opening statement was --

2    was ineffective because hard work and good intentions wasn't --

3    wasn't a good defense; is that right?  Do I understand that

4    right?

5         A.    It was the wrong defense.

6         Q.    Okay.  Now, you acknowledge, I think, because I

7    think you say it many times in your testimony, that you

8    understood from the beginning that the purpose of this grant

9    was to pay people, right?

10        A.    That was the purpose of the grant and that was my

11   intention and that's what I testified to.

12        Q.    And you never did pay them, right?

13        A.    I did not pay them.

14        Q.    Right.  And you had an excuse for that, right, which

15   was at least a part -- a couple of excuses, but one of them was

16   I -- the storm Irene came and decimated your business; isn't

17   that right?

18        A.    I -- I choose to use the word reasons instead of

19   excuses, Mr. Aframe.

20        Q.    Okay.  That's fair.  Whatever.

21              Did -- was Tropical Storm Irene a significant part

22   of the defense that that frustrated your ability to pay these

23   people?

24        A.    My defense was that I hadn't made false statements

25   that I had said I paid these people.  What happened with Irene

1    and whether they were eventually paid or not paid is not the

2    issue, in my opinion.

3         Q.    Thank you for your opinion.

4               My question is -- was -- did you present to the jury

5    that you understood this grant was to pay people.

6         A.    Yes.  And I told you that --

7         Q.    Yes or no?

8         A.    -- at the trial.  Yes.

9         Q.    And did, in fact, you not pay them?

10        A.    I did not pay them.  And I have been consistent with

11   that from day one.

12        Q.    And did you offer a reason to the jury for your

13   inability to pay despite your initial intention?

14        A.    Yes.

15        Q.    And was that the trouble caused by Tropical Storm

16   Irene?

17        A.    Yes.

18        Q.    And so it was -- the idea of hard work and good

19   intentions did incorporate that aspect of your defense, did it

20   not?  You had good intentions, but things got in the way.

21        A.    I had good intentions.  I worked hard.  But my

22   defense was that I hadn't made the statements in question or

23   the interpretation of SF 270 was incorrect on the part of the

24   government.

25        Q.    Okay.  And so in his closing argument, Mr. Lange

1    says this:  It's pretty clear, if you look at the instructions

2    on the back -- and then he goes on.  He then reads the outlays

3    definition and then he says:  She's sophisticated -- referring

4    to you -- she reads the 1941, she reads these regulations, and

5    she understands outlays, not just cash to be paid, but

6    obligations incurred.  She incurred obligations and she didn't

7    pay those people.  No question about it.  But that does not

8    mean this was false at the time she applied.  She, Wilma, and

9    Julie agreed to defer their compensation.

10          Ms. Brown, that is your argument, isn't it?

11    A.    That was Mr. Lange's argument.  Those were his

12    closing statements.  But the beginning of the trial was hard

13    work and good intentions and that changed when I took the

14    stand.

15    Q.    Well, this is something the lawyers can argue,

16    what's a good way to go about a strategy or whether it's

17    reasonable, so I'll leave that there.  I just want to remind

18    the Court that good intentions was a theme of the trial.  So

19    I'll move on.

20          So I want to turn to one other part of your

21    testimony, which I think is AA, page --

22          THE COURT:  When you -- Mr. Aframe, when you say

23    good intentions was a -- was a theme of the trial, I mean, I do

24    remember that in the closing and stuff and I think maybe even

25    in the opening, but I just want to make sure we're on the same

1    page.

2                    MR. AFRAME:  Yeah.

3                    THE COURT:  I viewed good intentions as the

4    defendant's intention to pay these contractors at some point.

5    In other words, she intended to make good on these obligations.

6                    MR. AFRAME:  Right.

7                    THE COURT:  Okay.

8                    MR. AFRAME:  She waited -- right.  And so the -- my

9    point is -- I know that we've both sort of inserted arguments,

10   but I guess that's helpful in some way.

11                   But my point is that if she acknowledges she's going

12   to pay people but doesn't, right, you have to kind of -- just

13   giving a very technical explanation to the jury very well may

14   not be satisfying and in an opening statement you very well may

15   want to say this woman suffered because circumstances beyond

16   her control changed.  That -- and that did come up in the

17   trial.  That was part of the trial.

18                   THE COURT:  Yup.

19                   MR. AFRAME:  So if we could look at page, sorry, 64

20   of the -- yeah.

21                   So if we could blow up the memo again a little

22   further.  I'm sorry, Tracy.  Down to the bottom of that big

23   answer in the middle.  Right.

24       Q.    So at this point of the trial you're actually

25   talking to me and I asked you for what in-kind means.  And

1    you -- you go on to say it's fair market value, you give a

2    definition, and then you say:  So that value gets calculated

3    into the reimbursement.

4           And then at the bottom you said:  What the

5    contractors were delivering -- and myself, for example,

6    included -- was third-party in-kind because we didn't receive

7    dollars in return.  We deferred our compensation.

8           Right?

9    A.    Correct.  Yes, I said that.

10    Q.    So am I wrong to say, based on reading that last

11    paragraph, seems to me that you are equating in-kind with

12    deferred compensation.

13    A.    That's right.  That was my understanding.  And,

14    actually, from the reading of in-kind -- third-party in-kind

15    services from the regulation, I still believe that barter, that

16    donations, also the deferred compensation, fall under that

17    in-kind umbrella.

18           Now, I may be incorrect, but that is how I read it

19    and that is how I still read it --

20    Q.    And --

21    A.    -- to this day.

22    Q.    And that's how you testified at trial?

23    A.    Yes.  It's consistent.

24    Q.    And that is -- and so there is your argument, right?

25    These -- I wrote these on the form as in-kind on the SF 270 and

1    that's because I deferred the compensation.  Right?

2         A.    Well, there were some things that were paid like

3    Damon Meeh's salary, which I don't remember if he was paid

4    before or after we put in the SF 270.

5         Q.    Okay.  This is a contractor.  He's an employee.

6    Let's stay focused.

7         A.    Okay.

8         Q.    Ms. Moran and Ms. Yowell are the contractors, right?

9         A.    Right.

10        Q.    The -- the indictment mentions them, right?

11        A.    Right.

12        Q.    And what it's saying here is the SF 270 is mentioned

13   in the prior paragraph and then it's saying third-party in-kind

14   is what I was doing because they deferred their compensation.

15        A.    Right, exactly.

16        Q.    Okay.  And so you said that and then in closing

17   argument, Mr. Lange said, she didn't lie, she declared

18   obligations incurred, and that was acceptable.  Right?

19        A.    Are you asking me a question?

20        Q.    Yeah.  I just read to you your argument here, which

21   is -- or what you said.  And I'm asking you does Mr. Lange's

22   closing argument reflect that.

23        A.    Could you read his closing argument again so that I

24   can consider this and answer properly?

25              THE COURT:  You've just got to answer the question.

 1            MR. AFRAME:  That's okay.  I don't need to do that.

 2   I'll withdraw the question.

 3            THE WITNESS:  I'm sorry.  I --

 4            THE COURT:  Well --

 5            THE WITNESS:  I didn't understand.

 6            THE COURT:  I do want to keep -- I'm going to ask

 7   Deputy Clerk Uhrin to keep an eye on this provision because I

 8   do want to ask Ms. Layne a question about this concept here.

