**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6/17/21

1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW HAMPSHIRE
2

3   * * * * * * * * * * * * * * * * * *
                                      *
4   SUZANNE BROWN,                    *
                                      *
5                  Petitioner.   * No. 1:20-cv-00170-JL
                                 * February 12, 2021
6                                * 10:00 a.m.
            v.                   *
7                                *
                                 *
8   UNITED STATES OF AMERICA,    *
                                 *
9                  Respondent.   *
                                 *
10  * * * * * * * * * * * * * * * * * *

11            TRANSCRIPT OF FURTHER MOTION HEARING
12                   VIA VIDEOCONFERENCE
          BEFORE THE HONORABLE JOSEPH N. LAPLANTE
13

14
    APPEARANCES:
15

16  For the Petitioner:          Donna J. Brown, Esq.
                                  Wadleigh Starr & Peters PLLC
17

18  For the Government:          AUSA Seth R. Aframe
                                  U.S. Attorney's Office
19

20

21  Court Reporter:          Brenda K. Hancock, RMR, CRR
                             Official Court Reporter
22                           United States District Court
                             55 Pleasant Street
23                           Concord, NH 03301
                             (603) 225-1454
24

25

1                    P R O C E E D I N G S

2          THE CLERK:  Court is in session and has before it for

3    consideration a motion hearing in case number 20-cv-170-JL,

4    Suzanne Brown versus United States of America.

5          THE COURT:  Good morning, everyone.

6          MR. AFRAME:  Good morning.

7          MS. SUZANNE BROWN:  Good morning, your Honor.

8          MS. BROWN:  Good morning.

9          THE COURT:  I want to close argument on this case

10   today.  I have a few questions for you that I tried to raise

11   for you in the procedural order.  What was the document number

12   of my procedural order, by the way?

13         MS. BROWN:  13.

14         THE COURT:  13?  Thank you.  And we'll do that.  This

15   may take a little while, but we'll do it today.

16         And I want to first off just make sure I do a couple

17   of housekeeping issues.  One of them is to -- I want to make

18   sure, Ms. Brown, and I mean the defendant Ms. Brown, I want to

19   make sure you're still satisfied with your counsel in this

20   case.  Are there any reservations you have about proceeding

21   with your counsel?

22         MS. SUZANNE BROWN:  Not at all, your Honor.  She's

23   done a splendid job.  I'm very pleased.  Thank you for

24   appointing her.

25         THE COURT:  She certainly has.  Don't thank me.  I

1   don't remember if it was a random appointment or not, but don't

2   thank me, thank your counsel, because she's been very zealous

3   on your behalf, as you obviously know.  There's a reason I

4   raise it, though, and it's not because there's been any problem

5   with her performance, of course.  It's because -- I think she

6   filled you in -- before the second day of our evidentiary

7   hearing on this habeas petition she and I had an exchange that

8   was a little contentious, and I assume she filled you in about

9   that.

10          MS. SUZANNE BROWN:  She gave me all the details, yes,

11  sir.

12          THE COURT:  Thank you.  And it was unusual probably

13  for both of us.  I want to explain that to you from my

14  perspective.  I want to make sure you're comfortable.  I don't

15  know why you wouldn't be, but it's just important that we have

16  it on the record.  Before the first day of the hearing last --

17  it was in September.  Before our first day of hearing I had the

18  court contact your counsel and ask her what witnesses she would

19  present, and she said the expert, Ms. Layne.  We inquired if

20  there would be anybody else.  She said, No.  But before the

21  second day she notified the Court -- we asked again, and she

22  notified the Court that you'd be testifying, and I was a little

23  impatient about that, it's true, and I expressed that to her,

24  and we had a hearing, a conversation before the hearing about

25  it with all counsel, and then I asked about how much time it

1    would take, and she estimated about 40 or 45 minutes.  I got a

2    little more impatient, and in expressing myself your counsel

3    said -- she expressed that she felt like she was under attack,

4    and she explained herself.  I disagreed, but it was something

5    we did discuss.  I gave her a chance to make sure that you

6    still wanted to proceed.  She met with you, and she informed

7    the Court that, yes, you wanted to proceed.  And she and I

8    actually spoke after that, just the two of us, because, look,

9    it's important to me that counsel in the court don't feel as if

10   they're under attack, obviously.  They have jobs to advocate

11   for their clients.  I just didn't want -- I wanted to make sure

12   she was comfortable proceeding before me, frankly.  We talked

13   about that, she and I, and she said there was no problem

14   proceeding.

15           I just wanted to make sure you felt the same way.  You

16   don't have any reservations with respect to counsel, you just

17   told me.  Do you have any reservations about proceeding before

18   this court?

19           MS. SUZANNE BROWN:  I have no reservations, and I

20   appreciate that you've been transparent about the whole thing,

21   your Honor.

22           THE COURT:  All right.  That's fine.  Ms. Brown --

23   Attorney Brown, was there anything you wanted to add to that

24   record I just made?

25           MS. BROWN:  No, thank you, your Honor.

1          THE COURT:  Okay, good.  The second issue is just a

2     question before we proceed through some of these issues.  Are

3     there any of the issues, Attorney Brown, that you're not

4     pressing in this habeas petition at this point?

5          MS. BROWN:  Well, now I'm a little hesitant, based on

6     the history you just recounted, because I do recall that in

7     your motion you said to notify the Court.  I was preparing for

8     this last night, I think probably up till about 9:00, and I

9     think I got where you were going on something, but the light

10    bulb didn't go off till last night, and I spoke with Suzanne

11    about that before this hearing.

12         So, let me explain.  As to I think Claim C, which is

13    at the top of page 4 of your order --

14         THE COURT:  That is where I was going.  That is where

15    I was going.  You said you thought you knew where I was going.

16    That is where I was going.

17         MS. BROWN:  Okay, good.  And especially the light bulb

18    went off as I was reading the First Circuit's case, and, you

19    know, long story short, they're right, that either the jury's

20    question demanded a clarification of law, which in that case

21    then it would have been up to the lawyers to make that call as

22    to the clarification of law; to the extent the clarification

23    was as to a fact and that fact wasn't in evidence, it would not

24    have been permissible for you to give the jury facts that had

25    not been presented in the case.  And I totally agree with that.

1   And, in fact, I remember thinking that the first time I read

2   that exchange, and Suzanne and I spoke about this this morning,

3   what I wasn't sure about was, and I think this is where the

4   Court was going, because obviously the Court knows that you

5   can't give a jury instruction with no facts.  What I was

6   thinking the Court was thinking that maybe I was missing

7   something is that maybe there was a Federal rule that could

8   have been -- okay -- but I agree with the First Circuit's

9   analysis that the question either called for law, and that

10   would have been up to the attorneys to give.

11          Suzanne and I did discuss about, you know, whether

12   they could have given -- directed the jury's attention to a

13   particular exhibit.  I don't think that's proper, though I've

14   tried to do that myself on some occasions, but usually the

15   Court doesn't -- the Court will say, You've got the evidence,

16   and do with it what you will.

17          THE COURT:  When counsel agree to it, I do it, sure --

18          MS. BROWN:  Yeah.

19          THE COURT:  -- if both sides, but usually not

20   otherwise.

21          MS. BROWN:  Yeah.  So, I agree with the First

22   Circuit's assessment of that.  I still do think the question is

23   relevant, because one of the things that -- and I think this is

24   where we're going to spend most of our time today, is the

25   prejudice prong of Strickland, and there are cases out there

1    that will look at, you know, if the jury was out for five

2    minutes or five days, did the jury ask a question about

3    something that was at issue, and I think the fact that the jury

4    asked a question about the fact -- about a definition of a term

5    that was used as part of the government's case against Suzanne,

6    I do think that's relevant.  I don't think in and of itself it

7    establishes prejudice, but I think it's part of a bigger

8    picture.  I know I've done this research in other cases where

9    the jurors were given a dynamite charge and the courts

10    considered that in terms of whether there was prejudice, or, on

11    the other hand, if the jury came back with a ten-minute verdict

12    that would go towards like, hey, it's kind of a strong case.

13    So, I think it's relevant for that, but that's more information

14    than you asked.  So, I do withdraw that claim.  I think the

15    First Circuit's right on that.  I think the evidence is

16    relevant, but in terms of the actual error itself as a

17    free-standing error, I agree with the First Circuit.

18             THE COURT:  All right.  So, your claim of ineffective

19    assistance that I've labeled C, the jury question, is no longer

20    part of the case?

21             MS. BROWN:  Right.

22             THE COURT:  Okay.  I was focused on the Circuit

23    opinion.  I was also focused on Anne Layne's testimony about

24    it, because she talked a lot about the concept of in-kind

25    really only having an application to cash accounting and in

1   this case only having an application to matching funds.  So, I

2   just thought it was really not really a big part of the case

3   anymore, and I thought we talked about that.

4            MS. BROWN:  I totally agree, and I think it kind of

5   got an outsized --

6            THE COURT:  Yeah.

7            MS. BROWN:  In light of all the evidence we have now,

8   it's a very small part of our argument.  I totally agree with

9   that.

10           THE COURT:  Okay.  So, C's out.  That's it as far

11  as -- that's all I was expecting.

12           MS. BROWN:  Yes.

13           THE COURT:  Okay.  All right, then.  I'm going to let

14  you each argue for a few minutes.  Why don't I give you each 15

15  minutes.  If it turns out you didn't cover what you wanted to

16  cover, I'll let you emphasize what you want to emphasize.  I

17  may interrupt you sometimes and ask questions, and we'll take

18  it from there.

19           It's your petition, Attorney Brown.  Do you want to go

20  first?

21           MS. BROWN:  I do want to go first as long as I can

22  have maybe, at most, five minutes for a rebuttal.

23           THE COURT:  Oh, sure.

24           MS. BROWN:  Oh, okay, okay.  Then, definitely.  I

25  wanted to start with, Judge, your questions in order, because I

1    think the first three or four, they're important, but obviously

2    the last question regarding both prejudice and the cumulative

3    impact of the error is most important, and I'll get to that

4    after I address the other questions.

5         The first is to the applicable standard.  Obviously,

6    as you just stated, we bear the burden, as I understand it,

7    that it's by a preponderance of the evidence.  While we are

8    talking about the burden, I do want to mention that I don't

9    believe we have to prove that if we had had this evidence it

10   would have resulted in an acquittal and all 12 jurors would

11   have found not guilty.  I understand the standard under

12   Strickland as whether it rendered the result unreliable or the

13   result of the proceedings would have been different.  That

14   second quote's actually from the Dugas v. Coplan, First Circuit

15   case.  And as I just mentioned, part of this analysis as

16   mentioned in Dugas v. Coplan is the strength or lack thereof of

17   the government's case in, obviously, stronger cases of

18   overwhelming evidence in order to get to that burden than cases

19   that were more of a close call.  It's our position that this

20   was a close call.  We've answered the second question, and I

21   think the third question was the one we just discussed

22   regarding in-kind services.

23        And so, that brings us to the fourth.  The thing I

24   wanted to start talking about that is not just what evidence

25   was presented at the hearing and in our pleadings but what

1    wasn't presented.  The government did not call an expert at the

2    hearing to refute our expert's claim.  Also, the government did

3    not recall any of its witnesses.  Again, we have the burden,

4    but it's significant that our expert was not refuted by any

5    other expert testimony.  The government did call witnesses at

6    trial, but my recollection is that none of them were qualified

7    as expert witnesses.  And specifically, as our expert, Anne

8    Layne, testified, not only did she find several specific errors

9    that she could cite to, she felt that several of the government

10   witnesses just didn't understand both grant law and accounting,

11   so it was a very global lack of understanding of this that

12   these witnesses made numerous errors.  But, again, at the

13   hearing the government did not call -- recall any of these

14   witnesses to give examples of how they would have rebutted Anne

15   Getchell's claims or even respond to her claims that --

16           THE COURT:  I just want to ask you straight up.

17           MS. BROWN:  Sure.

18           THE COURT:  I view that as your burden, not their

19   burden.  I mean, they were on the record at trial.  Your expert

20   disagreed with their view of the applicable grant rules I think

21   at least inferentially, maybe explicitly, but I viewed that as

22   your burden to call them.  You don't?

23           MS. BROWN:  No.  I think most of the cases you look at

24   the record, and what we're saying here is, if you look at the

25   record as it was at trial, our expert would have substantially,

1    materially, what other adjectives, impeached their key

2    witnesses, and if they were called, if we would have called

3    them at a hearing, I would expect they would have repeated that

4    testimony, saying, That's what I was taught.  That's what I

5    know.  Why would they say, Oh, yeah, you got me, I lied at the

6    whole hearing?  I didn't expect them to say that.

7            THE COURT:  I agree with you, but you're right, That's

8    what I was taught.  That's what I know.  I don't know why you

9    think a trier of fact would decide, then, that Anne Layne had

10   the correct interpretation and that people who actually

11   administer the grants had the incorrect interpretation, and I

12   think one of the ways to demonstrate that would have been to

13   confront them with Anne Layne's conclusions or your own

14   conclusions or something, but the idea that -- I agree with you

15   on saying I think they likely would have stuck by their

16   testimony, but I'm not sure why a trier of fact would take Anne

17   Layne's view over their view.  They could, certainly, but why

18   would we assume that they would?  I guess as people who

19   actually run the grants there didn't seem to be any evidence

20   that they were accustomed to anybody reporting or anybody

21   turning in SF-270s on an accrual basis.  Why would Anne Layne's

22   opinion about that have made an impact?

23           MS. BROWN:  Because she has expertise in this area.

24   Experts carry a much greater weight with jurors, and this was a

25   very confusing area of law, confusing area of expertise.  In

1   fact, the reason you call experts in most cases is when a

2   layperson's common sense is not enough, and you call an expert

3   to explain that.  And this was exactly what happened in this

4   case, that it wasn't enough, that, as we've explained, that

5   common sense not only doesn't help but gets in the way of this.

6              THE COURT:  But this wasn't common sense.  This was

7   experience.  They weren't qualified as experts under Rule 703,

8   but they were certainly viewed as people with experience.  As a

9   matter of fact, they might have been qualified as experts if

10  someone had sought to do that, but they weren't.  I'm with you.

11  But I don't know why a sort of, I don't want to say academic,

12  but -- yeah, an academic or knowledge of the law would have

13  necessarily -- you wouldn't have to prove necessarily, but

14  would even likely have trumped the experience of people who

15  say, Look, this is how we do the grants, which is what they did

16  say.  Nobody asked them about accrual, I don't think, although

17  they did repeatedly say it was cash basis.

18              Anyway, the bottom line is you've answered my

19  question.  Your position is it was at this hearing that we had

20  on this petition the government should have presented them at

21  least to explain.

22              MS. BROWN:  I'm not saying they should have presented

23  them.  I'm saying the fact that --

24              THE COURT:  They didn't.

25              MS. BROWN:  Anne Layne's testimony was unrebutted, and

1   if she had a chance to testify at trial, that -- it's not just

2   testifying; she would have helped counsel prepare to

3   cross-examine, and so that -- they did not present -- the

4   government did not present the evidence that she didn't know

5   what she was talking about, Here's something she's missing, or

6   here's some reg.

7        THE COURT:  Well, sure he did.  He cross-examined her

8   and said, which one was it, the 1942-G, which, by the way, was

9   in evidence under Government's Exhibit 3, right, at least the

10  law was, but he said to her that refers to reporting; that

11  doesn't refer to reimbursement requests.  Now, she had an

12  explanation for that, which involved a different reg applicable

13  to nonprofits.  She did.