 9   Not right now.

10            Go ahead, Mr. Aframe.

11       Q.   Now, before the trial, you send on January 3rd --

12   and I don't know what exhibit this is.  You send a -- you --

13   you provided an email that was sent to Chase McNiss and copied

14   to Bjorn Lange, right?

15       A.   It was sent to everyone, I believe.  I don't

16   remember -- I would have sent it to --

17       Q.   You're right.

18       A.   -- to Bjorn and copied Chase.

19       Q.   And Ms. Graham.  And I'm --

20       A.   And Ms. Graham, yes.

21            MR. AFRAME:  Donna, I can't find the exhibit list.

22   Do you have what that one is?

23            MS. BROWN:  Which one are you looking for?

24            MR. AFRAME:  January 3rd email.

25            THE COURT:  That's the -- yeah.

1              MS. BROWN:  It is the last one.  It is GG.  GG.

2              THE COURT:  GG, yeah.

3              MR. AFRAME:  Okay.  GG.  Sorry about that.

4         Q.   And so looking -- now, this is January 3rd, 2017,

5    and the testimony we just looked at was January 25th, 2017.

6              So on January 23rd, 2017, you say:  My understanding

7    of outlay was the actual work, third-party in-kind, not the

8    funds expended.

9         A.   I -- I did not say that on January 23rd.

10        Q.   No, you said that on January 3rd.

11        A.   Right.

12        Q.   And then on January 25th you said what I read a

13   second ago, which was in-kind meant deferred compensation.

14        A.   Correct.  I was implying that in the January 3rd

15   email --

16        Q.   Right.

17        A.   -- because I had already discussed it in the

18   November email.

19        Q.   And then in the next sentence you say:  The SF 270

20   was filled out to the best of my knowledge and in accordance

21   with the grant conditions.

22        A.   That's correct.

23        Q.   And the -- the only phrase I see there -- I see two

24   phrases from the SF 270 in that prior sentence, outlay and

25   in-kind.  Do you see other -- those are the key terms, right?

1    You're defining outlay as the actual work which you define as

2    third-party in-kind, right?

3        A.    In that particular email, yes.

4        Q.    Yes.

5        A.    And not the actual cash that went out.

6        Q.    Right.

7        A.    That's what I meant by that, not the funds expended.

8        Q.    Right, as you distinguish from, with capital

9    letters, not the funds expended.

10        A.    Right.

11        Q.    Right.  Okay.  And before that, on the January --

12    sorry, November, what, 16th email -- so my only question is

13    this.  Does that mention accrual anywhere?

14        A.    To my recollection, no, it does not.

15        Q.    Okay.  You checked the box -- so you already

16    acknowledged you checked the box cash on every single form,

17    right?

18        A.    I left the box cash on every single form.

19        Q.    So when you -- did you not -- I guess that

20    difference --  when you say prefilled, how did you pull these

21    up?  I guess I never understood that.  Your testimony is that

22    these were already -- that part was already filled in?

23        A.    Yes.  What Anne Getchell did was she gave me a

24    form.  She gave me the -- the sample form that she filled in,

25    then she gave me a blank form that had cash already filled in.

1           Then when I did the claims, instead of just

2    hand-writing them out, I went into a fillable PDF and pulled it

3    up.  And it was -- I can't remember whether it was prefilled

4    cash or not, but I made sure that it -- that the heading was

5    consistent with what she had asked me to do.

6        Q.    Okay.

7              THE COURT:  So you're saying that if it wasn't

8    prefilled, prepopulated on the form, you checked off cash to be

9    consistent with her instructions.

10             THE WITNESS:  That's right.

11             THE COURT:  Okay.

12       Q.    Choosing never to tell her that you think her

13   instructions are in conflict with the regulations of the grant

14   that you are then acting upon?

15       A.    I did not tell her that.  I had no idea it was

16   relevant.

17       Q.    And so since -- it appears to me that you argued

18   deferred compensation, Mr. Lange made that in the closing, and

19   you never mentioned the word accrual and it doesn't appear in

20   any of these documents.  Can you just explain to me, because I

21   guess I don't understand it, what is it you -- what is it you

22   wish your lawyers had done?

23       A.    What I wish my lawyers had done was understood the

24   regulations and that I was really stuck in a bad position of

25   being told by a grant administrator who was supposed to have

```
 1    been trained and up on the regs what I was supposed to do; that
 2    that was wrong and that I did the -- actually, the right thing
 3    and followed that correct process and that the values of the
 4    numbers that I put in that form were not cash that left the
 5    bank account at NH -- or I wasn't representing that that was
 6    cash that left the bank account of NHIAF and went to these
 7    people; that it was expenses incurred.
 8             Q.    And so when you --
 9             A.    That's what I wish they understood.
10             Q.    And so when that grant administrator's boss called
11    you into the office to challenge you about what you did, you
12    didn't -- you did not tell him at that time that you had gotten
13    inaccurate advice from his subordinate.  That's your testimony?
14             A.    That is my testimony.  She was there at that
15    meeting, Anne Getchell was.  So, yes --
16             Q.    And did you not bring it up?
17             A.    -- I did not -- I did not bring it up, no.
18                   MR. AFRAME:  No further questions.
19                   THE COURT:  Redirect, Ms. Brown.
20                   MS. BROWN:  Just a couple of things.
21                        REDIRECT EXAMINATION
22    BY MS. BROWN:
23             Q.    Suzanne, when you went to meet with the grant
24    administrator in the office, the thing that Attorney Aframe
25    just talked to you about, did you understand that the person
```

98

1   you were meeting with was a colleague of Anne Getchell?

2         A.    A colleague?

3         Q.    They worked together.

4         A.    They worked both at USDA.  Yes, I knew that they

5   both worked at USDA.

6         Q.    And so they worked for the same company?

7         A.    They worked for the same federal agency, yes.

8               THE COURT:  Is that -- did you have any assumptions

9   about who was higher in the chain of command?

10              THE WITNESS:  I knew that Mr. Robinson had some sort

11  of administrative responsibilities.  I did not know exactly

12  what his area of expertise was.  I knew that he was some sort

13  of regional coordinator, but I didn't know anything beyond

14  that, really, about him.

15        Q.    Okay.  And I just have one other question.

16              Attorney Aframe asked you about a statement that

17  Attorney Lange made in closing.  And I think that is at CC.

18  It's Document 45.  Let me double-check with the Court.

19              Yes, it is.  So it's CC, which is the closing

20  arguments.  And, specifically, Attorney Aframe asked you about

21  statements made at page 100 and 101.  And I'm not going to pull

22  it up, but I'm just going to read it to you real quick.

23        A.    Okay.

24        Q.    Attorney Lange said:  She's sophisticated.  She

25  reads the 1941.

1          The 1941 he's referring to, was that an exhibit at

2   trial?