14       But it isn't as if to say -- I didn't view her

15  testimony as unrebutted.  I viewed her testimony as pretty

16  effectively challenged.  But I think you made a good point,

17  Counsel, that Anne Layne's expertise might have been useful in

18  cross-examining Getchell and Robinson about how they view,

19  sure, but, again, that comes down to whose burden it really was

20  to present that, and I'm not sure I accept your position that,

21  you know, you just compare it to the record.

22       Frequently we call attorneys who tried the case to

23  testify in these hearings.  I mean, to evaluate prejudice I've

24  got to remember that now I've seen this testimony that would

25  have been presented, and, yes, I have, and I have to evaluate

1    it for whether it could create prejudice.  What I haven't seen

2    is how Getchell and Robinson would have reacted to being

3    confronted with these regs.  Okay.  Go ahead.

4         MS. BROWN:  I don't think we need to prove that, your

5    Honor, under Dugas v. Coplan.  Counsel did not recall all the

6    witnesses at the underlying trial to see how they would have

7    met those challenges.  And so, if the Court doesn't agree with

8    the point that -- I mean, they impeached her, they didn't rebut

9    her, and this is not whether --

10        THE COURT:  You submitted, like, a mock

11   cross-examination of Getchell.

12        MS. BROWN:  Yes.

13        THE COURT:  You imagined it.  So, that was your

14   burden, but calling the witness wasn't your burden?  Let me

15   just say it.  I think it was your burden.  I do.  And I'm not

16   suggesting, by the way, that that means you failed in your

17   showing.  I'm just saying to me that was an opportunity to

18   Show -- I would have been interested to see, frankly, what

19   Getchell and Robinson would say about that.  I think I said at

20   the hearing, by the way, I think they would tell you or any

21   cross-examiner, they'd say, Well, Anne Layne is entitled to her

22   opinion, but let me tell you how we do these grants and how

23   we've always done them, and that's the only way I've ever seen

24   them done.  And what I think I disagree with you about is that

25   a jury would have been unmoved by that, especially given the

1    fact that there was testimony from your client that she ran the

2    SF-270 forms by a cash basis.

3         Anyway, I don't mean to keep cutting you off, but when

4    you tell me it's the government's burden but you present me a

5    mock cross-examination, that's difficult for me to accept.  It

6    seems to me that presenting me a mock cross-examination is

7    meant to convey a message.  You did convey the message, but it

8    would have been just as easy to convey it in a way where we

9    could have evaluated what Anne Getchell actually would have

10   said, not what the dream cross-examination would have

11   indicated.

12        MS. BROWN:  Well, let's presume that Anne Getchell

13   says what you think she might have said, and I expected her to

14   say that, too.  I don't think we need to even call her.  Let's

15   take that presumption that she gets up there and says, This is

16   what I've been trained, this is what I've always been doing,

17   and I went through much training on that.  And, you know, just

18   like the expert in <u>Dugas</u>, of the arson expert there was

19   recalled he would have said the same thing:  I'm an arson

20   expert.  This is what I've been told.  This is what I believe.

21   This is what I did.  The First Circuit didn't say, Oh, the

22   government --the government in that case was the state -- the

23   state had an answer for this new expert?  That's not the

24   standard at all.  The standard is would it have resulted in the

25   jury having some questions.  Okay, yeah, on the one side we can

1    believe these people, they've been doing it for a while, this

2    is how they're trained.  They work for the government.  This is

3    their job.  On the other hand, we have a person with a degree

4    in accounting who has testified in numerous other cases, who

5    has worked for the government, who's been hired as a government

6    expert in numerous cases to analyze whether the proper

7    accounting methods -- so, you know, the jury would have to

8    decide which one of those two things is better.  And it's not

9    for you to decide, it's not for Attorney Aframe to decide, it

10   was for that jury to decide.  And, yeah, that would have been a

11   way to try to prop up those witnesses.

12          I was thinking of an example, as you were talking

13   about that, of in a state case if, say, you have a DWI and

14   you've got a police officer who's given the Horizontal Gaze

15   Nystagmus Test.  He's one of those quasi experts, you know, he

16   probably doesn't understand the neurology of the whole thing,

17   but he knows to do A, B, C and D, so I think that's a good

18   analogy.  But a defendant in that case could have gone ahead

19   and hired an expert who says, Okay, I'm a neurologist, and here

20   are some things this particular officer, even though he's

21   trained in Horizontal Gaze Nystagmus, here I can tell he did it

22   wrong in this case, and I'm going to testify for the defense to

23   say that, as a science, the Horizontal Gaze Nystagmus, that I'm

24   going to come in and say this person, even though he's trained

25   in it, he's done it 200 times, he did it wrong in this case,

1    and I can explain that to the jury.  I don't think it's a

2    perfect analogy, but I think that that would have been up to

3    the jury.  Do we go with the smart expert with all the letters

4    after their names, or do we go with the person who does this

5    every day and that's how they're trained?  And that would have

6    been a question for this jury to do.

7            And I really do -- I disagree, your Honor.  I think it

8    would have been pointless to call Anne Layne, because I believe

9    she would have said exactly what you just said, which is, This

10   is what I was trained, this is what I believe, this is what

11   I've done in all the other cases, and that's fine.  That

12   doesn't in any way undermine our argument that counsel should

13   have consulted with an expert and called an expert.  As I said,

14   you can assume that she would say something different from Anne

15   Layne.  That's why I didn't call her.  I assumed she would say

16   something different.

17           THE COURT:  I know, but don't you agree with me that

18   the effectiveness of that cross-examination and possibly

19   eliciting even concessions from Getchell and Robinson would

20   have been very effective, right?  I don't think it's just, I

21   really don't -- I don't know of any authority for the

22   proposition.  Your proposition is to show deficient performance

23   and prejudice.  This goes to prejudice, right?

24           MS. BROWN:  Okay.

25           THE COURT:  So, your point is, and I think I

1      understand it, based on what I've heard that's reasonable

2      doubt, or at least a pretty good chance of it, and that's your

3      way, in effect, of showing of prejudice.

4               MS. BROWN:  Correct, your Honor, and where I was going

5      with this is that -- when I was going back and looking at the

6      First Circuit, what I was actually first looking at last night

7      was their sufficiency analysis, and when you look at that, I

8      think it's on page 599 through 601, or something like that, and

9      the whole case is Anne Getchell, Anne Getchell said this, Anne

10     Getchell said that, Anne Getchell said this, and Anne Getchell

11     could have come to this hearing and said everything that she

12     said at the hearing and not given me one single concession, and

13     we are still entitled to a new trial.  There's a type of

14     cross-examination style, and I've engaged in it many times,

15     where the witness's answer just doesn't matter, that you expect

16     them to say, Yeah, or, No, you're wrong, you're wrong, but

17     you're still making the point that they didn't understand

18     things.  And I put this in my motion, that there are some

19     inconsistencies in her statement.  They weren't enough to get a

20     not guilty in the first trial, but that combined with an expert

21     saying she didn't know what she was talking about would have

22     been enough to make a difference.  I'm not going to take on a

23     burden higher than I need to here, but it would definitely have

24     made a difference.

25               And I just want to repeat quickly what the First

1    Circuit said the government's case was based on, said that the

2    testimony of Getchell, it was Getchell who gave a definition of

3    outline -- of outlays, that she explained this term to Brown,

4    Ms. Getchell explained this term to Brown, and that again,

5    quoting from the First Circuit, that she was explaining to

6    Brown that reporting things that had not been paid, that was

7    contrary to her understanding, at least in Getchell's

8    understanding.  The government also contended that there was

9    enough evidence because, quote, Brown falsely represented that

10   Moran and Yowell already had been paid for their work in

11   another way.  So, again, it was all the interpretation of these

12   forms.  Getchell's testimony was that she went through the

13   letter line by line and that she explained to Brown that funds

14   that were actually spent for the purposes outlined were what

15   were going to be reimbursed.  The whole First Circuit

16   opinion --

17          THE COURT:  Attorney Brown, we lost your client.

18          MS. BROWN:  Oh, yes.  Let me see if she's trying to

19   call me here.  No.

20          I would not be surprised if she didn't have the best

21   internet connection.

22          THE COURT:  I will let you decide if you would like to

23   wait for her or continue or take a short break and let her

24   rejoin.

25          MS. BROWN:  Let me just get a real quick call.  Oh, I

1    just saw a text message.  If you give me half a second, I'll

2    read it.

3              THE COURT:  Sure.

4              MS. BROWN:  She just says she's trying to reconnect

5    right now.

6              THE COURT:  All right.  I'll let you decide if you

7    want to wait for her.

8              MS. BROWN:  I'll wait for a couple of minutes.  I

9    don't think it will be that long.  She says she's connecting

10   right now.

11             THE CLERK:  Yeah, I've been watching for her to

12   reconnect.

13                            (Pause)

14             MS. BROWN:  Jadean or the Judge, I have my client on

15   the phone.  She's fine with listening in by being on my cell

16   phone.

17             THE CLERK:  Okay.

18             MS. BROWN:  I'm going to put my phone up next to my

19   computer.  Hopefully, it doesn't cause any feedback.

20             THE COURT:  Sure.

21             MS. BROWN:  But, Suzanne, if you can just -- if I put

22   you right here now, Jadean, can you just talk just to see if

23   Suzanne can hear it?

24             THE CLERK:  Is that working for you, Ms. Brown?

25             MS. SUZANNE BROWN:  You're very faint, Jadean, and I

1   apologize for dropping off the internet.

2           THE CLERK:  The internet is what it is.

3           MS. BROWN:  We'll try to keep our voice up.  I'll put

4   it over here.

5           THE CLERK:  Put it near where your sound comes in.

6           MS. BROWN:  Yeah.  I've never kind of quite figured

7   out where that is.  I'm guessing it's near the front here.

8           Can you still hear us, Suzanne?

9           MS. SUZANNE BROWN:  Yes, I can, and I will do my very

10  best to listen, and if the Judge has any questions I'll speak

11  up.

12          MS. BROWN:  Okay, great.  What I'll also do, Suzanne,

13  just to be on the safe side, I have the phone where I can see

14  it.  If you either want to text, and also at some point maybe

15  before I conclude my arguments I'll check my email messages, so

16  if there's something I'm missing that you want to talk about

17  you can let me know, okay?

18          MS. SUZANNE BROWN:  Okay.  I'm so sorry to interrupt

19  your flow.

20          MS. BROWN:  Oh, no problem whatsoever.

21          And I think where -- is the Court ready to proceed?

22          THE COURT:  Sure.

23          MS. BROWN:  Okay.  I think where I was is I was

24  talking about the First Circuit's case and how they were very

25  focused on the testimony of Anne Getchell, so that is why we

1    feel that if anything had rebutted that -- and most importantly

2    want to go to -- there was this quote in our expert's report,

3    Anne Layne's report.  She said it's very clear to anyone who is

4    knowledgeable about these items, and I think she was

5    referencing grants and accounting, such as an accounting

6    expert, that neither Ms. Getchell nor Ms. Redmond possesses

7    accurate knowledge of regulations, policies and procedures.

8         So, what we were arguing is that this would have

9    undermined globally the government's -- Suzanne, I'm just

10   talking to the judge now.

11        MS. SUZANNE BROWN:  Oh, I'm sorry.

12        MS. BROWN:  That's okay.

13        I think she thought I was talking to her.

14        So, two things I want to talk about of the

15   government's arguments that they made in their motions and I

16   think they made at the hearing, and I think they're actually a

17   little bit contradictory.  One is that the government argued

18   that Suzanne was looking to, quote, unquote, do a do-over

19   because her defense at trial didn't work, and I think they also

20   argued that there was no prejudice, because this was a, quote,

21   slightly different version of the defense that was presented at

22   trial.

23        THE COURT:  You should focus on the second one.  The

24   first one -- the idea that she's looking for a do-over, it

25   doesn't make a difference to me one way or the other.  She's

1    either entitled to a do-over or she's not.  It doesn't matter

2    what she's looking for, so focus on the second one.

3         MS. BROWN:  Okay, great.  So, our basic position is

4    it's not slightly different, it's all the difference in the

5    world.  The analogy I make to that is if someone said, I have

6    an alibi defense to their lawyer and their lawyer didn't do the

7    research and the person gets on the witness stand and said, I

8    wasn't there, I was in Boston, and they get cross-examined by

9    saying, Do you have any proof you were in Boston?  Well, I have

10   my word I was in Boston.  And then after trial you do some

11   investigation and you find the friend that they were in Boston

12   with who has a picture of them and all other sort of

13   corroborating evidence, and it's the same thing.  Just because

14   someone had a slightly different version of it, it's a more

15   effective version, it's a more understandable version, it would

16   have clarified the point and, most importantly, corroborated

17   Suzanne's arguments.

18        And I know I keep going back to the Dugas case, but I

19   think that case gives the Court all the answers here, because

20   Suzanne Brown has a stronger case for ineffectiveness than the

21   defendant did in Dugas, because in Dugas the lawyer testified.

22   He came to the post-conviction hearing, and he said, I made a

23   tactical decision.  I made a tactical decision that I'm going

24   with the "you got the wrong guy" defense as opposed to it

25   wasn't an arson defense, and in that case the First Circuit

1    said, well, this evidence would have been helpful to rebut the

2    case, and especially -- and one of the quotes I was looking at

3    from that case trial counsel had to admit that a layperson

4    would have viewed the government's case a certain way, and, in

5    fact, even though trial counsel said, I'm going with the "you

6    got the wrong guy" defense, he conceded that the government

7    had -- the state had a strong case as to arson, and that if he

8    lost his defense then there would be a problem.  But also trial

9    counsel admitted that there were problems with his theory.

10         THE COURT:  Sure.  But you know that Dugas was an

11    unsuccessful habeas petition, right?

12         MS. BROWN:  Well, I know that the First Circuit said

13    that the trial -- the court below had erred in its analysis

14    of --

15         THE COURT:  No, no.  Deficient performance.  The Court

16    remanded it for deficient performance, they had another

17    hearing, the Court found no prejudice, there was another

18    appeal, and the First Circuit found no prejudice.  The idea

19    that this is -- I disagree, by the way, that this is a stronger

20    deficiency or prejudice case, but, regardless, Dugas was not a

21    successful habeas petition.

22         MS. BROWN:  Okay.  Well, but my point is, your Honor,

23    that in this case there's just no question it was prejudicial,

24    and I state this in my motion over and over that the government

25    tried to portray her as this smart, clever, highly educated

1    person, and this is contrary to the arguments that trial

2    counsel made.  Trial counsel's, and I state this in my motion

3    as well, that they were trying to say, Well, this is all

4    complicated, this grant stuff, and she was trying to do the

5    best she can.  She wasn't trying to, you know, cheat the

6    government or anything like that.  She was just, you know, she

7    was just working hard and trying to do the best she could.  And

8    the government decimated that argument.  In their closing they

9    decimated that argument by saying she's a smart woman.  And

10   this would have rebutted that, that what she was saying all

11   along was true, that what she told her lawyers and they didn't

12   understand was true.  This is complicated, and that's why you

13   get an expert.

14        And, as I said earlier, the prejudice -- it's not even

15   close that there's not prejudice in this case, because the

16   whole case is based on Anne Getchell, and if they had talked to

17   an expert the expert would have basically said, I would have

18   testified Anne Getchell doesn't know what she's talking about.