3       A.   It was 1942.  I believe he was mistaken.  And that

4   was not an exhibit at trial.  That's what I wished had been an

5   exhibit at trial.  At the time I thought it was an exhibit at

6   trial.

7          So that -- does that answer your question?

8       Q.   So assuming he's talking about the 1942, which is,

9   in this hearing, Exhibit C, he's -- he is talking about

10   regulations that the jury didn't get to see, correct?

11       A.   That's correct.  They did not get to see the

12   regulations at all.

13       Q.   And in that same closing remarks, Attorney Lange

14   said:  She understands outlays not just to be cash pay but

15   obligations incurred.

16          Was there any expert testimony that backed up

17   that -- your understanding as he argued it at closing?

18       A.   Well, the definition of outlays is in OMB A-110, so

19   I believe that an expert would be able to draw that definition

20   out and put it right in front of the jury.

21       Q.   Okay.  And OMB 110, which is Exhibit E for this

22   hearing, that wasn't introduced by your lawyers either, was it?

23       A.   That was not introduced, no.

24       Q.   Okay.  So this argument that the government is

25   making that you -- you had your chance with this and this is --

1    you're basically looking for a do-over, is that what -- is that

2    the case?  Are you looking for a do-over with the same argument

3    or do you want to present the evidence in a different way?

4         A.    I would like to present the proper defense

5    consistently and the evidence in a different way with the

6    support of an expert and with the support of the regulations.

7    All I'm asking for is a fair trial.

8              MS. BROWN:  Okay.  I have nothing further.

9              THE COURT:  Okay.  Mr. -- yeah, Mr. Aframe, do you

10   have anything else?

11             MR. AFRAME:  No, your Honor.

12             THE COURT:  That last -- the deposition testimony --

13   I'll just ask you, Ms. Brown, and I'll -- to see if I need to

14   revisit this with Ms. Layne.

15             The deposition testimony where the prosecutor was

16   asking your client about basically -- basically conflating or

17   confusing or maybe illogically connecting the idea of deferred

18   payment with in-kind, all right?  Now, your client was clear.

19   She said, in my mind, it was the same thing.  I understand

20   that.  That was her testimony about her understanding.

21             But are you maintaining today that in-kind

22   contribution in the way it was described in that line of

23   questioning is the same thing as accrual accounting or even --

24   I don't even think it's related, but I -- I need to understand

25   your position.

1          MS. BROWN:  Yeah.  So the starting point of our

2    position, we're not saying that Suzanne Brown at trial got

3    every point and definition spot on and -- you know.  And what

4    we're saying is she did a better job than Suzanne -- than Anne

5    Getchell and -- but that she -- I mean, the definition -- the

6    whole point that we keep coming back to is did she make a false

7    statement, did she have a good faith belief that she was

8    telling the truth; not whether she was right, not whether she

9    got all the regs correct, not whether, you know, her

10   interpretation is spot on, but did she have a good faith belief

11   that what she was reporting was true or obviously whether it's

12   false.  It's the correct definition.

13          And what we're saying is that she had a good faith

14   belief it was true because she relied on these regulations.

15   We're not saying she got every single one of them right, but

16   there's enough evidence there that backs up the fact that she

17   had a good faith belief that the way she was reporting these

18   things was -- you know, was consistent with the regulations.

19   She may have got some of them wrong.  She may not, you know,

20   have done everything perfectly.  But it is consistent with her

21   not being guilty of making a false statement.

22          THE COURT:  Okay.  But I tried to ask your client --

23   and I tried to ask, I think, your expert, I can't remember now,

24   to be honest -- some questions about in-kind because in-kind

25   makes no sense to me unless it's an in-kind contribution or

1    in-kind expenditure in some way by your client or by the

2    grantee, by the institute.

3              Work performed, goods and services provided by the

4    contractors, makes no sense in terms of this reporting to the

5    in-kind.  And that's what I keep trying to drill down on.  I --

6    and that's not a confusion or a conflation.  All right?

7    Everything the grantor -- everything -- I'm sorry.  Everything

8    that the contractor employees do is not monetary.  They're not

9    paying.  They're getting paid.

10             So the idea that they're doing something in-kind and

11   she's asking -- and your client is asking for reimbursement for

12   that doesn't make sense to me.  I keep trying to ask this.

13             MS. BROWN:  Well, yeah.  It's our argument that the

14   OMB -- I think it was at page 10, I'm trying to find if I've

15   got a copy of it here on my direct -- is that that is at least

16   a good faith basis to believe -- let me just pull it up so I

17   can read directly through it.

18             THE COURT:  Just direct me to the exhibit.  I'll

19   look at it.

20             MS. BROWN:  Yeah, I just -- I just -- so that's --

21   E.  So page --

22             THE COURT:  An in-kind -- an in-kind --

23             MS. BROWN:  So the definition, third -- so this is

24   on KK, on page 10:  Third-party in-kind contributions means the

25   value of noncash contributions -- so things that, you know,

1    they haven't given money -- provided by nonfederal third

2    parties.  The third-party in-kind contributions may be in the

3    form of real property, equipment and other expendable property

4    and the value of goods and services.

5               So her good faith belief here is that this provision

6    allowed her to report as in-kind contribution services that

7    were given by some of these third parties.

8               THE COURT:  But what -- but the third parties are

9    the contractors and employees.  What would distinguish their

10   contributions from their work?  They -- they're not giving her

11   money.  They're giving her work, goods and services.  They're

12   not giving her money.

13              So the idea -- to interpret that as -- to interpret

14   that as I'm asking for more money to give them -- to give to

15   the grantor employees doesn't make sense in this whole thing.

16   Well, then --

17              MS. BROWN:  The money -- yeah, the money doesn't go

18   to them.  The money goes into the organization and that was

19   what Ms. Layne was explaining before with the 10,000 and the

20   2,000 and the --

21              THE COURT:  If it's not going to them, why would it

22   be included in their invoice that she created?  Because it's

23   their -- because -- I think your answer is it's their

24   third-party in-kind contribution.  I think I get that.

25              But you're requesting with these grant -- you're

1    requesting with these reimbursement requests money to pay them,

2    not to put in your pocket.  That's not -- that doesn't make

3    sense.  I don't mean your pocket like she personally took the

4    money.  I don't mean to suggest that.

5         But, anyway, we're going to go round and round on

6    this --

7         MS. BROWN:  And, as I said, I think our expert --

8    the question isn't who's right here; the question is would an

9    expert have supported our client's testimony.  That's the only

10   issue here, not who's right.  It's whether the testimony of the

11   expert would have supported a defense in this case and --

12        THE COURT:  And your testimony, Ms. Layne, your

13   testimony today under oath here, is that this grant recipient

14   reporting work done by these third parties, that requesting --

15   I guess I need to know from you as an expert accountant how

16   would -- how would a good faith person distinguish their work

17   from something else they contributed that would require a

18   reimbursement request from the grantor.  I can't imagine how

19   that makes any sense.

20        MS. LAYNE:  Sure.  And I apologize if this hasn't

21   been clear in the testimony.