19   I mean, right there that's prejudice.

20        THE COURT:  Okay.

21        MS. BROWN:  I didn't know if that was my client.

22        Suzanne, are you still there?

23        MS. SUZANNE BROWN:  Yes, I am.

24        MS. BROWN:  Okay.  I heard a noise.  I didn't know if

25   she was disconnected.  Okay.

1          THE COURT:  All right.  Mr. Aframe.

2          MR. AFRAME:  Are you done, Donna?

3          MS. BROWN:  I am.  Thank you.

4          MR. AFRAME:  Okay.  So, let me just walk back for a

5    minute.  I agree with Attorney Brown's answers to the first

6    question, so I'll just proceed to prejudice.

7          There were two undisputed facts at this trial.  One

8    was the grant required the payment of contractors, and the

9    other fact was that they weren't paid.  The dispute was whether

10   she ever intended to pay.  The government's claim was she never

11   intended to pay the contractors, so everything she wrote on

12   those forms and the invoices was false, and her defense was, I

13   intended to pay them later.  That's what the trial was about.

14   That was the question for the jury to resolve.

15         So, here's the evidence that went to the government's

16   contention that she never intended to pay the contractors:

17   From the beginning she sent false letters to the USDA saying

18   she had put aside in a bank account money to pay the

19   contractors that, in fact, she had not done.

20         Two, she did not tell the contractors that there was a

21   government grant that was intended to pay their salary.  Both

22   contractors testified to that.

23         She made up false invoices without the permission of

24   the contractors that were signed by the contractors falsely to

25   show the USDA that this business relationship was going on and

1    that payment was due, and those were not -- those were false.

2          She filled out other forms that said that the

3    institute had paid all of the money it needed to pay under the

4    grant.  Well, that's not even consistent with this idea that,

5    We owe money to be paid later, because she actually wrote, We

6    paid it all.

7          She submitted invoices for an employee who had quit

8    and continued to submit to get every last penny from that grant

9    for someone who didn't even work for the institute anymore.

10   After that person quit that person continued to send emails to

11   Suzanne Brown, saying, When are you going to pay me?

12   Meanwhile, Suzanne Brown is taking in the money from the

13   government every month.  What does she say to that contractor?

14   I have no money, I have no idea when I'm going to pay you,

15   basically, Go away.  She never intended to pay them.

16         She also knew, and I think this is an important fact,

17   she also knew in real time that this idea that I'm going to pay

18   them later wasn't a good argument, because when David Robinson

19   called her out on, What did you do on the second grant that you

20   haven't paid these people, she wrote a letter to David Robinson

21   setting forth what her position was, and her position wasn't,

22   I'm going to pay them later.  Her position was, I paid Moran,

23   and Moran immediately gave the money back as a donation, which

24   allowed me to put it back into the institute, which is what

25   Moran wanted.  But she understood at that time that to sort of

1    finesse this thing she needed to say, I had paid the people

2    when I didn't.

3            Now, when we get to trial, and Moran is going to

4    testify, I should have been paid, I didn't make any donations

5    back, the claim, the argument, the testimony of Suzanne Brown

6    was, well, and I think this is key, this is a key thing that

7    just keeps getting glossed over, which is Suzanne Brown

8    testified, I filled out the SF-270s on a cash basis, and when I

9    did so I read the back of the form, she testified, and one of

10   the things that you can declare under a cash basis is in-kind,

11   and what I, Suzanne Brown, understood "in-kind" to mean was I

12   can pay them later.  And so, that was the dispute:  Was she

13   really saying on that form, I'm going to pay them later?  That

14   was her argument.  The government's argument was, no, she's

15   never going to pay them, she never intended to pay them.  From

16   the first letter to the USDA lying about how much money was in

17   her account she never intended to pay them.  She didn't pay

18   them.

19           THE COURT:  But that's not really the burden, though.

20   Your burden of proof at trial wasn't to show whether she

21   intended to pay or not.  Evidence of her intent to pay could go

22   to her willfulness of the false statements, but your burden at

23   trial was to show that the SF-270 forms in a couple of

24   different respects, as noted by the Court of Appeals, were

25   false statements, right?

1          MR. AFRAME:  Right.

2          THE COURT:  Even if she never intended to pay them, if

3     she thought accrual basis accounting made the statements true,

4     that she did them by accrual basis and, therefore, that they

5     were true, she would be not guilty whether or not she intended

6     to pay them, right?

7          MR. AFRAME:  She would be not guilty -- but she argued

8     -- that was her argument at trial:  I believed they were true,

9     Judge, because I believed that the grant allowed me to pay them

10    later, and her theory at that time was cash basis, in-kind

11    allowed me to pay them later, and I believed that was true, and

12    I submitted them that way.  And we said, That isn't what you

13    meant when you filled out those forms and you sign to say you

14    were complying with grant conditions.  What you were saying is,

15    as you admitted, the grant conditions required you to pay, and

16    what you were saying when you signed that was you had paid.

17          Now, she says, No, what I meant was I was going to pay

18    in the future, and that was a question for the jury:  What did

19    she mean when she filled out that form and signed it?  And

20    based on all the evidence I went through, what we argued was

21    what she meant was, which was a lie, I had paid them, and she

22    argued, No, it wasn't.  It was I'm going to pay them later.

23          And when I say that, well, what would this have

24    mattered, she wants to just make a different argument, but it's

25    the same, it's the same argument.  Instead of cash basis,

1    in-kind allows me to pay it later, accrual allows me to pay it

2    later.  But at the end of the day the government would have

3    said the same thing, which is, You didn't mean pay it later

4    when you said you filled out those forms.  What you meant was

5    you had paid them already, and that was a lie.  That's what the

6    trial was about.  Is that what she meant, or did she mean I'm

7    going to pay them later?  If she truthfully meant to declare,

8    I'm going to pay them later, and that's what she intended, then

9    she was being truthful, but we argued she wasn't, and all that

10   evidence I went through, like making up the invoices, like

11   putting in for people who didn't work there anymore, like

12   telling someone, I have no money, when I do have money, that

13   all got to what was she testifying to when she says, I certify

14   I have met grant conditions.  And what we say she was saying

15   when she signed that is, USDA, I have paid these people

16   already, when, in fact, she didn't and wasn't going to pay them

17   ever.  And that's what the trial was about.

18          So, I don't see how it matters whether that's framed

19   up, as she testified, as she testified -- it wasn't like this

20   Bjorn Lange or Dotty Graham's argument that it was cash basis,

21   in-kind that she based it on.  That was Suzanne's testimony.

22   And so, now Anne Layne, I guess, is supposed to have said,

23   Well, it should have been not that argument.  The better

24   argument was Suzanne shouldn't have said it was accrual,

25   because no one knows what they're talking about except Anne

1    Layne.

2         And I would say that I went back while we were talking

3    and looked at the 1942-G again, and it says, Accrual accounting

4    shall be used for financial reporting, and then the 1942-G

5    lists what are the various financial reports, and the SF-270 is

6    not one of them, and Anne Layne had no real response to that.

7    So, whether you call that impeachment, as Ms. Brown did, or you

8    call that rebuttal, it's important because it shows that Anne

9    Layne may have a bunch of letters after her name, but there was

10   a pretty easy response to what she was saying.

11        So, one, it doesn't matter whether it's Anne Layne's

12   way of describing it or Suzanne's, because it's the same

13   argument under different headings, but it's the same argument.

14   The trial would have been about the same thing.  The

15   government's evidence that prevailed at the first trial would

16   have been the same evidence at the trial that they would like

17   to have now, and how could they have it when Suzanne Brown has

18   already testified to something completely different, when she

19   testified, This is what I did?  And now they want her to say,

20   well -- I mean, Suzanne has said, I told them this all along,

21   and so she perjured herself at the first trial or her lawyers

22   told her to say what was not true.  I mean, I can't figure that

23   part of this out.  But at the end of the day, whether it's the

24   Anne Layne theory or the Suzanne Brown theory, they are the

25   same theory under different labels.  The question for the jury

1    would have been the same, was she certifying that, I'm going to

2    pay them later, or was she certifying, I've already paid them,

3    and we think the evidence overwhelmingly supported the view

4    that she was telling the jury, I've already paid them, and so

5    none of this would have mattered, and there is no prejudice,

6    even assuming that there's ineffective performance, which I

7    don't, but I don't think there's prejudice.

8         THE COURT:  All right.  I know you want rebuttal time,

9    Attorney Brown, and I'll give it to you, as much as you want.

10        I want to ask you both, though, about something I've

11   been wondering about.  Is it possible that the Circuit opinion

12   on the direct appeal forecloses this entire line of argument?

13   I look at it, and the Court makes a few different decisions.

14   One's about sufficiency, but it found a basis for sufficiency,

15   as a matter of fact it was the main thrust of the opinion, that

16   the reimbursement requests in terms of their amounts and

17   whether they represented deferred obligations or past payments

18   wasn't the only misrepresentation.  The Court found that there

19   was a different misrepresentation and sustained the conviction

20   based on that, mostly because it hasn't been addressed on

21   appeal, but the Court found sufficient evidence on that as to I

22   think all counts.

23        There's also this issue on Counts Four through Twelve,

24   right, that said -- it might have been Four through Nine or

25   Four through Twelve, but the Court said the phonied-up invoices

1   were a grounds.  So, none of these arguments go to that at all.

2   I mean, even if I found ineffective assistance, the Court of

3   Appeals found that the jury had a basis to convict her on that

4   subset of counts, which is most of the counts, based on the

5   phonied-up invoices.

6          Now, I know you don't accept that they're phonied-up

7   invoices, Ms. Brown, but, I mean, the law of the case is that

8   has nothing to do with accrual versus cash accounting.  Even if

9   I found ineffective assistance of counsel, why don't those

10  counts stand anyway?

11         Do you have a opinion about that, both those

12  questions, Mr. Aframe?

13         And then I'll ask you, Ms. Brown.

14         MR. AFRAME:  I do agree as to the invoices that those

15  were false statements, those were alleged in the indictment,

16  there were arguments made about the indictment being

17  multiplicitas that the Circuit dealt with, and so I do think

18  those are separate and distinct false statements that don't go

19  to the certification.  The two arguments were the invoices and

20  the certification.

21         And so, as to the -- I agree that the -- I don't see

22  how the accrual issue matters to that she submitted phony

23  invoices, and as to the certification question, there is no

24  argument here about ineffective assistance of appellate

25  counsel, and the Court of Appeals held that there was

1    sufficient evidence that the certifications were untrue.  Now,

2    Ms. Brown will say, I think, and I don't know what the

3    Circuit -- I mean, Ms. Brown will say, Well, I have more

4    evidence about the certifications --

5            THE COURT:  Yeah.

6            MR. AFRAME:  -- based on the accrual method that, if

7    had been introduced, would have changed the calculus.  I don't

8    have the Circuit opinion in front of me, so I'm not sure that

9    the First Circuit opinion --

10           THE COURT:  Yeah.  I think Attorney Brown could make

11   an argument that the accrual versus cash basis, there might be

12   an argument that that goes to, you know, the adherence to grant

13   requirement --

14           MR. AFRAME:  Right.

15           THE COURT:  -- basis of the conviction.  I think you

16   could make that argument, Attorney Brown.  I'm not sure if it

17   flies, to be honest, because I haven't really thought it

18   through.  But on the Counts Four through Twelve they were

19   challenged as duplicitous, right, as a violation of due

20   process?  The Court found that to be waived, right?  But then I

21   analyze it anyway under a plain error standard and say, no,

22   those are lawful convictions, and those convictions on Counts

23   Four through Twelve, which the jury, as a matter of law of this

24   case now, could have, based on the invoices, have been upheld

25   on appeal, and there's no challenge here to any of that.

1          So, why don't those counts withstand -- even if I

2     agree with Ms. Brown that the other, that Counts One through

3     Three have been proven to be infirm based on ineffective

4     assistance, Counts Four through Twelve I think stand.

5          What do you think about that, Ms. Brown?

6          MS. BROWN:  Our argument to that is that there was

7     testimony, as I recall, from our expert.  I don't think it was

8     transcribed, but I think there was testimony that the grant

9     rules did not require that the money be paid out in the

10    invoices before -- I mean, it all comes down to whether this

11    was an invoice or not, whether this was, I'm giving you record

12    of a debt incurred, or I am giving you record of something I

13    paid, and I think it does go to the quote, unquote, phony

14    invoices because of that, that it was Suzanne did not, and I

15    think this was testified at trial, did not feel that she was

16    making a falsehood of reporting those salaries that had been

17    incurred, even though they had not been paid.

18         So, I disagree.  I think it would have gone to all

19    counts.  I do want to come back to something that I think is

20    very critical.

21         THE COURT:  Wait a minute.  But wait a minute.  I

22    don't want to let this go yet --

23         MS. BROWN:  Okay.

24         THE COURT:  -- because I want to understand your

25    argument, and I'm asking this question not rhetorically or as a

1    challenge but as an actual question.  I don't remember that

2    testimony you're referring to from Anne Layne, but I take your

3    word for it, that she said those invoices weren't required or

4    -- yeah, she said that, basically said that accrual would have

5    been a permissible method to complete the forms, and,

6    therefore, that it wasn't a necessity that they be filled out

7    on a cash basis, thus requiring proof of paid invoices, right?

8    That's what she said, and I accept that.  But I'm not sure what

9    difference that makes.  I'm asking that as a question.  I mean,

10   that doesn't go to whether or not these invoices were phonied

11   up, and I mean -- I'm using "phonied up."

12         I'm not trying to upset you, Ms. Brown, by saying

13   that.  You testified to how you constructed and compiled the

14   invoices, but I happen to agree with the idea that they were

15   made up in a sense that they weren't based on documents or,

16   like, records of hours worked or anything like that.  They were

17   constructed by the defendant.

18         MS. BROWN:  Correct.  Everything in this case boils

19   back to whether she willfully made false statements.

20         THE COURT:  I know, but my point, though, is your

21   accrual versus cash challenge, which I understand, and I think

22   it's a colorable challenge for sure, but I don't think it

23   touches these counts now.  I think the Court of Appeals found,

24   A, that the jury could have based its convictions on Counts

25   Four through Twelve on the invoices, and there was a challenge

1    to that as potentially not a unanimous jury in the first

2    appeal, but it was waived, so the Court found it waived but

3    then still did a plain error analysis and still found a

4    sufficient basis for conviction, that this challenge, your

5    memorandum of law, doesn't address at all, unless I'm

6    overlooking it.

7            MS. BROWN:  If you go back and look at Anne -- I'm

8    getting my Annes mixed up --

9            THE COURT:  Anne Layne.

10           MS. BROWN:  -- Anne Layne's report, she specifically

11   addresses that, of the invoices.

12           THE COURT:  But the point isn't whether the report

13   addresses it.  The point is whether your habeas petition

14   addresses it, and it doesn't.  You don't challenge -- I mean,

15   there's nothing to challenge.  The Court of Appeals found that

16   that could be the basis for a sufficient -- that's a sufficient

17   basis for conviction, and your challenges don't go to that

18   issue.  They go to whether the numbers on the SF-270s were

19   false statements.  They don't go to whether the invoices that

20   some of them were based on were manufactured falsehoods, and

21   the Court of Appeals has found that those convictions are sound

22   and that the jury could have relied on that, and any challenge

23   that they might have relied on something else is, A, waived,

24   and, B, unsuccessful, even as a matter of plain error.  Anyway,

25   that's my --

1          MS. BROWN:  Can I address that, your Honor?

2          THE COURT:  Of course.  That's what I'm asking you.

3          MS. BROWN:  I thought I was addressing something else.

4    The First Circuit case, other than things we've already talked

5    about, which is the jury question, is completely uncontrolling

6    here, because they didn't have all the facts.  To the extent

7    that they found as to the invoice there was sufficient

8    evidence, and to the extent that they found that that was

9    unrebutted and that all those claims as to that, the First

10   Circuit case has no applicability at all to this issue here,

11   because they didn't have all the facts.  They went on the facts

12   that they had in terms of sufficiency, and so they were making

13   that claim.  So, I find it absolutely noncontrolling, because

14   they just didn't have everything, and now they will, and now

15   you have it, and when you look at it, you look at it

16   differently.