22        But the in-kind contributions -- so services that

23   are performed by somebody who is a third-party, you know, using

24   the same example, the 2,000 and 10,000.  That $8,000, based on

25   the regulations, cannot be included in the reimbursement

1    portion.  It is only included on the SF 270 to show the

2    matching portion that the company has provided and they are

3    allowed to show that because that is services they would

4    otherwise be paying for.

5              So they can't include it in the reimbursement side

6    saying I need to get reimbursed for this, but they can say I

7    need to get reimbursed for the $2,000 and this $8,000 goes

8    towards my matching contribution to this grant.

9              THE COURT:  But you understand she requested and

10   received the extra 8,000.  That's the evidence in this case.

11   You understand that, right?

12             MS. LAYNE:  I am understanding that now and I am

13   also understanding where Ms. Brown was incorrect in her

14   assumption that deferred compensation would also be an in-kind

15   contribution.

16             THE COURT:  Yeah.  Okay.  So you've answered my

17   other question, too.  Those are not equivalent concepts at all.

18   Okay.

19             MS. LAYNE:  They are not.

20             THE COURT:  Okay.  All right.  I don't want to

21   prolong this, but since I asked a few questions, I do want to

22   give counsel a chance to follow up, both of you, if you want

23   to, on my last line of questions because I'm satisfied now that

24   I understand it.

25             MS. BROWN:  I don't have any additional questions,

1    your Honor.

2                    CONTINUED RECROSS-EXAMINATION

3    BY MR. AFRAME:

4        Q.    Ms. Layne, there's nothing that says you're supposed

5    to report the matching on the SF 270, right?

6        A.    You are -- the matching was reported on the SF 270

7    and that is something that is usually required so that the

8    granting agency --

9        Q.    Can you point to anything that says put the matching

10   on the form?

11       A.    I'd have to review the form again.

12       Q.    All right.  But the -- but the actual letter of

13   intent -- the letter of conditions says the point of the SF 270

14   is to get reimbursement, submit for reimbursement, right?

15       A.    That's correct.

16       Q.    And so she took reimbursement for the whole

17   enchilada, right, in-kind and the actual dollars valued.

18   Right?

19       A.    I believe that's been established, yes.

20       Q.    And she did that by putting it all on the

21   SF 270, right?

22       A.    Yes.

23       Q.    And you can't point me to anything that says put

24   that extra nonreimbursable stuff on the form that's being used

25   for reimbursement, can you?

1    A.    Not right now I can't.

2         MR. AFRAME:  All right.  Thank you.

3         THE COURT:  I'm looking at -- I'm looking at

4    Exhibit I then, which are the 270s.  All right?  And I'm asking

5    Attorney Brown -- I don't know, do you have the exhibits,

6    Ms. Layne?

7         MS. BROWN:  I have them on my computer, so I can

8    pull them up here.  So --

9         THE COURT:  I'm asking Ms. Layne.

10        MS. LAYNE:  I don't have them handy.

11        THE COURT:  All right.  Because counsel --

12        CLERK UHRIN:  This is Tracy.  I'm still here.  I can

13   pull up something if you'd like.

14        THE COURT:  I'm just wondering if there's anything

15   that would suggest -- anything that would suggest that the 270s

16   were used to request matching funds.  I don't even think the

17   defendant testified to that, by the way, at all, for what it's

18   worth, but since we're all sitting here, it's -- it -- to get

19   to the truth, I think it's important to understand this.

20        MS. LAYNE:  My recollection of what was --

21        THE COURT:  Because my understanding of what's being

22   advanced here is that what she was saying was that she was

23   seeking reimbursement for deferred compensation she would

24   eventually pay, not matching funds.

25        Go ahead, Ms. Layne.

1          MS. LAYNE:  Regarding the matching, it's my

2    understanding, based on the sample SF 270 that was provided to

3    Ms. Brown, which I don't have the exhibit number in front of me

4    and I apologize for that, that in that example, Ms. Getchell

5    provided instruction that the matching funds should be reported

6    on the SF 270.

7          As to whether that is required for all

8    SF 270s, I haven't performed that research and cannot testify

9    to that at this time.

10          THE COURT:  Okay.

11          MR. AFRAME:  Can I pull up Exhibit M, page 5 of the

12    document?

13     Q.    So 14 talks about the use of the SF 270 and it says

14    in the middle of 14:  The request for reimbursement will be

15    submitted to the agency using the standard form SF 270.

16    Adequate documentation will be required to show expenditures.

17          And your testimony is she's not -- she's not able to

18    get reimbursement for the donated services, right?

19     A.    That's correct.

20     Q.    She's only able to get reimbursement for the

21    deferred compensation, which I take it you mean is the amount

22    the contractors actually billed her for?

23     A.    That's correct.

24     Q.    But what she did instead, right, is she submitted

25    an invoice under their names, combined it all together on this

1    SF 270 form as a request for reimbursement?

2         A.    And it's my understanding, based on Ms. Brown's

3    testimony today, that she believed that was the right thing to

4    do.

5         Q.    Okay.  But your answer to me was yes?

6         A.    Yes.

7         Q.    And then she got all the money from the USDA for

8    both the part that she said she would pay to them later and the

9    part that she says was donated?

10        A.    My understanding -- my understanding is that the

11   USDA provided payment for what was included on the forms, yes.

12              MR. AFRAME:  Okay.

13              THE COURT:  But your earlier explanation about

14   how -- about how in-kind contributions might be reported --

15   might be -- in-kind contributions might be reported but not be

16   the subject for a request for reimbursement, that's not what --

17   that's not what we're looking at here, right?  That's not what

18   these 270s did, right?  Or -- at least that I can tell.  Can

19   you see anything different?

20              THE WITNESS:  So what I noticed on the sample SF 270

21   which was provided by Ms. Getchell to Ms. Brown and was

22   reflected on the subsequent SF 270s is that two columns of the

23   form were completed, one that showed the reimbursement portion

24   of the grant that was being requested and one that showed the

25   matching portion of the grant that was being reported.

1          So, in that instance, all of the in-kind should have

2    been -- should have -- if Ms. Getchell was requiring this to be

3    included -- should have been included in the matching column,

4    not in the reimbursement column.

5          THE COURT:  And have you seen any evidence that that

6    was the case?

7          THE WITNESS:  I have not done a thorough -- you

8    know, I looked at the SF 270s, but I did not tie them to all

9    the supporting documentation.

10          THE COURT:  Thank you.

11          Attorney Brown, can you direct me to any evidence

12    that that is the case, that in-kind was reported as not for

13    reimbursement but for matching?

14          MS. BROWN:  My answer is similar to Attorney

15    Layne's.  I can't say it exists or doesn't exist, your Honor.

16          THE COURT:  Okay.  I'll have to figure it out for

17    myself.

18          MR. AFRAME:  My opinion is it doesn't exist.  So ...

19          THE COURT:  Now, let me say this.  All right?

20          Well, I guess I'll hear argument to the extent you

21    want to make it.  We're going to finish this.

22          It's -- it's your motion, Attorney Brown, so I'm

23    listening.

24          MS. BROWN:  I guess I'm going to start by saying the

25    Court doesn't even need to get down into the weeds of defining

1   in-kind and deferred and accrual.