17          The First Circuit, and that's why I was going through

18   before, they quote Anne Getchell, Anne Getchell said this, and

19   Anne Getchell said that, Anne Getchell said this, and Anne

20   Getchell said that, and their whole finding on this whole issue

21   was about Anne Getchell.  The government's case was around

22   that, and this would have --

23          THE COURT:  Except that's not what they ruled, though.

24   They did talk about Anne Getchell at times, right?  And you and

25   I disagreed already about whether that made it your burden or

1 someone else's burden to bring Anne Getchell back.  But that

2 aside, what the Court of Appeals based its affirmance on wasn't

3 Anne Getchell's testimony.  It was on a document that -- it was

4 on the SF-270s that said these reimbursements will comply with

5 grant requirements and an exhibit, a document, that spelled out

6 what the requirements were, which was reimbursement basis.  All

7 right?

8          MS. BROWN:  But that was Anne Getchell's testimony.

9          THE COURT:  That was an exhibit.

10          MS. BROWN:  Anne Getchell said this was on a

11 reimbursement basis, and that the reason she knows that is

12 because of a document.

13          THE COURT:  Hold on.  I want to make sure I'm not

14 misunderstanding here.  Okay.  Yeah, but wait a minute.  At the

15 bottom of page -- you're right, it talks about Getchell, but

16 then it says at the bottom, This testimony occurs moreover --

17 I'm looking at page -- well, it's page 4 of the Westlaw

18 version.  I'm not sure what page it is on the -- it's on page

19 601, Counsel, 601.

20          MS. BROWN:  Okay.  It's page 4 of Westlaw?

21          THE COURT:  Page 4 of my Westlaw, which might not look

22 like your Westlaw, but it's on page 601 of the opinion, and it

23 goes through the Getchell testimony, as you just noted, but

24 then it says, This testimony accords moreover with the text of

25 the grant conditions letter, as the letter states that the

1    funds would be paid out on a reimbursement basis, and that

2    NHIAF needed to document expenditures to receive funding.  And

3    the Court found -- this is not even the Counts Four through

4    Nine issue, this is the entire case issue -- that that basis

5    alone had basically been not challenged on appeal and was a

6    sufficient basis to convict.

7            Now, you're telling me, well, I think you're telling

8    me, yeah, but the Court there didn't have all the evidence now,

9    like Anne Layne's testimony, and how that would have affected

10   Getchell's testimony.  And I think I understand that argument.

11   Your point is that that part of the holding is touched by your

12   ineffective assistance claim, right?

13           MS. BROWN:  Correct.  Maybe we're reading it

14   differently, but when I was reading that, I was reading that in

15   a succession of things where they're repeating Anne Getchell's

16   analysis of what she told Ms. Brown or what the forms required

17   Ms. Brown to do.  So, I read that all together as them

18   recounting Anne Getchell's explanation both as to what the

19   forms required.  And, obviously, I think that if we had Anne

20   Layne to explain that these forms were confusing and there's

21   parts of the forms that use the word "reimbursement" but

22   there's also parts that say you should use accrual -- and this

23   isn't about who's right.  This is about whether this would have

24   put the case in a different light and presented a defense that

25   would have cast doubt such that there would have been

1   reasonable doubt about whether Suzanne Brown willfully made

2   false statements during these grant applications.  That's what

3   it comes back to.  But along those lines I want to go back to

4   that --

5         THE COURT:  Are you going to go back to your rebuttal,

6   or are you going to stick with this Court of Appeals issue?

7         MS. BROWN:  Well, if you want to stick with -- there's

8   something I just didn't want to forget that Attorney Aframe

9   said.

10        THE COURT:  I promise you can rebut.  I just wanted to

11  before I left the Court of Appeals issue just ask you, since

12  you've been arguing with me for a bit or arguing to me for a

13  bit, Mr. Aframe, are you good on the Court of Appeals, the

14  impact of that, or do you want to say anything more about it?

15        MR. AFRAME:  No.  I mean, I think that you stated it

16  correctly, which is that there is no dispute that she was

17  supposed to provide documentation to support reimbursement

18  claims, and there's no -- I mean, you set it out.  There's no

19  dispute here that she didn't contact the people, didn't, you

20  know, she just sort of made up the numbers, and then she

21  submitted it, and that's a basis for a false statement, and

22  that was one of the theories.

23        THE COURT:  Okay.  Understood.  Now, I promised you

24  rebuttal, Attorney Brown.  Go ahead.

25        MS. BROWN:  Yeah.  And here's the thing we keep going

1    around on, and I'm really glad we had this moment to summarize,

2    because I don't think I really addressed it well at the last

3    hearing, because there's a lot of moving parts, but the

4    government keeps coming back to this argument that, well, she

5    stuck with her testimony at the trial, she said that it was

6    cash, when now she's saying it's accrual.  There's two big

7    problems with that.  One is, and I don't have all the cites in

8    front of me.  If you go back and read my memorandum carefully,

9    I explain this, because that was something, when I read through

10   this, that was the first thought I had.  It's not like I just

11   ignore facts that are contrary to my argument.  I went through

12   that, and I answered that, and that is that, if you look

13   carefully Suzanne was saying that she was using two different

14   types of accounting, she was using one for her organization,

15   and, as she understood it, she was using one for reporting, and

16   that's something that, if you look at Anne Layne's testimony,

17   she agreed that that happens all the time, that a corporation,

18   an organization, can use two methods of accounting.  I even

19   cited a case in my brief.

20            THE COURT:  I have to cut you off here, because, see,

21   this goes to why I was a little impatient when you wanted to

22   put your client on the stand for 40 minutes at the end of the

23   second day of this habeas hearing, because I have to say I

24   really do question the credibility of your client's testimony

25   on many occasions during this proceeding, and that particular

1    thing you just noted is one of the biggest examples.  At the

2    end of the day we hear, Oh, I ran the institute on a cash

3    basis, but I did the grant on an accrual basis.

4         I combed this record up and down.  I read her

5    testimony at trial, I read her testimony at the February

6    post-trial hearing, post-trial presencing.  I read her

7    pro se submissions, one of which was, you know, 90 issues,

8    ineffective assistance of counsel over 10 pages.  She never

9    said that before that day, she never said it once, and it

10   strains credulity, I'm sorry, the idea that, A, that she did

11   that, number one, though it's certainly possible, and Anne

12   Layne explained that, A, that she did that.  What's completely

13   implausible is that she never explained that to her trial

14   lawyers.  You didn't even put that in your initial petition

15   here that we're deciding.  You didn't say she ran it in two

16   ways.  That's a pretty significant -- that would have been

17   certainly a defense at trial that would have been something to

18   hang a hat on and talk about.  I don't think it would have

19   worked, to be honest, but this idea that you just explained,

20   oh, she did it in two ways, she ran the institute by cash, she

21   ran the grants by accrual, even though -- not only she never

22   said that; she actually said the opposite of that repeatedly,

23   okay?  That's a problem.

24        So, I don't want you to think I'm accepting the

25   proposition that there's credible evidence in this case.

44

1    There's evidence, your client's testimony at the last September

2    hearing, but I don't want you to be under the impression that I

3    accept that there's credible evidence that your client, A, ran

4    the institute on a cash basis but did the reimbursement

5    requests on an accrual basis, number one, or, B, ever, ever

6    communicated that to her trial counsel, which is a big part of

7    this analysis of deficiency.

8         You can continue with your argument, but I don't want

9    you to be deluding yourself that I find that credible.

10        MS. BROWN:  And I don't have the cite right now, but I

11   do know I address this in my memorandum, and here's why:  I've

12   been spending a lot of time trying to find a case.  I spent a

13   good part of this case for me trying to understand the

14   difference between accrual and accounting.  It's very confusing

15   if you're not an accountant.

16        THE COURT:  You did address it in your memo.

17        MS. BROWN:  Right, I did, and I found a case where the

18   trial judge said what you just said and then got reversed

19   because the trial judge said that, I find this incredible that

20   the person's using two different accountings, and the appellate

21   judge said, again, I don't have it in front of me, but the

22   appellate court said that, yes, that happens, that

23   corporations, whatever, that they do that.

24        THE COURT:  I accept that.  I accept that.

25        MS. BROWN:  But you don't even need to get to whether

1       you believe her or not, and this is the bigger problem.   I

2       started off with the weaker problem.   This is the bigger

3       problem.   If trial counsel had done what they were supposed to

4       do, if they had consulted with an expert, and the only measure

5       we have of that is Anne Layne, not only would they have been

6       able to undercut the credibility of the government's key

7       witnesses because they used language and terms that they didn't

8       know what they were talking about, they could have decided not

9       to put Suzanne Brown on the stand.   They could have said --

10              THE COURT:   How would this defense -- and I'm not

11      burden shifting here, so let me just take that off the table

12      now.   All right?   How in the world would a jury looking at her

13      signed forms where she checked the word "cash," how in the

14      world would a jury ever have been able to hang a hat on that

15      for reasonable doubt unless she explained it that she used

16      accrual basis accounting, because there's not a shred of

17      documentary evidence in the case that she did, not in her

18      emails to her own lawyers, not in her letter to David Robinson

19      where she testified under oath, I wrote that letter to explain

20      what I was doing and why I did it, right?   There was never a

21      shred of evidence in the case that she used accrual basis

22      accounting.   All the evidence would have been cash.   You're

23      suggesting that she could have raised reasonable doubt without

24      testifying based on Anne Layne?

25              MS. BROWN:   Yes.

1          THE COURT:  Okay.

2          MS. BROWN:  Can I explain?

3          THE COURT:  Of course.  Please don't ask me if you can

4    explain.  You know you can explain.  Come on.

5          MS. BROWN:  Suzanne Brown testified, and there was a

6    reason for this.  What happened was her defense was like this

7    Swiss cheese, like, there were parts of this defense that got

8    in there just because she kept begging her lawyers to put

9    documents in, even though they didn't even know why they were

10   putting them in.  But she kept begging them to do that, and

11   they put in a document that had the word "cash" on it, and

12   Suzanne, she explained that.  But the expert could have

13   testified that you can't assume that, because these forms are

14   filled out, that that means the person paid them, that that's

15   not what accrual accounting is.  Again, I disagree, your Honor.

16   I think, and, again, I think it's a February hearing, the

17   post-conviction hearing gives Suzanne an immense amount of

18   credibility in this case, because she might have not used the

19   magic words, she might have not articulated it in a way that

20   you understood it, because I know I didn't understand it when I

21   read it the first time, it took me three times to understand it

22   and then to talk with an expert before I even understood what

23   she was talking about, but then when I talked to the expert she

24   made sense, and what she said to you at that hearing was that

25   her lawyers didn't understand her defense, and she said that

1    without there ever being an Anne Layne.  I would agree with

2    you, if we hired Anne Layne and then all of a sudden Suzanne

3    Brown is like, Yeah, what she said, yeah, I'm totally going

4    with that --

5           THE COURT:  I need to correct you about something.  I

6    did understand your client's testimony at that hearing.  Your

7    client said on the record that I was the only person in the

8    room who understood it.  All right?  I understood it

9    completely.  She was talking about that her statements were

10   true because she was allowed to claim reimbursement for

11   deferred payments.  Absolutely I understood it.  By the way,

12   that was argued to the jury by trial counsel in this case; it

13   wasn't argued using the words "accrual accounting," but I did

14   understand it.  I'm not saying I didn't understand it.  I did.

15   And I'm not even saying that Anne Layne doesn't provide some

16   corroboration for that idea, not the conduct, but the idea

17   certainly, absolutely.  So, again, I don't want to just let

18   things pass like, Oh, well, she didn't say it in a way you

19   understood it, Judge.  She was very clear.  I did understand

20   it, and I didn't need Anne Layne to explain it to me, although

21   it certainly helped, I'll admit, because Anne Layne pointed to

22   the regs, and the regs showed at least that accrual was a

23   permissible way to do those forms, and I accept it.  I do.  Go

24   ahead and continue.

25          MS. BROWN:  Well, as I said, the problem that we have

1    here is that the prosecution is, you know, trying to go back

2    and say that she was trying to get that defense out, and she

3    was trying to use that language.  That's an issue with the

4    credibility.  I mean, I think that she was trying -- she's been

5    trying to tell this story for three years, and I think the fact

6    -- I mean, you may have understood it.  Her lawyers definitely

7    did not understand it.

8              THE COURT:  I think they did understand it.  I think

9    they argued it.  They might not have argued it in a way you

10   would have liked to have argued it or the way she would have

11   liked to have, but they did argue it.  And for it's worth,

12   remember, your witness told me what I thought already.  Your

13   witness told me that the difference between accrual -- I took

14   accounting in college, a lot of us did.  Your lawyer told me

15   what I thought was the truth, that the difference between cash

16   and accrual accounting is undergraduate Accounting 101

17   material.  Your client went to an elite college, got an MBA,

18   taught business administration and was an executive in

19   businesses, and the idea that -- and I'm not suggesting

20   deferred payment as a concept that wasn't valid or a defense,

21   but the idea that her lawyers were put on notice by her that, I

22   ran the institute on a cash basis but did the grant

23   reimbursement on an accrual basis, despite getting on the

24   witness stand and saying she did it on a cash basis, is

25   difficult.  It's difficult to charge counsel with that type of

1    knowledge that they should have explored that and used the buzz

2    word "accrual" in a way that would have led them in a different

3    direction.  That's a tougher sell, I think, than you're

4    appreciating.

5            MS. BROWN:  Well, I actually think it's a tougher

6    sell, your Honor, because the case law is very clear that

7    decisions made by counsel after investigation, analysis and

8    consultation with experts are given a lot more deference than

9    decisions made --

10           THE COURT:  How do we know that her lawyers didn't

11   consult -- you concede in your brief we don't know if they ever

12   consulted.  They might have consulted an expert, they might

13   have done it informally, they might have retained one.  There's

14   not a shred of evidence in this record that her lawyers didn't

15   consult with an expert other than the inference one would draw

16   from not putting an expert on the stand.  That's, I guess, an

17   inference one could draw.  But they testified in my courtroom.

18   They didn't say they didn't consult an expert.

19           MS. BROWN:  But they did say they didn't understand

20   the accounting method.

21           THE COURT:  Well, Bjorn Lange said something that

22   might be interpreted that way, I admit.  But, I mean, again,

23   whose burden was it to show that they didn't retain an expert,

24   never mind the law, never mind the law?  The facts.  We have no

25   evidence that they failed to consult with an expert, none.

1    They might have.

2        MS. BROWN:  You do, your Honor.  My client testified

3    to that.

4        THE COURT:  Your client can't testify to the conduct

5    and thoughts of another person.  Your client said, she claimed,

6    she claimed she asked them to, but they could have been asked

7    that question very easily.  They were in a courtroom.  It could

8    have been, Did you consult with an expert?  Did you retain an

9    expert?  They might have had explanations for why -- see,

10    that's what ineffective assistance of counsel, is how it works.