2           Under *Dugas vs. Coplan*, which I cite copiously in my

3   motion, you don't even need to go there because -- the facts in

4   that case, briefly, defendant -- it was an arson case.  Trial

5   counsel decided to go with a he-wasn't-there defense or

6   it-wasn't-him defense, I think, and decided to forgo consulting

7   with an expert.  In the postconviction motions, the expert

8   said, oh, I would have said it wasn't even an arson.

9           THE COURT:  That was the Ray Raimo case with Peter

10  Dugas?

11          MS. BROWN:  It is, your Honor.  And --

12          THE COURT:  Isn't that a state -- isn't that a state

13  of New Hampshire case?

14          MS. BROWN:  It is a First Circuit Court of Appeals

15  case at --

16          THE COURT:  Oh.

17          MS. BROWN:  -- 148 F.3d 317.

18          The state's case said no ineffective; went --

19          THE COURT:  Oh.

20          MS. BROWN:  -- went to the -- it went to the

21  District Court.  I think it was Judge DiClerico.  He said it

22  was ineffective, but not prejudice -- there was no prejudice.

23  And then it went up to the First Circuit and they said

24  ineffective and prejudicial.

25          MR. AFRAME:  Worked on by a very eager young law

1    clerk named Seth Aframe for months and months and months.

2              MS. BROWN:  You lost?  That's why I brought it up,

3    because you lost.  No, anyway, it's very relevant.

4              THE COURT:  That's interesting.  Because I grew up

5    with Peter Dugas, who burned down his parents' grocery store,

6    so I know that whole story.  But go ahead.

7              MS. BROWN:  Oh, I'm not going to get into the -- the

8    fact -- the reason I bring up that much of the facts is he went

9    with one defense and then got an expert.  And the -- and the

10   First Circuit reversed, saying, well, he could have gone with

11   this totally different defense if he'd consulted with an

12   expert.

13             And I say that because the -- the gist of the

14   government's argument in Ms. Brown's case is, well, she -- she

15   rode her horse, her horse was this, and she didn't mention

16   accrual, so, you know, too bad, she doesn't get a do-over.  And

17   I think that's really what *Dugas vs. Coplan* said; yeah, they

18   get a do-over because if they'd consulted with an expert, the

19   expert might have given him a better defense.

20             And what's really key here -- you know, is this is

21   where the government's case -- the government's arguments

22   completely fall apart.  Their whole case is she didn't say

23   accrual, she didn't do this, she didn't do that.  She might not

24   even have had to testify if there had been an expert in this

25   case.  The -- the attorneys could have consulted with an

1  expert, put the expert up there to say that, you know, this --

2  this is -- you know, that this is -- there's a method called

3  accrual accounting and -- and the government's witnesses were

4  wrong.  And that hasn't been focused at all at this hearing

5  this afternoon.

6        You know, put aside what Suzanne Brown thought.  Put

7  aside accrual accounting.  Put it all over there.  If the

8  attorneys had consulted with an expert, it would undermine the

9  critical witnesses in this case.

10        You know, if they -- if Suzanne never testified and

11  they called Anne Layne and Anne Layne said, for lack of a

12  better word, Anne Getchell didn't know what she was talking

13  about, not only did she not know what she was talking about,

14  she gave bad advice to this grantee or the grantee

15  administrator in this case.

16        So now you've got --

17        THE COURT:  Question, though.  Question, though.

18  Because that's a -- it's a good argument, but weren't you

19  really -- if you're going to show that, if you're going to show

20  prejudice in an ineffective assistance claim like this, don't

21  you need to show me what Getchell or what that superior would

22  have said about this?  Because Getchell -- you know, there's no

23  guarantee.  Getchell would have said -- she might have said, we

24  always do this with cash and the superior who called her to the

25  carpet might have said the same thing.  I mean, to show

1    prejudice, don't you have to show that this new theory you want

2    the expert to support actually has legs, or am I supposed to

3    guess about that?

4          MS. BROWN:  No.  And, in fact, that didn't happen in

5    the *Dugas vs. Coplan* case.  So in the postconviction hearing in

6    the *Dugas v. Coplan* case, the only witness, as I understood it,

7    was the new arson expert -- well, the only arson expert for the

8    defense.  There was no arson expert in the first case.

9          So they bring in this arson expert in the

10   postconviction and the arson expert says, I could have

11   undermined that; I could have said this expert was wrong on

12   this, I could have said this testimony was wrong.

13         So the only -- the only evidence they presented

14   postconviction was their expert, their new expert, and that

15   expert talked about how they would have undermined the

16   credibility of -- in that case, it was the state's case because

17   it was a state case -- of how they could have undermined.  And

18   that was enough.

19         Right there -- you know, just the fact that in this

20   case Anne Layne would have undermined the credibility of Anne

21   Getchell, right there under *Dugas v. Coplan*, that's the end of

22   the inquiry; she gets a new trial.  Because if -- that was the

23   case with Getchell, a little bit Redmond but not too much, not

24   anything that really affects these issues, and that was the

25   case.

1            And if the jury had heard that Getchell didn't know

2    what she was talking about and that Getchell gave bad advice on

3    how to fill out the forms, that was enough to call into

4    question the legitimacy of the conviction in this case.

5            But we have more than that in this case.

6            And the other problem I have with -- we have with

7    the government's argument, they seem to be inconsistent because

8    on one side they're arguing, well, she never raised accrual; if

9    this was accrual accounting, she never said the words and she

10   never raised it.

11           But she's already presented this defense.  Like how

12   can both of those be true?  They can't be true.  Either she got

13   to present it, she got her day in court, her lawyer argued it

14   in closing as Attorney Aframe just -- you know, we referred to

15   Attorney Bjorn Lange's closing, or she just sat there quietly

16   and never mentioned anything about it.  In reality, it was a

17   combination of both.

18           As I said before a few minutes ago, we're not

19   claiming she got everything right, but we are claiming she had

20   a good faith belief that what -- how she was filling out these

21   forms was correct and that good faith belief would have been

22   backed up by Exhibit C, Exhibit E, and pulling -- putting them

23   into evidence, you know, regardless of anything else, just

24   making them exhibits and showing the jury.

25           And the -- the quotation that Attorney Aframe

1   brought up a few minutes ago I think proves our -- our motion.

2   And that was -- I think it's CC on here, which was the closing

3   arguments.  And he read to her and I read it back to her:

4   She's sophisticated.  She reads the 1941.

5           So this shows a lot.  So this is a change from the

6   opening, which is like good intentions, you know, she tried.

7   This is she's sophisticated.  She -- now he's shifting to, you

8   know, maybe she's smarter than Anne Getchell, which is good;

9   that's where Ms. Brown wanted him to be.  She reads 41.

10          So he's realizing, or at least is trying to say what

11  Suzanne said, that this 1940 -- it's actually 1942, which is

12  Exhibit 3 -- is important here to show that she reads these

13  regulations and understands them.