11    We don't just look at counsels' decisions; we look at the

12    reasons they made the decisions.  Not only do we not know their

13    reasons for not calling a witness, we don't even know if they

14    consulted with one, and they were in a courtroom with every

15    opportunity to be asked, and you had every opportunity to ask

16    them the same thing.  You could have recalled them.  That's why

17    I had the Deputy Clerk telephone you before the hearing to ask

18    who you were going to call.  I fully anticipated more than the

19    expert, because I think, based on your brief, like arguments

20    regarding the closing and not objecting, I thought they had

21    some things to explain, and I was looking forward to the

22    explanations, but they did testify in this ineffective

23    assistance proceeding, and we have no idea if they consulted an

24    expert.  When you hired an expert, we know, because we have a

25    record.  You had to ask my permission, and I granted you.

1   They're the Federal Defender.  I have no idea.

2        MS. BROWN:  Well, your Honor, Attorney Aframe will

3   corroborate this.  We both talked about this prior to the

4   hearing.  I did speak with Attorney Lange about this.  He said

5   he had absolutely no memory of this whole thing, and, to the

6   extent he had any memory, that whatever he said at the prior

7   hearing, he would go by that.  I did contact him, but basically

8   he would say, I have no memory of what my decisions were.  And

9   I shared that information with Attorney Aframe.

10        So, it's not like we didn't do our job.  It was just

11   we were going to call a witness who had no memory, and he

12   deferred to his memory back then.  As I said, you have

13   unrebutted testimony from my client, who was part of that

14   defense, that she asked them to get an expert, and they didn't

15   get an expert.  That is unrebutted.

16        THE COURT:  Well, your client testified that she told

17   them to hire an expert, okay?

18        MS. BROWN:  Yes.

19        THE COURT:  She testified to that I think at that very

20   hearing where those two lawyers were there.  I think that's my

21   memory when she gave that testimony, which I accept as her

22   testimony.  And we know they didn't present an expert, but I

23   don't take that as proof that they didn't consult with an

24   expert or didn't consult and then reject the idea based on what

25   they learned.  I just don't know that, and that's not my

1    burden, and, frankly, I inquired about it, and the record is

2    what it is at this point.  Anyway --

3             MS. BROWN:  Well, anyway, we stand by the fact that we

4    did consult with counsel that there's absolutely no evidence

5    that they did consult with -- and if they had consulted with an

6    expert Attorney Lange would not have got the terms confused at

7    the post-trial hearing, which he did.  He did not understand

8    the terms, and when he was asked about them he didn't

9    interject --

10            THE COURT:  Did you hear what you just said to me?

11   You just said to me, We have no evidence that they consulted an

12   expert.  You're right.  We don't.  We also have no evidence

13   that they didn't.  We have no evidence on this.  That's the

14   problem.  It's only the problem on the factual basis.  It's not

15   the problem on the eventual legal analysis.

16            Mr. Aframe, you're holding your hand -- do you have

17   information on this you want to share?

18            MR. AFRAME:  I have no idea on that point.

19            THE COURT:  I don't either.

20            MR. AFRAME:  They don't talk to me other than in the

21   courtroom about it; so whatever is in the record is what it is.

22            THE COURT:  Sure.  When we're sitting in a courtroom

23   with your client testifying and two lawyers, all right, the

24   idea that Mr. Lange today doesn't remember why he made

25   decisions that he made isn't very persuasive to me.  I think he

1   could have been asked that day, Did she ask you to consult with

2   one?  Did you consider consulting one?  Did you consult one?

3   Did you retain one?  Did you make a decision about why or why

4   not?  That's what I'm accustomed to hearing in an ineffective

5   assistance evidentiary hearing, which we've had in this case on

6   three different days now.

7        So, look, it's only one of your issues, but, again,

8   see, if I don't make these points on the record they're not

9   going to be anywhere, and I need to make them.  It's not that

10  there's -- you're right.  Even your brief, by the way, you were

11  careful in your brief.  You said there's no evidence they

12  consulted an expert, and there is none.  But to make a claim of

13  ineffective assistance your burden is to show that they didn't

14  consult or something or consulted and made a decision that was

15  unreasonable and deficient.  We at least need to know whether

16  they consulted, and we don't know that.

17       All right.  Is there anything else you wanted to

18  cover?

19       MS. BROWN:  If I could have a moment to speak with my

20  client, your Honor?

21       THE COURT:  You can mute yourself out, if you like.

22            (Counsel conferred with client)

23       MS. BROWN:  Thank you, your Honor.  My client, and I

24  think I was actually going to talk about this before, based on

25  Attorney Aframe's argument, and it's probably a good place to

1   end, is the focus of this case goes back to mental state:  Did

2   Suzanne Brown have a purpose to make false statements on these

3   forms at the moment in time when she filled them out?  That's

4   the case, and the evidence that we've presented that her

5   attorneys did not seek out and did not present rebut that, and

6   it's not repetitive, it's not cumulative, by any means, and I

7   know there's cases that say, if you present cumulative

8   evidence, having an expert support a theory is the opposite of

9   cumulative.  It's new evidence that goes to your credibility.

10          And this goes to what you were saying before; it's,

11  like, well, what if we can take this part over here, and don't

12  those convictions still stand, because these are the

13  convictions -- a doubt may have been cast on those.  You have

14  to look at everything together that comes back to the

15  cumulative part, and I know you wanted us to address that

16  earlier.  When you do look at things being cumulative and all

17  the parts together undermining the credibility of the state's

18  key witnesses, corroborating the defendant's testimony, having

19  the lawyers understand the issues better so they can articulate

20  the issues better; you can't just go around chasing all these

21  different issues, you've got to look at it all together of

22  whether all of this evidence would have cast doubt on whether

23  she willfully made false statements.

24          THE COURT:  Thank you.

25          Last word, Mr. Aframe?

1    MR. AFRAME:  I agree the question is about whether or

2  not she willfully made false statements, and the question was

3  she said, I made deferred payments, and we said, No, you were

4  never going to pay them, and I went through the evidence on why

5  that strongly supported the notion she was never going to pay

6  them.  Call it accrual, call it cash basis based on in-kind.

7  It's did she intend to defer, was it deferred payment, or was

8  she going to pocket the money?  And she was going to pocket the

9  money, and the statements that she made to suggest otherwise

10  were false, and that's what the case was about.

11    THE COURT:  All right.  Listen, the court reporter has

12  been going exactly 90 minutes, and I want to give you a ruling

13  today during this hearing, and it's going to take me a few

14  minutes to go through these issues, so I'm going to take a

15  break to give the court reporter a break.  It's 11:34.  We're

16  going to reconvene at 11:50, and I'm going to give you a ruling

17  issue by issue.  We're in recess.

18    MR. AFRAME:  Thank you.

19    (Recess taken from 11:34 a.m. to 12:00 p.m.)

20    THE COURT:  I'm going to issue the ruling here, but I

21  want to alleviate the defendant, Ms. Brown's, anxiety a little

22  bit about it.  I'm going to deny this petition.  I don't think

23  there's been ineffective assistance of counsel here, and I

24  don't think it's close, to be honest.  Counsel has given me a

25  lot to think about, but none of the issues to me come out as

1    close calls at all.  Not only is there no showing of prejudice;

2    there's not even showing, in my view, of deficient performance.

3        Now, that said, though, I'm not going to order the

4    defendant detained right away, because I assume the defendant

5    wants to take an appeal, and I would expect that.  If it was a

6    longer sentence I would probably order her detained, but,

7    again, I don't think there's a strong appeal here, I really

8    don't.  In fact, I'm not even going to grant a certificate of

9    appealability, but defense can seek one from the Court of

10   Appeals, and I'll allow time for that.

11       So, I don't want you to think, Ms. Brown, today that

12   you're going to be detained immediately or ordered detained.

13   There will be time for that, and if your counsel can persuade

14   the Court of Appeals to grant a certificate of appealability

15   I'll continue bail pending appeal so that can all get worked

16   out in the system.  All right?  So, I know this is not the

17   ruling you wanted, and it's disappointing for you and your

18   lawyer, who has worked very hard on this.  I didn't want you to

19   have the anxiety today of thinking you were going to be

20   detained right away.

21       All right.  Look, I'm going to work through these

22   issues that are listed in document number 13, which is the

23   Court's procedural order, because my view is that those are the

24   issues listed in the defendant's basically amended habeas

25   petition when counsel was appointed for her, and counsel

1    crystalized these 90 issues that were identified in the

2    original habeas petition into several, and I'll address them

3    one at a time.

4         Again, this is the familiar <u>Strickland</u> standard.  I

5    think defense counsel is right, the burden is by a

6    preponderance, and it must be shown that there was deficient

7    performance under the *Constitution* and that the deficient

8    performance prejudiced the defendant.  I'm not going to get

9    into a long dissertation about the case law and what they mean.

10   It's familiar to everybody, and sometimes what's advanced in

11   oral argument as what needs to be shown isn't exactly on point,

12   but the law on the burden is clear.

13        I also want to make a point that I don't think there

14   has been any showing here that there's been a violation of the

15   right to a fair trial based on ineffective assistance, to the

16   extent that was a separate claim.

17        Issue A on document number 13 had several sub-issues,

18   but they're all really part of the same issue, and it was the

19   issue explained to us by the expert, Ms. Layne, at the

20   evidentiary hearing.  It was a failure, an alleged failure on

21   the part of counsel to research and prepare enough to basically

22   corroborate the defendant's position that she used accrual

23   basis accounting to complete the SF-270 forms, and, therefore,

24   that those forms did not contain falsehoods, and Ms. Layne

25   explained that to us.  And all those issues under A are

1    basically a subset or a corollary of that.  A(1) was failure to

2    realize through research and prep that certain U.S. department

3    of agriculture regulatory materials were corroborative; second,

4    failure to introduce those exhibits; third, failure to notice

5    those regulatory materials; fourth, failure to ask the

6    defendant to explain the difference between cash and accrual

7    accounting to the jury, which would have played into those

8    regulatory materials that made reference to the permissibility

9    of using accrual accounting to do grant reporting and perhaps,

10   perhaps, even reimbursement requests.  The fifth issue is

11   failure to address accrual accounting in the closing; and,

12   sixth, failure to explain that the reporting obligations of

13   USDA, that reporting incurred obligations as opposed to simply

14   cash disbursals was legitimate and maybe even required, and

15   that was all the regulatory material described by Ms. Layne.

16   That's the first issue, and we heard from Ms. Layne regarding

17   that argument.

18          So, Ms. Layne pointed us to a number of materials, and

19   the crux of her testimony was that, according to the applicable

20   regulations, the accrual method of accounting is the proper

21   method to complete an SF-270 form, which is what the defendant

22   claims she did post trial.  She never claimed that pretrial

23   that we know of, at least on the record.  She claimed she told

24   her counsel that.  There's some evidence that she claimed she

25   told her counsel that, but her evidence at trial was that she

1    used a cash basis of accounting on the 270 form.  And Ms. Layne

2    reasoned that, number one, the financial reporting of USDA

3    grants must be completed using the accrual method; and, second,

4    that this requirement applies to the SF-270 because it's a

5    financial reporting form, and she pointed us to three things,

6    in particular.  First was RD Instruction 1942-G.

7          Now, trial counsel did present this information to

8    Anne Getchell at trial, wasn't successful at getting it

9    admitted into evidence.  But Ms. Layne focused on 1942-G as

10   follows:  There's a quote in there, "Financial reporting will

11   be on an accrual basis."  That's in 1942-G, in Section (b)(3)

12   of 1942-G entitled Responsibilities of the Grantee, and the

13   regulation clearly states, "Financial reporting will be on an

14   accrual basis."

15         Circular A-110 was also cited by Ms. Layne.  That's

16   the overarching set of regulations according to Ms. Layne

17   issued by the OMB for federal grants to nonprofits.  This was

18   defense Exhibit K at trial but not introduced.  And Ms. Layne

19   directed the Court to a quote from Circular A-110 stating that,

20   "The federal awarding agency shall prescribe whether the report

21   shall be on a cash or accrual basis."  And then there was an

22   excerpt of A-110 that said, "If a federal awarding agency

23   requires reporting on an accrual basis from a recipient that

24   maintains its records on other than an accrual basis the

25   recipient shall not be required to establish an accrual

1    accounting system, but these recipients may develop such

2    accrual data for its reports on the basis of an analysis of the

3    documentation on hand."  That's Circular A-110.

4         Ms. Layne also pointed us to OMB compliance

5    supplement.  It's an annual issuance by Office of Management

6    and Budget "for the use of people who perform audits over grant

7    programs."  It's available on OMB as a compliance supplement,

8    and Ms. Layne explained that the OMB compliance supplement

9    supports the assertion that SF-270 is a financial reporting

10   form.  Ms. Layne acknowledged that neither 1942-G nor A-110

11   specifically define the SF-270 as a financial report, but she

12   used the OMB circular to make that argument.  She testified

13   that the OMB compliance supplement lists the SF-270 as a

14   financial report.

15        Now, the question is whether on this, in isolation, is

16   whether failure of counsel to notice and develop this

17   corroborative -- well, I call it "corroborative --"

18   corroborative of her claim post trial.  It didn't corroborate

19   her claim to much of a degree at trial, because she said she

20   used the cash basis to complete the SF-270 forms, but it

21   corroborates her position at habeas, okay, that she used

22   accrual basis accounting to complete the forms.  I don't find

23   it persuasive.  First and foremost, 1942-G does not clearly

24   support the categorization of the SF-270 as a financial report.

25   In fact, it's a reimbursement form.  There are reports in the

1    case, and the SF-270 isn't necessarily one or even likely one,

2    from the Court's perspective.

3            Section J of 1942-G is labeled Reporting, and it does

4    not mention the SF-270 form.  Instead, Section J discusses the

5    SF-269, Financial Status Report, which the defendant completed.

6    1942-G only mentions the SF-270 form in Section I, entitled

7    Fund disbursement.  There the regulation states that, "Except

8    for grants for revolving loans, grant funds will be disbursed

9    by Rural Development on a reimbursement basis."  So, I don't

10   think 1942-G is particularly persuasive, and I wasn't persuaded

11   by the testimony, and that was developed on cross-examination

12   by the prosecutor.

13           Second, it's important to remember that the

14   information in 1942-G was in evidence at trial.  It was in a

15   different form, it was in Government Exhibit 3, but it was part

16   the record, and anybody could have relied on it, including the

17   jury that had the evidence before them.

18           And, second, the A-110 required -- if I can describe

19   this correctly, what it required, the language is in the last

20   line, "These recipients may develop such accrual data for its

21   reports on the basis of an analysis of the documentation on

22   hand."  So, it required the development of data to support

23   accrual accounting, if it had been used.

24           Now, it was conceded at the hearing by Ms. Layne and

25   by the defendant that she didn't develop that documentation.

1    Even if she had used accrual accounting, even if that was

2    required by A-110 and 1942-G, it would have been an empty

3    gesture, I think, or an unpersuasive point to make, given that

4    she hadn't complied with A-110.  She hadn't developed -- she

5    didn't have the documents on hand to develop the accrual data

6    to justify that type of filing.

7    Ms. Layne confirmed that the defendant did not testify

8    at trial that she used the accrual method of accounting when

9    completing the form, the SF-270.  The defendant testified that

10    her accounting was performed on a cash basis.