14          And he's -- but he doesn't put it into evidence,

15  he's not pulling it up in front of the jury in closing

16  arguments, he's not doing what we did in this hearing, to say,

17  look at what this says, and that her argument that she

18  understands the regulations to mean outlays and not just cash

19  pay.  That's good that he got there by the end of the trial,

20  but there's zero to back that up except Ms. Brown's testimony.

21  No expert, no exhibits.

22          And what's -- what's really key here is that in

23  this -- and what I really encourage you to -- you know, we've

24  all pored through Suzanne's testimony and I -- I recommend it

25  for one reason.  You will see that she gets grilled about,

well, are you calling Anne Getchell a liar, are you saying Anne

Getchell was untruthful when she said that, are you saying Anne

Getchell is wrong?  Repeatedly the government goes after

Suzanne and tries to make her as a sort of outlier out there

who -- who is contrary to all the other government witnesses.

And now we know she knew more than them.

As I said, I'm not saying she got everything right,

but she got a lot more right than Anne Getchell did.  And --

and so she would have had that backup, she would have had an

expert to explain this.

And also, too, this whole issue with the phony

invoices and the markups, that doesn't apply to all the

indictments.  It only applies to part of the indictments.  Not

every indictment alleges these, like, phony invoices.  I think

it's 4 through whatever, 12, but it's not all of them.  And so

that's a problem for the government here as well is that issue

in terms of the -- again, they called them the phony invoices.

But Suzanne --

THE COURT:  But wait.  Why is it a problem?

MS. BROWN:  Let me pull -- I have the --

THE COURT:  No, just -- no, just tell me why it's a

problem that it's --

MS. BROWN:  Well, it's a problem that they're saying

that -- well, regardless of whether she understood this to be

accrual accounting, there's also these phony invoices where the

1    invoices submitted are higher than the amount that was billed

2    for.

3              So that's part of their prejudice argument.  And

4    we're saying that, first of all, she could have explained that,

5    that at least she read these regulations and she understood

6    those regulations.  And we feel that it's not prejudicial

7    because it didn't go to all of the charges, it wasn't charged

8    that way in terms of the jury instructions to the jury.  So I

9    think that's a problem, too.

10             But as I said, just under *Dugas* -- the other thing I

11   want to mention about *Dugas*, too, which is an interesting fact,

12   is *Dugas* had given some inconsistent testimony, like he had

13   said one thing to the police and then later on he said

14   something different.  And the state in that case tried to argue

15   that as, you know, to get past the prejudice prong, like, oh,

16   he gave inconsistent statements, so, you know, you don't even

17   need to get to this whole whether it was arson or not because

18   that's enough to get us over, you know, the prejudice hump.

19             And the First Circuit said no.  The First Circuit

20   said like even though there's these inconsistent statements by

21   the defendant which would, you know, presumably go towards

22   guilt, that still -- he still gets a new trial.  He still

23   gets -- and he gets to have a new trial with maybe even a new

24   defense.

25             But even if -- if -- if it was the same defense --

1    so there's this one argument like, oh, she doesn't get to have

2    a new defense now.  Like, yes, she does, if she's got an expert

3    to back it up, and she gets to have a new trial if the expert

4    undermined the government's witnesses.  But she also gets to

5    get a new trial if she did present the same defense, but not

6    without the benefit of the exhibits and the witness -- and the

7    expert witness.

8              There's lots of cases out there where people went to

9    trial on a defense and didn't have an expert and they got to go

10   redo the whole defense all over again, but with an expert this

11   time.  And that's what we're saying.

12             And so all --

13             THE COURT:  That seems to me like a recipe for two

14   trials for every defendant.  I mean, that -- the idea that I'll

15   go take my shot without my expert because -- by the way, don't

16   get me wrong, and I'll say this to -- I'll say this to the

17   defendant.  I -- an expert might have been a good idea.  No

18   question about that.  I can't argue that at all.  But -- but it

19   seems to me that this is -- what you're describing is -- it's a

20   recipe for take your shot, if it doesn't work out, you got a

21   good look at the trial evidence, you do it again with an

22   expert.  I mean, that seems dubious to me.

23             MS. BROWN:  I'll disagree, your Honor.  And I'm not

24   going to call Suzanne back to the stand, but if I were to ask

25   her, like, hey, how about the plan is you kind of go to trial

1    and then maybe lose, then you go up to the First Circuit and

2    then you, you know, have to argue bail and then you have to,

3    you know --

4              THE COURT:  Yeah.

5              MS. BROWN:  -- not be able to get employment because

6    you've got this case hanging over your head for four years,

7    I -- I don't think that's such a great idea.  I wouldn't advise

8    it to a client.

9              And so I don't -- I don't -- I don't see that.  And

10   the issue here is, you know, she was lucky she had good bail

11   facts in terms of being released for -- you know, you're saying

12   like every defendant could, you know, let's try it this way and

13   do it a different way.  You know, for many people, most people,

14   that would mean sitting in jail for a long time.  So that's not

15   a great idea either.

16             But most important, consulting with an expert is not

17   a tactical -- it's a -- it's a win-win because there's no loss

18   to that situation because you go consult with an expert and

19   you're like, oh, that wasn't so helpful, have a nice life,

20   here's your money.  And that could happen.

21             And so there's -- it -- there's no downside.  It's

22   not like, you know, if there was evidence that a lawyer didn't

23   object to, you know, say it's an ineffectiveness claim and the

24   lawyer didn't object to something and the lawyer could come in

25   and say, you know, I actually thought it helped; yeah, it was

1   hearsay, but I kind of thought it was helpful to us.  That's a

2   tactical decision and, you know, most of the time the lawyer

3   would come in and say, yeah, that was a tactical decision,

4   that's why I didn't object and I could have objected.

5           Here there's no -- you know, there's no loss.

6   Obviously she was -- had court-appointed attorneys, but they

7   could have applied to the court for money.  They could have,

8   you know, asked the court to, you know, say, hey, she's saying

9   there's these accounting methods and we need to speak with an

10  accountant.  They would have got the money.  So there's no

11  tactical reason not to present an expert in this case.

12          You know, I understand in some cases like, hey,

13  let's try this defense and then if we get a new trial, we'll

14  try a different defense --

15          THE COURT:  But I don't -- I mean, I don't want to

16  cut you off.  I don't think Mr. Aframe is arguing that that was

17  a tactical -- have you, that not hiring a tactical decision was

18  part or a strategic -- is that part of your argument?

19          MR. AFRAME:  I mean, from the beginning my argument

20  has been centered on prejudice and even --

21          THE COURT:  Can I -- Ms. Brown, you -- you don't

22  have to persuade me that hiring an expert was a good idea.

23          MS. BROWN:  Okay.

24          THE COURT:  It would have been.  But I don't think

25  you need to spend time on whether it's strategic or tactical.

 1          MS. BROWN:  Okay.  Great.  I just -- I just -- I

 2    just wanted to point that out because, as I said, I don't think

 3    there was any benefit to Ms. Brown of not -- of her lawyers not

 4    doing that.