11    Now, we'll talk about the expert angle on this in a

12    minute, because this is all part and parcel to the failure to

13    consult and call an expert claim, right?  And Attorney Brown

14    has argued that an expert would have explained a defense to

15    trial counsel and developed it through trial testimony,

16    including the introduction of these exhibits.  I recognize that

17    that's the argument here.  And Attorney Brown has also argued

18    that perhaps if this evidence had been introduced the defendant

19    would not have been able to testify -- would not have had to

20    testify at trial.  I'm uncomfortable with that.  The defendant

21    did testify at trial and testified in a way inconsistent with

22    her position in habeas.  She testified at trial that she used

23    the cash basis at length and there was lots to corroborate it,

24    and I don't think it makes sense to suggest that this evidence

25    would have eliminated the need for the defendant to testify at

1    trial.  She was going to have to explain forms that were signed

2    by her and checked that they were completed on a cash basis.

3    That would have required some type of explanation.  I'm not

4    burden-shifting.  I'm not suggesting it was incumbent upon the

5    defendant to testify.  I'm just engaging habeas counsel's

6    argument that it would have eliminated the need to testify at

7    trial if these exhibits would have been introduced.

8            Attorney Brown also argued that expert testimony could

9    have been used at trial to show that Anne Getchell provided bad

10   advice on how to fill out the form, the SF-270, by focusing on

11   reimbursements and on cash basis accounting, but we don't know

12   what Getchell -- and I think I concur with Attorney Brown that

13   she would have stuck to her guns, and I think that in the face

14   of that this would not have come close to leading to a

15   different result.  It might not have even been introduced.  The

16   people who administered the grant, they might not be expert

17   witnesses, but they certainly are experts on grant

18   administration and, in particular, on these grants, and they

19   conducted it the way they conducted it, on a cash basis.  In my

20   view I think they would have likely said, That's an interesting

21   set of regulations that you're confronting me with, but the

22   fact is we understood each other, the defendant and I, we

23   talked about it, I showed her how to do it, this is how we

24   always do it, no one does it the way you're describing, and it

25   would have been very persuasive to the jury.

1         The fact is that we don't know what Anne Getchell

2    would have said, and I think it was the defendant's burden to

3    present Getchell, not just relying on what she said at trial,

4    but to show what might have happened if she had been confronted

5    with these regulations.  I don't think it would have been

6    exculpatory to any significant degree, but we don't know, and

7    we don't know because she wasn't called.  We were presented

8    with like a mock testimony, a mock cross-examination, and there

9    was nothing stopping anyone from calling her as a witness.  I

10   repeatedly had the Deputy Clerk reach out to counsel both

11   times, both after trial, when defendant was represented by

12   Attorney Weberg, and before these proceedings to determine what

13   witnesses would be called, and the only witnesses we heard from

14   were Ms. Layne and the defendant.

15        Of course, there are other false statements on the

16   form and the false information accompanying the forms that

17   don't go to the specific reimbursement amounts.  Those form the

18   basis of the Court of Appeals' affirmance of this conviction,

19   and the effect of that on this case is something I'll talk

20   about in a minute, but what it goes to show, though, is that an

21   accrual focus, an accrual trial theory rather than cash, that

22   there's insufficient record evidence here to show that it would

23   have had any impact.

24        Now, Attorney Brown did explain, and she has zealously

25   argued, and she said something the second day of our

1   evidentiary hearing that the defendant's position was that she

2   completed the SF-270 form with a good-faith belief that the

3   information was true because she relied on the regulations in

4   doing so.  I'm having difficulty with that as a matter of

5   credibility.  I don't think there's any reason to believe that

6   defense counsel, trial counsel below, was provided this idea,

7   this idea that we first heard developed on the second day of

8   the evidentiary hearing on habeas.  Remember, the defendant

9   testified at trial, she had testified at a post-trial hearing

10  on ineffective assistance, she filed two written pro se

11  submissions, one of which is a memorandum of law explaining her

12  position and a list of 90 different instances of

13  ineffectiveness and then testified at this habeas hearing, and

14  she never said what she finally said, "I ran the institute on a

15  cash basis, and I did the SF-270 forms on an accrual basis."

16  That had never been said before, and I view that as adaptive

17  testimony, adapting the questions heard from the Court,

18  arguments advanced by counsel, testimony from the expert.  I

19  don't find it credible.  And it's important because defense

20  counsel at trial is only required to make decisions, tactical,

21  strategic, defense-oriented decisions, based on information

22  before it, and I am not persuaded remotely by a preponderance

23  that accrual accounting as a concept, as distinct from cash

24  accounting utilized for the institute, while accrual was

25  utilized for the grant reimbursement forms, was ever presented

1    to trial counsel below, and these exhibits wouldn't have moved

2    counsel necessarily to employ them in the way Ms. Layne

3    suggests they should be employed.  Certainly, when it comes to

4    prejudice, all of what I just said goes to whether the

5    defendant -- trial counsel below was deficient in not

6    developing this idea based on these exhibits, and I don't think

7    it was deficient for those reasons.  I also don't think it's

8    prejudicial.

9         Remember, the question isn't -- I want to stay with

10   deficient performance for a minute, though, because it's

11   important, because, actually, what I just said goes more to --

12   and I don't want to make the record too muddy -- a lot of what

13   I just said goes more to prejudice.  But deficiency is another

14   question, and the question isn't whether the jury was made

15   aware of accrual accounting or of these regulations.  The

16   question is whether the defense lawyers were deficient for not

17   making them aware.  They certainly were made aware at trial

18   that the defendant believed she was able to claim reimbursement

19   for payments she hadn't made yet, deferred payments.  That was

20   developed at trial through the defendant's testimony and

21   through argument by counsel, no question.  It just didn't have

22   a label of "accrual accounting" on it.

23        There was no reason for her counsel to have known that

24   the documents referred to by Ms. Layne corroborated her

25   defense, because that defense was not communicated to her trial

1  counsel.  Deferred payment as a concept perhaps was and I think

2  was, but accrual accounting as a corroborative basis for her

3  view that deferred compensation was reimbursable and, thus,

4  requestable, no; it is just not plausible that the defendant

5  used cash accounting to run the institute but accrual

6  accounting to administer the grant and request reimbursements,

7  yet did not explain that to her counsel.

8         I'm not suggesting it's not credible that she used two

9  different forms of accounting, and Attorney Brown has cited

10  case law for that proposition, and a court accepted it, and I

11  accept it, but I don't accept the idea that this defendant, who

12  is sophisticated, did not -- in case I forget to say it, by the

13  way, defense counsel called her sophisticated in his closing.

14  He didn't portray her as a bumpkin or a farmer.  He portrayed

15  her as sophisticated.  Now, that wasn't a missed opportunity by

16  defense counsel, as far as I'm concerned.

17         But getting back to this deficiency of performance in

18  terms of allegedly not using these regs and documents, the

19  defendant is a sophisticated person.  She's received an elite

20  undergraduate education, she served in the military, she earned

21  a master's in business administration, she taught business

22  administration, she's been a business executive and a nonprofit

23  executive.  She is sophisticated, and, as the expert Layne

24  testified, accrual versus cash accounting is undergraduate

25  Accounting 101 material, and if this was a distinction that

1    mattered for her defense the defendant would have communicated

2    it to her lawyer.  There's no evidence that she did.  There's a

3    couple of emails, the emails dated November 6, 2016 and January

4    3rd, 2017, that were offered in this proceeding to support the

5    proposition that the defendant put her trial counsel on notice

6    of this concept.  They don't make any reference to accrual

7    accounting.  They make some reference to the concept of

8    reimbursement for a deferred payment, but that was presented at

9    trial.

10            Nothing was presented that would have necessarily

11    persuaded trial counsel below to have introduced these

12    regulatory materials and exhibits.  Those documents simply --

13    by the way, it would have been a perfectly reasonable decision

14    not to present them, even if they had been aware of them.  They

15    refer in the Court's mind much more clearly to grant reporting

16    than they do to reimbursement, and when held up to testimony

17    from Getchell and Robinson, remember, the defendant never

18    suggested to Mr. Robinson when she was being called to the

19    carpet.  The USDA official, Mr. Robinson, called her to the

20    carpet to explain her conduct, her administration of this grant

21    and her failure to pay her contractors and employees.  She

22    never said any of this.  The idea that she wouldn't have raised

23    this is just implausible, if it was really an accurate

24    description of her conduct at the time.  It wasn't.  She never

25    brought it up until after trial.

1          Now, counsel were called.  Remember, counsel

2     testified, trial counsel testified at the post-trial hearing.

3     They never testified that the defendant made her aware of a

4     distinction between accrual and cash accounting, but, more

5     importantly, here's the really important thing:  that she

6     claimed that she ran the institute by cash accounting and

7     administered the grant, including reimbursement requests, by

8     accrual accounting.  It would have been a very simple thing to

9     bring out.  It wasn't brought out for any number of reasons.

10    It might not have been helpful.  I don't know.  I don't know.

11          I also think, listen, here's one of the things that

12    strains the most credulity.  If the defendant had communicated

13    to her trial lawyers that she used accrual accounting to

14    administer the grant and to request reimbursement, she would

15    have perjured herself at trial by suggesting she used cash,

16    which is what she said.  Her lawyers would have been knowingly

17    supporting perjury.  It's implausible that they had any

18    knowledge that she used accrual basis accounting or claimed

19    that she did at the time of trial, and that's the time we have

20    to assess whether their performance was deficient.

21          Remember, these pretrial discussions, her defense was

22    based, of course, on her communications with her lawyers in

23    advance of trial, and she discussed her employees' payments,

24    lack thereof, the concept of in-kind donation of labor, but

25    there's no evidence that she discussed accrual basis

1    accounting.  This is a key distinction, because the defendant

2    is not claiming and cannot claim that her counsel did not

3    understand that her SF-270 grant reimbursement forms did not

4    request grant funds for obligations incurred as opposed to

5    funds actually paid out to the institute's employees and

6    contractors.

7         Trial counsel did understand that and presented that

8    very defense.  But what Ms. Brown is now claiming is that that

9    approach supports accrual basis accounting, but there is no

10   evidence, except for her self-serving testimony in hindsight,

11   not at the time, that she ever made a claim to that distinction

12   to use an accrual basis accounting to her lawyers in a way that

13   would render their performance deficient for failure to follow

14   up on it.  Testimony from her lawyers at the evidentiary

15   hearing on her motion make it clear that they understood

16   Brown's accounting approach as she explained it at trial, that

17   she included Yowell's, Moran's, and her own salaries as outlays

18   on the SF-270 in the form of expenses incurred but as deferred

19   payment or counted as in-kind contributions, and that was

20   presented as the defense.

21        Lead trial counsel, Mr. Lange, testified that the

22   defense he put forward "at the trial was that at the time she

23   filled out the forms she did not have criminal intent," because

24   "she was doing the best she could with what she understood to

25   be her obligations to get reimbursed."  He explained to her her

1    defense at trial was that people hadn't been paid but the work

2    had been done, and so she was entitled to reimbursement because

3    this was deferred compensation.  That was his testimony.  He

4    further testified consistent with Ms. Brown's testimony at

5    trial that Ms. Brown explained her reported outlays as

6    "deferred payments," that these employees had agreed to defer

7    their payment and that at one point they basically agreed to be

8    volunteers.  That was the trial evidence.  And her view "was

9    that outlays didn't just include money paid out but included

10   obligations incurred."  This was presented.

11           Now, Attorney Graham testified that Brown's defense at

12   trial was "that the work was done and that she didn't falsely

13   mislead or create a misimpression when she filed the form.  It

14   wasn't her intent to defraud, because she filed it believing

15   that the work was done and the people had deferred payment."

16   She also -- "that was key to her state of mind," according to

17   Attorney Graham.  Attorney Graham continued, "The defense was

18   not that she had actually paid her employees, but that she

19   incurred obligations to them, and she intended it to be

20   deferred compensation;" and, further, that Brown "intended to

21   pay them eventually" at the time, at the time she filled out

22   the SF-270, but because of "subsequent events she didn't pay

23   them."

24           Now, there's the issue of Exhibits FF and GG from the

25   September 25th hearing.  Again, I don't find those to be

1    evidence of putting counsel on notice that she used accrual

2    basis accounting, which is what this habeas attack is based on.

3    Those exhibits are more or less the same as her trial testimony

4    and don't really significantly add anything to our

5    understanding of what happened.

6         I'm spending a lot of time on this, because this is

7    really the main thrust.  I mean, this is all we talked about in

8    oral argument, this and the expert issue.  The other issues in

9    the petition weren't even mentioned, really.

10        I want to touch again on the trial testimony from the

11   defendant herself.  At trial Ms. Brown -- it's not just that

12   she said she used cash accounting.  Everything surrounding that

13   pointed to cash accounting.  She testified consistently that

14   she understood the institute to be reporting its outlays on a

15   cash basis on the SF-270 forms.  She never mentioned accrual

16   accounting.  She checked the box indicating that the basis of

17   the request was cash as opposed to accrual on each SF-270 form.

18   She did so, she explained, because she understood from the

19   sample SF-270 that Getchell gave her that cash was the

20   organization's method of accounting, and in the process she

21   distinguished accrual as a form of accounting that "a lot of

22   times bigger businesses will use, and we certainly weren't a

23   bigger business, being a small nonprofit."  That was the

24   defendant's words.  Accrual is "a lot of times bigger

25   businesses will use and we certainly weren't a bigger business,

1    being a small nonprofit."  Now, that's what's consistent with

2    Getchell's testimony that the cash box was prefilled on the

3    sample she gave to Brown, and that the grant was on a cash

4    basis, and that Brown presented the grant on a cash basis,

5    Getchell's sworn testimony.  I know the defendant doesn't

6    accept that, but that was the testimony.

7          It isn't so much that Layne's argument isn't

8    colorable.  It is colorable, but I don't think it would stand

9    up at all to Getchell and Robinson.  I don't think it would

10   have come close to creating a different result, and I don't

11   think the Dugas case says otherwise.  We'll talk about that in

12   a minute.

13         Very important, another reason focusing on accrual

14   accounting would not have been helpful and there's nothing

15   deficient about rejecting it or not following up on it is that

16   Ms. Brown did not raise accrual accounting during the USDA's

17   investigation of the institute's payroll procedures in relation

18   to the grant money.  In response to that investigation

19   Ms. Brown submitted a letter to the representative of the USDA,

20   Mr. Robinson, explaining how she had disposed of the grant

21   funds.  Nowhere in that letter did Brown mention accrual

22   accounting or state that she reported the institute's outlays

23   on that basis.  The idea that a person of this education and

24   experience would not have said that, if that's what she was

25   doing, is just implausible.  It certainly doesn't create a

1   deficiency on the part of counsel in not presenting evidence

2   that would have been completely inconsistent with that

3   evidence, which was certainly going to be before the jury.

4        Now, instead, consistent with her testimony at trial

5   the defendant reported that she and Moran agreed to defer their

6   payments for the benefit of the institute's overall mission by

7   "volunteering to accept the funds into the institute's payroll

8   account but then to immediately automatically return them to

9   the institute to support our mission.  The funds were to be

10  re-released back to us at such time as NHIAF improved the cash

11  position through continuous fundraising and/or NHIAF profits."

12  That's the defendant's testimony.  In short, she testified

13  consistent with Getchell's testimony and the other record

14  evidence that the institute accounted for its outlays on the

15  SF-270 forms on a cash basis.

16       My thinking on this runs through all the subparts of

17  item A, the failure to research and prepare based on regulatory

18  materials suggesting that accrual basis accounting was the

19  proper way and corroborative of this, her position here on

20  habeas attack.