 5          And I will address the prejudice because that is --

 6    and I think that argument is also addressed in *Dugas v. Coplan*

 7    in terms of, you know, the -- there was a central witness in

 8    the case.  In that case, it was the arson expert; in this case,

 9    it's Anne Getchell.  And that witness's credibility could have

10    been undermined.  And when you undermine a government's central

11    witness, you undermine their whole case.  And I mean, it's sort

12    of a *Kyles v. Whitley* argument that when there's -- which -- I

13    mean, that's a *Brady* case, but it's still that argument of if

14    you find some problem with the government's case and someone's

15    misrepresented something, that can infect the whole case.

16          But that's -- I think the prejudice -- I've already

17    stated that the prejudice is that it would have undermined the

18    witness -- the government's key witness, it would have backed

19    up Suzanne's story, and it would have -- you know, having

20    that -- well, and having the exhibits in there, I think that

21    the combination of those things -- and, you know, we -- we

22    don't know why the attorneys didn't put them in.

23          The other thing I really suggest to the Court in

24    rereading the transcripts is to ask why -- the attorneys made

25    attempts at C and E, which is the -- the RBEG 1942 is C and the

1   OMB A-110 is E.  They made attempts to get them in through

2   Getchell and it failed because Getchell couldn't lay the

3   foundation because she didn't know them herself.  And if they

4   had -- but they didn't try to get them in through Suzanne.

5         And our argument as to why that is is I don't -- I

6   don't think they understood them enough to lay the foundation

7   as to why they were relevant, but they are mentioned throughout

8   the trial, especially Exhibit C.

9         Suzanne mentions it in her trial -- in her testimony

10  as backing up what she's saying at trial.  Attorney Lange

11  mentions it in his closing.  There was some vague understanding

12  that this Exhibit C was important, but the attorneys were not

13  able to articulate it.  And so that, you know, it -- that part

14  of the ineffectiveness is really key.

15        And as I said before, this is not like -- we don't

16  have to decide what really happened.  We don't have to decide

17  all of these definitions.  Our expert would have said that --

18  you know, what she was saying is somewhat consistent with the

19  regulations.  Maybe she didn't get every term right, maybe she

20  misunderstood some things, but that's not the -- the standard

21  for a false report or false statement is not whether it's true

22  or not.  The standard is whether the person made it knowing

23  that it wasn't true.

24        THE COURT:  Yeah.

25        MS. BROWN:  And there's certainly evidence here that

1    she had a good faith belief for making the statements in

2    question that are alleged to be false.

3              I just -- there was one other thing I want to

4    mention.

5              I also -- and at Suzanne's testimony, it's Exhibit

6    AA, at 62, she's confronted by Attorney Aframe about the

7    definition of reimbursement.  And this is also addressed in the

8    expert report as well.

9              And Attorney Aframe says:  My understanding of

10   reimbursement is someone lays money out and says, I've laid it

11   out and in turn asks for it back; is that your understanding of

12   the word?  And Suzanne Brown says no.

13             So she is trying to communicate at the trial that

14   she doesn't read the reporting requirements the same way Anne

15   Getchell and the government do.  And she expressed that, but

16   not as well as she could, especially if her lawyers understood

17   it, submitted the exhibits, and called an expert.

18             And that's, I think, my statements.  Thank you.

19             THE COURT:  Counsel?  Go ahead, Mr. Aframe.

20             MR. AFRAME:  So Suzanne Brown knew that this grant

21   was to pay people.  She submitted letters to the USDA saying

22   she had put aside however many thousands of dollars was

23   necessary to pay the matching.  Then she fills out, month after

24   month, SF 270s where she checks off cash, then -- cash

25   accounting, puts in both what the contractors say they're owed

1   plus a whole bunch more, then makes up these invoices or

2   whatever, she creates these invoices and puts signatures of

3   other people on them, submits them to the USDA, takes back all

4   the money, gets all the money, then says, I'm not going to pay

5   these people back because I've determined that they have

6   defamed me somehow.  And then when called out about it, gives

7   the excuse -- gives reason that she gives.

8           And the government's position was she went into this

9   to never to -- not to pay these people, even though she was

10  supposed to and she took all the money and that was the case.

11          Now, the -- the claim is that what we should have

12  had was this expert who would have cast a different light on

13  the testimony that Suzanne put forward by arguing that even

14  though Suzanne checked cash in every box, testified at trial

15  she used cash accounting, and made these -- you know, using the

16  SF 270s for reasons that it doesn't say you're supposed to that

17  the expert would have said something super important that would

18  have changed everything.  And what that super important thing

19  is, I guess, is that the 1942 regulation required accrual

20  accounting.

21          And that is the core of Anne Layne's testimony.  I

22  asked her that.  She agreed with me.  That is the core of what

23  she would have said.

24          So how important was that?  Well, what is Anne's --

25  Ms. Layne's reason for that?  Well, it's the sentence that says

1  financial reporting will be on an accrual basis, which is

2  within the grant.

3           And then I pointed out to her the reporting

4  requirements as set forth in the regulations, as set forth in

5  the letter of conditions, the two USDA documents.  And I said

6  to her, do those mention the SF 270?  And she said no.

7           So that's what would have happened at trial.  She

8  would have said that; I would have crossed her.  That's the big

9  moment that Ms. Brown is talking about.  And that would have --

10 Ms. Layne's testimony contradicts what Suzanne said she did,

11 what Anne Getchell told her to do, what she checked off on the

12 form.  And so the way that was supposed to be helpful is

13 because it was supposed to be -- there was this other way that

14 she needed to have done it that she didn't do.  Now, I just

15 don't think that that would have been particularly helpful.

16          So the Court's right.  The question isn't -- you

17 know, I mean, you can always consult with an expert.  The

18 question is would it have made a difference in this trial,

19 which is why we put Ms. Layne on.  And the question is did

20 anything she said about accrual accounting make it so that this

21 Court believes that the jury wasn't presented with the

22 question, the question being did she go into this to take the

23 money or was this some kind of either mistake, goodwill,

24 technically correct.  And I don't think Ms. Layne's testimony

25 has added much, if anything, to that -- actually nothing to

1    that calculation -- to that -- to that inquiry.

2            And that's why I don't -- I think this case was

3    fairly presented to the jury.  I do think the defenses made

4    sense because Suzanne Brown had a lot of things to answer for.

5    And so to say that -- and so technical correctness and she's a

6    good person together made sense.  And to have, you know,

7    Ms. Layne come in and say what she would have said -- I mean,

8    if the Court thinks that that's super persuasive, then I guess

9    that's what the Court thinks.  But I don't.  I really don't.  I

10   think that the cross-examination of this would have been --

11   make it so that it's just so inconsistent with everything else

12   that Suzanne was saying.

13           And Suzanne never said all the things she told you

14   today; oh, I knew this from the beginning.  And I think I

15   established this wasn't what she thought from the beginning.

16   She would have told it to Mr. Robinson.  She didn't.  And so

17   this really would have been a whole bunch of nothing.

18           This was -- contrary to what Ms. Brown said, this

19   was a fair trial.  This was a fair conviction.  And I know

20   Ms. Brown doesn't agree with it, but that doesn't mean we do it

21   again.