21       Now, the second one.  The second issue, issue B in

22  document 13 is the failure to consult a defense expert.  Now,

23  look, I should say this:  I personally, myself, reviewed every

24  bit of the trial record and the habeas record.  There's a

25  reason for that.  The law clerks I had working for me when we

1    tried this case are long gone.  I felt personally responsible

2    to only evaluate all the evidence based on the understanding of

3    a person who sat through the trial, and the only person in the

4    building besides, I guess, Mr. Aframe is me.  So, I read

5    everything.

6            And on this issue of an expert, you know, I remember

7    very distinctly, Ms. Brown, at the last hearing you said,

8    Judge, based on <u>Dugas</u> this is over; you don't have to go any

9    further.  And I sort of expressed surprise, because I said to

10   you, You didn't cite the <u>Dugas</u> case.  What are you talking

11   about?  And you told me you cited it copiously.  Well, you've

12   never cited the <u>Dugas</u> case in any paper you filed in this case.

13   I have looked high and low.  I don't know why you would cite

14   <u>Dugas</u>, by the way.  I don't think <u>Dugas</u> helps you.  I think

15   <u>Dugas</u> has a decent holding for you on the first version of it

16   where the Court found deficient performance where the

17   prosecution called six expert witnesses and the defense didn't

18   call any, and it was remanded to determine whether that was

19   prejudicial.  But the Court eventually ruled that it wasn't

20   prejudicial, and I'll get to that in a minute.

21           But I have to say I view this -- this is going to

22   sound counterintuitive, because we've talked so much about the

23   expert during the oral and evidence part of the case -- but I

24   view this issue as insufficiently developed on this habeas

25   deal.  It's barely mentioned in any of your papers.  There's

1   not a single case cited.  You filed a 10-page habeas petition

2   and a 25-page memo, so you've got 35 pages of argument.  As far

3   as I can tell, there is one paragraph in the motion where you

4   mention it, with no cases, not Dugas, not any case, and there's

5   a couple of stray lines in the entire 25-page memorandum of

6   law.  You don't discuss the failure to consult an expert.  It's

7   mentioned; it's not argued in terms of law.  It's barely

8   briefed.

9          Document number 10-1 is your memorandum of law.  At

10  the front of it you have a 2 1/2 page summary of your argument.

11  You don't even mention the expert issue once.

12         So, I thought it was going to be a bigger issue.  I

13  sought in vain for Dugas, I sought in vain for an argument.

14  It's not there.  There are a couple of stray lines in document

15  number 10 or 10-1 where you mentioned it, but I view it as

16  waived.  I don't have authority presented to me on the failure

17  to -- it's argued based on Dugas, but it's not developed in

18  terms of a legal argument.

19         It's also not, to me, it's also factually

20  unsustainable.  I'm looking at document 10-1 right now.  The

21  line written by you, Attorney Brown, is, "Although trial

22  counsel was not asked about consulting with an expert at trial,

23  the record is devoid of any evidence that they consulted with

24  an expert."  That's true.  It's also devoid of any evidence

25  that they didn't consult with an expert.  We don't know.

1    Nobody ever asked them, and they could have been recalled.

2    They just weren't.

3          It's not enough to sit on the idea of not knowing, and

4    you knew he didn't know, because you argued it in your brief.

5    This was long before we held a hearing.  They could have been

6    called and asked.  We don't know if they consulted an expert;

7    we don't know if they retained an expert; we don't know if they

8    did it informally or formally; and we don't know, if they

9    decided not to, why.  One of the reasons why might have been

10   that the prosecution didn't call an expert.  I don't know.

11   There could be any number of reasons that may or may not be

12   plausible, and I don't know what they are.  So, I think this is

13   legally waived.  It's not really briefed.  I think it's

14   factually unsustainable.

15         That said, I don't think -- let's assume it wasn't

16   waived.  Let's assume it was sustainable factually that we had

17   some evidentiary basis that they didn't consult, which we do

18   not.  Let's assume that there was evidence that they didn't

19   consult an expert.  I should say this:  There is an inference

20   one could draw that they didn't consult an expert, because they

21   didn't call an expert.  That's not going to satisfy me by a

22   preponderance that they didn't consult an expert.  I mean,

23   Dotty, Dorothy Brown (sic), works here.  She's in this

24   courthouse every day.  She's available to testify.  Her

25   testimony did not cover this issue.

1          I also don't think it's prejudicial even if -- I've

2    heard the evidence now.  I've heard the expert, Ms. Layne.

3    I've explained at length why I don't think it was persuasive.

4    I think it refers, her evidence refers to grant reporting, not

5    grant reimbursement requests, and there's good reason to think,

6    based on the cross-examination that Mr. Aframe developed and my

7    own research under those regulations that, frankly, the accrual

8    accounting didn't apply to the SF-270 forms at all; it applied

9    to SF-269, not SF-270.  SF-270 is based on reimbursement.  So,

10   I don't think it would have created prejudice, anyway, for the

11   reasons I've explained.

12          Now, Dugas.  There's two Dugas cases, right?  There's

13   the case where there was a reversal, a remand, I should say,

14   because the Court of Appeals disagreed with the finding of a

15   lack of deficient performance.  Then there was a second appeal

16   after the trial court found no prejudice, and that was

17   affirmed.  There was no prejudice in Dugas.  I'm not sure how

18   it helps you, and I don't think it helps you on deficiency

19   either.  I don't think it helps the defendant's case.  In the

20   first case the Court held that the defense counsel's failure to

21   consult an arson expert -- this was a very high-profile case.

22   I remember when this case was happening in this state.  I

23   happen to know the people involved, so I followed it very

24   closely.  I knew the lawyers involved, everybody did, and I

25   remember Ray Raimo, the lawyer in the case, basically falling

1    on his sword on the witness stand saying, I should have

2    consulted an expert, he did, and he should have quite clearly,

3    but he chose "it was the wrong guy" defense.

4         Well, the Court of Appeals remanded the case for a

5    specific determination of whether an expert's analysis would

6    show that the defendant had been prejudiced by his counsel's

7    deficient performance, and on remand the District Court allowed

8    discovery, considered more affidavits, right, evidence, and

9    held a hearing, and then with this more robust record the

10   District Court concluded that Dugas had not established

11   prejudice under Strickland, and the First Circuit affirmed the

12   District Court's holding that the failure to hire and present

13   testimony from the arson expert did not prejudice the

14   defendant.  So, I don't think it helps on prejudice in this

15   case.

16        I also think the level of defense deficiency was far

17   higher in Dugas than anything that's been discussed in this

18   case.  In Dugas the state's counsel depended entirely on six

19   experts' investigation as to the cause of the fire in their

20   testimony at trial.  The situation I think in Dugas clearly

21   called for the defense to hire an expert witness.  That's not

22   this case.  The prosecution didn't use an expert here, because

23   it wasn't that complicated.  There were some concepts, I agree,

24   but the regs we've talked about, 1942-G, A-110, not that

25   complex, certainly not so complex that anybody, anybody thought

1    an expert was necessary in this trial.

2              The District Court in Dugas was facing a situation

3    where two of the state's experts testified during the

4    evidentiary hearing and defense counsel had the opportunity to

5    press its own experts' theories of these state experts through

6    cross.  See, that's what maybe could have happened here if

7    Getchell and Robinson would have been called to explain how

8    grants are run.  They said how grants are run, on a cash basis,

9    and I think in the face of sticking to that I don't think there

10   would have been any prejudice created by Layne's testimony.

11             So, I view the expert witness issue as waived legally,

12   unsupportable factually, and even if it wasn't waived or

13   unsupportable, I do not think it establishes prejudice or

14   deficient performance, but certainly not prejudice.  If I'm

15   incorrect, Ms. Brown, because I've taken a long time with this

16   record trying to find it, if I'm incorrect and you argued any

17   cases on this issue of expert retention, certainly Dugas, I do

18   want you to correct me, because I don't want to be wrong about

19   that.

20             Issue C is -- and I want to be clear I think it was

21   the defendant's burden on habeas to bring this evidence to

22   court either through an affidavit or something where they would

23   have had to account for their positions that these grants were

24   run on a cash basis and the expert's view that that's

25   incorrect.

1          And I guess it's just important to remind ourselves

2     the defendant's trial counsel did present a defense based on

3     the theory that Ms. Brown believed she was permitted to report

4     the institute's accrued obligations before paying those

5     obligations or at least permitted to request reimbursement for

6     them.  She testified to her belief that she was permitted under

7     the terms of the grants to report her employees' labor at the

8     time it was recorded but to defer their compensation.  Her

9     counsel presented this theory in opening statement and argued

10    for it in summation and presented evidence about it, just did

11    not use the term "accrual accounting," which had never been

12    raised by the defendant to counsel, or present those regulatory

13    materials Attorney Lange mentioned.  But their failure to

14    produce additional evidence in support of that defense does

15    not, as Ms. Brown now alleges, constitute ineffective

16    assistance, especially where the evidence corroborating Brown's

17    actual use of accrual-based accounting was somewhere between

18    here thin and none.  The additional evidence presented by the

19    defendant in this ineffective assistance habeas case may be

20    arguably corroborative, but it's not the basis for a deficiency

21    finding, and it doesn't create prejudice.

22          Issue C is the jury question.  That's no longer part

23    of the appeal.

24          Now, D is the lack of objections during closing.

25    Again, we haven't even talked about this, and trial counsel

1   hasn't been asked about it.  I mean, to me it's basic

2   ineffective assistance of counsel practice on a post-trial

3   collateral attack to have counsel explain their decisions.

4   That's just one of many problems with this.  But we don't know

5   why counsel didn't object during closing.  We don't know at

6   all.  It seems to me there's always good reason not to object

7   during a closing, and in this case it might have had something

8   to do with not wanting to focus on that evidence.

9         But there's more problems with this argument than

10  that.  That's sort of like the third or fourth problem.  The

11  first problem is, again, this is underdeveloped.  There's an

12  argument in the memorandum of law that counsel should have

13  objected during the closing to I guess what amounts to prior

14  bad acts evidence during the trial, and there's a citation to a

15  40-page swath of testimony.  These papers don't discuss what

16  the so-called inadmissible propensity evidence was.  I don't

17  know what it was.  I have an idea what it might be, but I don't

18  know what it was, because it hasn't been argued.  All that's

19  been focused on is the closing, not the presentation of the

20  evidence itself.  I did read the trial record, though, and I

21  did notice sometimes Mr. Aframe would focus on a prior

22  documentary filing or prior statement the defendant made, and

23  he would make the point that it was untrue.

24        I assume that's what you are referring to in your

25  papers, Attorney Brown.  But I'm sort of left to make that

1    assumption and assume it, because the record doesn't tell me.

2         It's very difficult to evaluate this claim for

3    ineffective assistance of counsel without at least some

4    references to the improperly admitted evidence.  And that's not

5    the claim, by the way.  The claim isn't that counsel -- the

6    claim here isn't that counsel was deficient by allowing it in.

7    It's deficient by not objecting during the closing.  I don't

8    know how you object to something during a closing that was not

9    objected to during the trial.  If it came in during the trial

10   it's not objectionable during a closing.  So, that's a problem

11   I have with this argument fundamentally.  It makes no sense

12   logically.  It can't be ineffective assistance of counsel not

13   to object to record evidence, and there's no claim here that

14   counsel was ineffective by allowing the evidence in and not

15   objecting to it.

16        That said, even if this record were developed enough

17   for me to evaluate it on this particular issue, I think

18   objections would have been futile by trial counsel.  Looking at

19   the evidence I saw that I think, that I think, I'm assuming

20   constitutes propensity evidence, I think it all would have been

21   admissible under Rule 404(b).  I think it would have been

22   admissible to show motive; I think it would have been

23   admissible to show plan; I think it would have been admissible

24   to show intent and knowledge, both, because in a case like this

25   intent and knowledge are, you know, they're conflated, they're

1    both part of the *mens rea*, and I think it would have been

2    admissible to show preparation.  All of those would have been

3    likely admissible, had they been objected to and argued about

4    for those reasons.  And so, what it would have amounted to was

5    an admission into evidence of the same material, because it did

6    show those things, motive, plan, intent, knowledge and

7    preparation, maybe even absence of mistake or accident, maybe,

8    but certainly the others, and what would have resulted would

9    have been a limiting instruction, and the Court would have, at

10   defense request, instructed the jury that they could only

11   consider the evidence for those reasons, or one of them, or two

12   of them, or whatever we worked out in court, whatever I decide,

13   right?  It's sort of textbook that it's difficult to question

14   or critique defense counsel's decision not to emphasize that

15   with limiting instructions.  It couldn't be kept out at

16   closing; it was already in evidence.  A limiting instruction

17   might have only emphasized it, and it certainly was a

18   defensible position for defense counsel to take to not want to

19   emphasize it and not object.  A lot of people don't object

20   during closings, almost as a rule.  I'm not saying this is that

21   situation, but I am saying that there is no basis here to find

22   a deficient performance based on failure to object during

23   closing to evidence that was admitted at trial, even if it were

24   sufficiently developed, which on this record it's not.  Now,

25   that was issue D.

1        Issue E are the legal flaws in the indictment.  I see

2   no deficient performance here and no prejudice.  The Court

3   would not have dismissed the case based on this case law cited

4   by defense counsel, habeas counsel, in this petition.  We've

5   got these legal questions.  It's very difficult to get an

6   indictment dismissed pretrial or even at the end of evidence on

7   a legal basis.

8        There's two bases argued here.  One was fundamental

9   ambiguity.  Now, traditionally, it's the province of the jury

10  to decide whether the defendant intended and did, in fact, give

11  a response that was literally false.  There are exceptional

12  cases where a question may be so fundamentally ambiguous as to

13  foreclose a jury's resolution of a perjury or false statement

14  charge, because it could never be said that one intended to

15  answer such a question untruthfully.  That's the <u>Mubayyid</u> and

16  <u>Richardson</u> cases.  <u>Mubayyid</u> is M-u-b-a-y-y-i-d, 658 F.3d 35.

17  <u>Richardson</u> is 421 F.3d 17.

18       Now, a question is fundamentally ambiguous when it's

19  not a phrase with a meaning about which men of ordinary

20  intellect could agree -- forgive the sexist terminology here;

21  it was a 1955 case -- nor one which could be used with mutual

22  understanding by a questioner and answerer unless it were

23  defined at the time it were sought and offered as testimony.

24  And for that the Court cites the <u>Lighte</u> case, L-i-g-h-t-e,

25  782 F.2d 367, and <u>U.S. v. Lattimore</u>, 127 F. Supp. 405.  It's a

1    D.C. Circuit case.

2          Now, the petition and the memorandum of law do not

3    cite any specific language in the SF-270 that's fundamentally

4    ambiguous.  They do argue, however, that the SF-270 was

5    fundamentally ambiguous as to the accounting method, right,

6    accounting method to be used in completing the form?  But I

7    think this in and of itself undermines the argument.  As I've

8    already discussed at length, the form's instructions allow for

9    the accounting on a cash or accrual basis.  The form contained

10   a box to be checked.  All of the defendant's forms were checked

11   "Cash."  So, if there was ambiguity, the defendant elected,

12   whether she was instructed to or not, and she clearly was

13   instructed to, I don't have any quarrel about that, but her

14   understanding was clearly reflected as cash.

15         The form included instructions for what expenditures

16   should be included, depending on whether accounting was done on

17   cash or accrual, and it was completed under cash.  That was the

18   testimony, and that was the evidence at trial.