22           THE COURT:  Okay.

23           MS. BROWN:  Can I just address something very

24   briefly?

25           THE COURT:  Yeah.

1          MS. BROWN:  Attorney Aframe just said the core of

2     Ms. Layne's testimony, if she had testified, was that Exhibit C

3     required accrual accounting.  I disagree with that.

4          Ms. Layne would have testified that the government's

5     key witness gave incorrect advice as to filling out federal

6     forms.  Ms. Layne would have testified that federal grant

7     regulations, as all of us now know, are extremely confusing,

8     complicated, and many times counterintuitive to the terms that

9     are used in filling out those forms.  Those are things that

10    Ms. Layne would have said in addition to what she said about

11    corroborating Ms. Brown's testimony.

12         And those are as important, if not more important --

13    and I think that's why the government keeps wanting to go back

14    to focusing on Suzanne's testimony, ignoring the fact she may

15    not even have had to testify; that if she had an expert, she

16    could have just put the expert on and the expert could have

17    said that they gave bad advice.

18         THE COURT:  I mean, that's where I have to -- I have

19    to question you about this again, Ms. Brown.  You keep saying

20    that.  You're right that it's not just that the reg required

21    accrual reporting.  You're right.  It's that Getchell gave her

22    the form, gave her bad advice on how to fill out the form.  But

23    that's what Anna Layne says.  All right?  We don't know -- we

24    don't know that Getchell was wrong.  We don't know that

25    Getchell thinks she was wrong.  We don't know that Robinson

1  thinks Getchell was wrong.  We don't know any of that.  And

2  that was all within your ability to prove.

3          I mean, did you ask them?  Did you -- have you gone

4  to them?  I -- I don't know what they would say.  I know what

5  your expert would say and now I guess I know, because

6  Mr. Aframe just told me, how he would cross the witness, but

7  the idea that that's going to lead to acquittal, I don't know,

8  I think you need to make a showing about that.

9          And I -- but I'm going to look at it.  I'm going to

10 look at two things very closely; that issue, sort of what your

11 burden is to show prejudice, because I don't think that the

12 fact that you have an expert that could have undermined

13 Getchell's position is dispositive.

14          MS. BROWN:  Well, it was in *Dugas v. Coplan*, your

15 Honor.

16          THE COURT:  Well, did you cite *Dugas v. Coplan* in

17 any of your briefing?

18          MS. BROWN:  I am pretty sure I did, but --

19          MR. AFRAME:  It's in something.

20          THE COURT:  It's in something?  It's probably in --

21 but that -- well, that's -- actually, that's the other thing I

22 wanted to say, though, Ms. Brown, because that's an important

23 issue is the expert -- like if you're right about that, and I'm

24 going to look very closely at that, that this was just a case

25 that required an expert, I think that's powerful.  I do.  And

1    I'm going to look at it closely.

2              But I -- I think -- and I actually think that what

3    you're arguing about Getchell giving what you call bad advice,

4    that might also be powerful.  I just don't know if you've

5    really shown it.  You've shown that based on an interpretation

6    of the regs and the applicable law and requirements by a good

7    faith accountant who knows her business that there's an

8    argument that -- but, I mean, Anne Getchell might walk in here

9    and say, look, I've done -- I've done -- you name it; I've done

10   55 grants and they've all been done in cash; I've never heard

11   anyone say it should be done by accrual despite what the regs

12   said.

13             And I don't think a jury would have -- I don't

14   think a jury would have been particularly moved by a sort of

15   attenuated interpretation that would have substantiated

16   Ms. Brown's own testimony that she was actually using accrual

17   although, again, that was not her testimony.  Her testimony at

18   trial was that she was using cash.

19             MS. BROWN:  Except her lawyer closed on a version of

20   accrual.

21             THE COURT:  No, yeah.  Look --

22             MR. AFRAME:  That -- that's inaccurate.  It's the

23   exact version of in-kind that she gave.  She said cash,

24   in-kind; I meant by that deferred compensation.

25             THE COURT:  Deferred compensation.  And I do --

1    while I do not -- at least from my rudimentary and I admit

2    flawed understanding of accounting -- I did not equate in-kind

3    contributions with accrual in any way, but I do see a

4    relationship with deferred compensation and accrual accounting

5    because it's -- one's based on the interpretation and one's

6    incurred on expending funds.

7                Yes, what?

8                MR. AFRAME:  So, Judge, I've only read the

9    transcript of this about a thousand times.  What I believe the

10   connection was was for right now they're donating it or giving

11   it to me until I choose to pay them later, so right now it's

12   in-kind.  That is what I -- when you read her testimony, that's

13   how I see a linking.  Whether that --

14               THE COURT:  Yeah.

15               MR. AFRAME:  So right now --

16               MS. BROWN:  That -- but that's the point I'm trying

17   to argue.  She may have been wrong about that --

18               MR. AFRAME:  Right.

19               MS. BROWN:  -- but it still would have been a

20   defense.  You know, that's -- that's what I'm trying to say.

21               Like I'm not even sure I understand all of this,

22   your Honor, and -- and to say that unless she can now prove to

23   you that everything she said was a hundred percent right --

24               THE COURT:  No, no.  You know I'm not saying that.

25   I'm not saying that.

1          MS. BROWN:  Well, I think the state is.  They're

2    saying that, oh, well, the expert wouldn't have perfectly

3    matched.

4          THE COURT:  Yeah.

5          MS. BROWN:  I think you have -- yeah.

6          THE COURT:  The question, of course, is not that she

7    said everything right.  The question is whether you've got

8    prejudice, whether if this had gone differently, there's a

9    likelihood of an acquittal.

10          And I'll -- look, I promise you, I'm looking very

11    closely at this.  All right?  Especially the *Dugas* issue.  I

12    think it's an important point.  It's an important point.  And

13    if -- if *Dugas* stands for the proposition that in this case it

14    was ineffective assistance not to hire an expert, she's going

15    to get a new trial.  But if it doesn't, she'll probably have to

16    wait to get the new trial from a higher court.

17          But I'll look at it because it's -- it's important.

18    And -- but I'm really -- I -- I've got to be honest.  I -- I

19    am skeptical of the idea.  I am skeptical of the idea because

20    I -- I do look at this defense, the way I remember it, of both

21    the defendant and her lawyers telling the jury this is a person

22    who was asking for reimbursement based on money she owed, an

23    obligation, that, without saying these words, had accrued.  And

24    that seemed to be consistent with her messaging to her

25    attorneys.

1          The question is -- this expert's an important

2    question and I'll take it under advisement and I'll look at it

3    closely.

4          Okay.  Now, we've gone a little bit late here on a

5    Friday.  I apologize for that, but I just wanted to give you

6    all an opportunity to make all your arguments.

7          Anything else anybody wants to add before we wrap?

8          MR. AFRAME:  No, your Honor.

9          MS. BROWN:  No, thank you, your Honor.

10          THE COURT:  All right.  Thank you.  It's submitted

11    and under advisement.

12          (Proceedings concluded at 5:28 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: March 17, 2021          */s/  Liza W. Dubois*
                                   LIZA W. DUBOIS, RMR, CRR