19         Now, on the one hand, nothing on the form indicates

20   whether one seeking reimbursement should use cash or accrual;

21   but, on the other hand, the form includes the option to

22   indicate which one was being used, and Brown checked the box

23   indicating she sought reimbursement on a cash basis.  If she

24   was reporting on a cash basis she made false statements when

25   she indicated by listing outlays that she had paid the

1    employees that the grant was made to reimburse.  Very

2    important.  It's never been in dispute in this case that the

3    grant was sought by the defendant, in her own words, her own

4    testimony, she sought it to pay the employees and contractors;

5    that's what the grant was for.

6           Now, if she did do it on an accrual basis she falsely

7    said it was a cash basis.  There's a question about whether

8    that would have been -- I know the defense is thinking, and

9    they're right, there's a question about whether that would have

10    been willful, since she was instructed to do it, but it would

11    have been false -- it would be false to say cash if one were

12    using accrual, which is the defendant's position now.

13           So, the fundamental ambiguity defense would not have

14    prevailed.  No prejudice there.  This Court would not have

15    granted a motion to dismiss.  If I'm wrong about that, the

16    Court of Appeals will tell me so, I'm sure.  I don't say that

17    with any disrespect for counsel or the court or anybody else

18    involved.

19           Now, the literal truth argument was another legal

20    defect as alleged by defense counsel.  The argument is that the

21    SF-270 forms were literally true, although her statements on

22    the forms were literally true, and trial counsel was

23    ineffective when they failed to move to dismiss on that basis.

24    The Richardson case I already cited sort of recognizes that,

25    and it quotes Bronston versus U.S., 409 U.S. 352.  It's a 1973

1    case.

2         MS. BROWN:  Your Honor, can I interrupt?  I haven't

3    had a break since 10:00, so can we take a break?

4         THE COURT:  Yeah.  Yeah, you didn't get a break.  You

5    were probably talking to your client.  Yeah, let's take a

6    break.  How much would you like?

7         MS. BROWN:  Ten.

8         THE COURT:  You've got it.  Ten minutes.

9         (Recess taken from 1:00 p.m. to 1:15 p.m.)

10        THE COURT:  Okay.  I think we have everyone back.

11   I'll pick up where I left off.  We were talking about the

12   literal truth defense or doctrine and whether it was

13   ineffective for trial counsel not to have litigated that issue,

14   and the Richardson case cited the Bronston case.  That's a U.S.

15   Supreme Court case, 409 U.S. 352.

16        Now, our Court of Appeals has "questioned whether the

17   literal truth defense as articulated in Bronston is

18   appropriately invoked outside the context of adversary

19   questioning," and it has declined to provide it where the focus

20   is on the ambiguity of the question asked.  That's the Boskic

21   case, B-o-s-k-i-c, 545 F.3d. 69.  It's a 2008 case.

22        This was on a form.  This question was on a form.  It

23   wasn't even so much questioning.  It was completion of a form,

24   not adversary questioning, and the focus, again, here is on the

25   ambiguity of the question, not on a literally true but

1    nonresponsive answer.  So, it's not remotely clear in this case

2    that defense counsel should have raised this or were deficient

3    in not doing so.

4         Even if this literal truth defense did apply, it

5    hasn't been demonstrated to the Court that trial counsel was

6    ineffective for failing to raise it on a motion to dismiss or

7    judgment of acquittal.  Again, despite taking evidence from two

8    of her lawyers, they were never asked this question about why

9    they didn't file, so we don't know why they didn't file, but I

10   can't imagine it would have established prejudice anyway,

11   because I can't imagine granting that motion.  I don't think

12   there's a legal basis for it.  Again, if I'm wrong about that,

13   I guess I will find out.  I certainly don't claim to have

14   mastered every possible application of the literal truth

15   doctrine, but I don't think it applies here under our Circuit's

16   tradition and law.

17        The other argument is argument F in document 13, the

18   cumulative effect of trial counsel's several errors.  I

19   honestly don't think a single one alleged constituted deficient

20   performance.  I don't think a single one alleged constituted --

21   created a prejudice, even if it had -- was deficient

22   performance.  So, cumulatively I can't grant the habeas relief

23   based on that as well.

24        Look, I also think this is something that the

25   prosecutor has been trying to remind us all of, and it was one

1    of his main arguments in the beginning.  This is a case about

2    stealing money, stealing money through false statements or

3    covering the theft of money through false statements, obtaining

4    funds from a government grant -- oh, I should mention one more

5    thing.

6            The reference to taxpayer in the closing, that did not

7    strike me at all, the failure to object to that, that did not

8    strike me at all as an effort to enlist or inflame the passions

9    of the jurors as taxpayers at all.  I thought it was playing

10   into the idea that it was easy money; in other words, easier to

11   steal from a possibly lax, lax federal government stewarding

12   its own money than it would be from a private entity.  Easy

13   money was the idea.  It wasn't the idea that you, juror

14   taxpayers, have been victimized by this crime.  I don't think

15   it was an improper argument, and I don't find any problem, any

16   deficiency in failing to object to it.

17           Look, this is a case where the defendant admitted,

18   always has admitted the purpose of the grant was to pay the

19   employees.  The employees didn't get paid, and she did pay

20   herself.  There's evidence that she paid to sustain her private

21   residence and buy groceries and live her life with some of this

22   money, and if anybody else did, except for the one employee who

23   was paid less than he was entitled to, it looked like, I'm not

24   aware of it.  There's a couple of, I guess, grocery purchases

25   for one of the contractors.  But the fact is this is a

1    situation where the defendant obtained funds and used funds to

2    sustain herself and to sustain a project she thought was

3    important, by the way.  I don't doubt that for a minute, her

4    commitment to the project, but I don't think that either an

5    expert on its own or as a means to focus defense counsel on a

6    different way to corroborate a defense would have made a

7    difference here.  There's no prejudice resulting from it, and I

8    don't find it to have been deficient in failing to undertake

9    any of these efforts.  The defendant admitted the grant was to

10   pay salaries.  The testimony was that she had to submit the

11   SF-270 "just to get money," to get money for the institute.

12   Nobody was paid what they were entitled to or at all, some of

13   them.

14        The invoices that were submitted did appear to be made

15   up, not made up in the sense of there was no work underlying

16   them or made up for nonexistent individuals, but the basis for

17   them was not established with the record at trial in any way.

18   They were created by the defendant, more evidence that made it

19   very unlikely that these alleged deficiencies would have made

20   any difference.

21        This excuse at trial for not paying the employees and

22   contractors, defamation, as far as I know, it wasn't offered to

23   anyone anytime before trial.  It came out at trial, but if that

24   was the rationale for not paying them, it was new at trial, not

25   persuasive.  And there was evidence of overbilling, that more

1    money was requested than even the invoices would have

2    supported, money that went to the institute.  None of the other

3    witnesses corroborated her version of things either during

4    trial or now, the new version.  And, finally, I think it's very

5    important to remember that, in effect, the defense that her

6    statements on the forms were true because she thought she was

7    entitled to requests for reimbursement for obligations incurred

8    as opposed to funds disbursed was presented at trial.

9         Her lawyers did not present her as unsophisticated or

10   any of that.  They presented her as sophisticated.  They also

11   presented her as doing her best under the circumstances but not

12   that she was unsophisticated.  I was just looking at the

13   closing this morning again for Mr. Lange, and I remember well

14   that he said -- yeah, he focused, on page 101 of the

15   transcript, he turned her sophistication into an explanation of

16   her understanding of outlays, incurred obligations, deferred

17   compensation.

18        I do think there's a very good argument that the Court

19   of Appeals' opinion forecloses this challenge, not any

20   challenge, but this challenge.  I think the Court of Appeals

21   has found that there is an evidentiary basis to sustain

22   convictions under Counts Four through Twelve.  Those were

23   challenged as potentially nonunanimous verdicts on appeal.

24   That appeal was found to have been waived, and then the Court

25   still evaluated it from the standpoint of plain error and found

1    a basis to -- found that the invoices formed a basis to convict

2    her on Counts Four through Twelve, and my view is that this

3    challenge does not impact those verdicts at all.  I think those

4    are left untouched.  If I accepted all of this argumentation in

5    the habeas petition and found ineffective assistance I think

6    those counts would still stand, because they had an independent

7    basis that was not touched by accrual versus cash accounting.

8            Even if the defendant had been reporting the

9    institute's expenditures on an accrual basis, and I don't think

10   there's any really reason to believe that, based on the actual

11   evidence, including the statements that we received from her

12   post-trial, the jury could readily have concluded from the

13   evidence that she willfully over-reported the amount that the

14   institute owed to the employees.  She indicated through the

15   false invoices that she prepared and on the forms that Yowell

16   performed work for the institute was $42,600, but through her

17   own final invoice reflecting all the money that the institute

18   owed to her Yowell requested only $9,500.  The defendant

19   similarly over-represented the amount owed to Moran, seeking

20   reimbursement for her work in the amount of $60,900.  Moran

21   herself only sought $47,200 and change.  And she created and

22   submitted pay stubs, pay stubs to the USDA representing that

23   the institute had paid Meeh, M-e-e-h, Meeh, $16,728, when his

24   actual pay stubs reflected he had only been owed and paid

25   $10,267.

1          Now, of course, I have to recognize here that the

2     defendant testified that she believed she had authorization to

3     create Moran's and Yowell's invoices, sign them and submit

4     these estimates for their work based on her own "estimate of

5     what each person had done in terms of time and what time she

6     thought they would have expended for that," but the fact that

7     she actually did receive invoices from these individuals on

8     more than one occasion indicating the actual amounts, actual

9     amounts claimed, or in Meeh's case actually generated paychecks

10    in that amount, but, instead, reported to the government, the

11    USDA, the maximum amount of work for which the institute could

12    receive reimbursement constituted very powerful, persuasive

13    evidence of both the material misstatement and the obligations

14    the institute incurred and a willfulness in making the

15    statements.

16          So, even if her trial counsel had advanced the defense

17    based on the accrual-based accounting, it would not necessarily

18    or even likely have lead to a different outcome in the Court's

19    view.  That's aside from the fact that the Court of Appeals has

20    found sufficient evidence to convict on Counts Four through

21    Twelve based on the invoices alone.

22          All right.  So, look, the petition is denied on those

23    grounds.  I'll issue an order giving you some time, Ms. Brown,

24    I'll issue an order with a self-report date to the Bureau of

25    Prisons.  But, of course, I'm not going to issue a certificate

1    of appealability in this case.  I don't think there's a

2    legitimate appealable issue, but you may be able to seek one

3    from the Court of Appeals, and if you do that and you take an

4    appeal, you actually take an appeal, you get a certificate, I

5    I'll tell you now I will grant bail pending that appeal.  If

6    not, it won't be an issue, but I assume you will pursue an

7    appeal.  All right.

8              That was a long, obviously, oral order, but I've tried

9    to address every single argument that was in the habeas

10   petition, well, the operative petition, which is defense

11   counsel's petition, not the one the defendant filed pro se,

12   because it had 90 issues, and, obviously, that's why I

13   appointed counsel, one of the reasons, so counsel could boil it

14   down to the colorable claims, and I've addressed all of those

15   at length.  I apologize for having you sit through that, but it

16   seemed like the best way to do it.

17             Are there any factual or legal issues that I've

18   overlooked that either side would like me to address?  I'll ask

19   Mr. Aframe first.  I'm not asking if you disagree with me on

20   anything.  You obviously do, probably both of you do.  I'm

21   asking if there are any issues that I haven't addressed that

22   you would like me to address.

23             MR. AFRAME:  No, your Honor.

24             THE COURT:  Ms. Brown?

25             MS. BROWN:  There are some factual conclusions that I

1   disagree with.  I don't think it's worth -- that's not how I

2   understand your question.  You're asking if there's anything I

3   want to put on the record.

4            THE COURT:  Yeah.

5            MS. BROWN:  There isn't.  I just want to make clear

6   the fact that I'm not objecting to any factual assertions at

7   this time doesn't mean that we don't have those qualms.

8   Obviously, we can raise those on appeal, but I don't see

9   anything to be gained about arguing over the facts at this

10  point.

11           THE COURT:  Understood.  Okay.  Mr. Aframe, maybe you

12  can help us here, because I don't want to waste counsel's time

13  in making her file unnecessary things in this court or the

14  Court of Appeals.  Assuming she takes a timely appeal here,

15  that exercise of seeking a certificate of appealability, do you

16  know how long that usually takes or if there is a customary

17  timetable?

18           MR. AFRAME:  For them to resolve it or for the counsel

19  to file it?

20           MS. BROWN:  I've got one pending right now, your

21  Honor.

22           THE COURT:  Yeah?

23           MS. BROWN:  I think we filed the appeal, the notice of

24  appeal, and then they gave me January 5th to file the --

25           MR. AFRAME:  Right.

1          MS. BROWN:  -- motion for the certificate of

2     appealability.  They haven't had a decision.  I actually

3     consulted with Behzad about another case he had as to the

4     timeline.  I think the case he had was around six months.

5          Does that sound right, Seth?

6          MR. AFRAME:  Yeah.  I mean, it takes a while, but

7     Donna's right.  She'll file a notice of appeal.  They'll say,

8     no, no certificate of appealability has been granted, so you

9     have until X date to seek one from us.

10          THE COURT:  About how long?

11          MR. AFRAME:  Oh, you know, I think 30 days, something

12     like that, and then it takes a while for them to rule on it.

13          THE COURT:  Okay.

14          MR. AFRAME:  And the government doesn't typically

15     respond.

16          THE COURT:  Oh, really?  Yeah?  Okay.

17          MR. AFRAME:  It just gets resolved.

18          THE COURT:  I thought about doing that here, but I'm

19     not going to.  I'm going to let this Court of Appeals do it,

20     because I don't see it here.  What I'll do, then, I'm going to

21     issue a report date to the BOP, Attorney Brown, in 60 days, but

22     you can move for an extension of that and bail or continued

23     bail once you file your request for appealability, okay?

24          MS. BROWN:  Okay.

25          MR. AFRAME:  And at this point I won't object until

1    the Court of Appeals rules on the certificate request.

2              MS. BROWN:  Okay.

3              THE COURT:  I assume Ms. Brown is on the phone here.

4              Listen, Ms. Brown, listen, I know this is not the

5    result you wanted, and I've made some findings here that,

6    frankly, I didn't believe you, okay, I didn't find your

7    post-trial testimony credible?  I know that's not something you

8    want to hear, and I know it's something you take very

9    seriously, but my sense is that you have -- I could be right or

10   wrong about this, we don't know each other, but your commitment

11   to clearing your name here has led you astray, and you have

12   reacted to court proceedings and fashioned your testimony to

13   fit what you've heard in court, sometimes things I said,

14   sometimes maybe things other people said.  It's not that I

15   begrudge you your right to litigate these issues, but I was not

16   persuaded not only by the legal arguments but by your factual

17   assertions, which I think don't hold up over time, but I think

18   were motivated not so much malevolently but by, I don't want to

19   use the word "obsession," but a very strong commitment to

20   clearing your name regarding your handling of a grant that you

21   thought was important.  It doesn't change any of the results

22   here, but I wanted you to understand that.

23             All right.  Nick, anything you want me to cover that I

24   haven't covered?

25             THE LAW CLERK:  No, Judge.

1          THE COURT:  Okay, then.  I'll get an order out for a

2   60-day report date.  Thank you.

3       (WHEREUPON, the proceedings adjourned at 1:34 p.m.)

1                              C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of the

8    record of proceedings.

9

10

11

12

13   Date: ___3/18/21___              /s/ *Brenda K. Hancock*
                                     Brenda K. Hancock, RMR, CRR
14                                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25